**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TOWERNORTH DEVELOPMENT, LLC,** | ) | |
| **and CHICAGO SMSA LIMITED** | ) | |
| **PARTNERSHIP d/b/a VERIZON** | ) | |
| **WIRELESS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.  22 C 4151** |
| | ) | |
| **CITY OF GENEVA,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs TowerNorth Development, LLC ("TowerNorth") and Chicago SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon") seek to build a cell tower on a specific parcel of land in the City of Geneva.  Defendant, the City of Geneva ("Geneva" or "the City") has denied their application to build on that parcel (referred to as the "Oscar Swan location").  Plaintiffs bring this action under the Telecommunications Act of 1996 ("TCA") seeking reversal of that decision. Defendant has moved to dismiss two of the counts in Plaintiffs' complaint, and both sides seek summary judgment.  In this ruling, the court addresses only the motion to dismiss Counts I and IV of Plaintiffs' second amended complaint [17].[1]  For the reasons stated below, the court grants the motion with respect to Count I and denies the motion to dismiss Count IV without prejudice.

<u>**LEGAL STANDARD**</u>

To survive dismissal under Rule 12(b)(6), a party's complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  In determining whether the plaintiff has done so, the court will "accept as true all factual allegations in the

---

[1]     The parties have also filed motions for summary judgment (the Defendant on Counts II–IV [28]; the Plaintiffs on all four counts [31]).  The court will address those claims in a future order.

complaint." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 555 (7th Cir. 2012). Granting Rule 12(b)(6) motions is "limited to situations in which, even taking the facts as plaintiff portrays them, the law does not confer a right to relief . . . ." *Luna Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022). Additionally, even if "a complaint . . . otherwise states a claim," it may be subject to Rule 12(b)(6) dismissal if "the plaintiff pleads . . . all the ingredients of an impenetrable defense." *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004). Finally, if "it is clear that the defect cannot be corrected," amendment is futile, and the court may dismiss with prejudice. *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 520 (7th Cir. 2015).

## BACKGROUND

Because Defendant's motion to dismiss focuses primarily on threshold legal questions—the mootness of Count I and the unavailability of a private cause of action on Count IV—the court saves a detailed account of the case's history for its forthcoming ruling on the parties' cross-motions for summary judgment.

## I.    Factual Background

The Plaintiffs—TowerNorth and Verizon—are telecommunications businesses. TowerNorth "develops, owns, and leases wireless communications facilities" throughout the country, renting out "space" in such facilities to wireless carriers like Verizon, who use them to provide an array of telecommunications services. (Second Am. Compl. (hereinafter "SAC") ¶ 25.) Each facility, often a cell tower, is called a "cell site[]," networks of which carriers use to extend their communications coverage over large areas. (*Id.* ¶ 34.) In order to "provide reliable service to a user," the cell sites must interconnect in a "grid pattern resembling a honeycomb." (*Id.* ¶ 35.) Accordingly, if a cell site is not (or cannot be) located in the right spot, carriers cannot "provide service to the consumers within that area," and those who "live or travel in the area will experience an unacceptable level of dropped calls and call connection failures." (*Id.* ¶¶ 35–36.) Seeking to avoid this, telecommunications businesses employ radio frequency ("RF") engineers to use

2

different techniques to create "propagation stud[ies]," which identify locations that need additional cell sites to avoid gaps in coverage.  (*Id.* ¶ 36.)

Verizon's RF engineers discovered that a "significant and high priority" gap in its coverage existed in Geneva.  (*Id.* ¶ 37–38.)  According to Verizon, the issue was compounded because four of the six "sectors in the area [we]re completely exhausted," preventing the carrier from "offload[ing] one onto another or handle additional data capacity."[2]  (*Id.* ¶ 38.)  Verizon teamed up with TowerNorth to look for a site that would remedy this problem.  (*Id.* ¶ 39.)  They ruled out multiple methods they "prefer[red]" which did not involve building a whole new tower, but ultimately "could not find any existing facility to replace, or find any existing buildings or base stations . . . tall enough to enable sufficient coverage for the gap."  (*Id.* ¶¶ 42–43.)  With other methods turning up short, Plaintiffs began hunting for properties on which to build.  (*Id.* ¶ 44.)  The search presented a Goldilocks problem: any location in just the right place to fill the "gap" had to accommodate the construction of a tower and facility; be leasable, accessible land; and "have the potential to comply with the local zoning requirements."  (*Id.*)

TowerNorth turned its attention to a "heavily wooded" property known as "the Oscar Swan location."  (*Id.* ¶ 45.)  While other properties "were not suitable for building, did not have a willing landlord, or were smaller tracts that presented the same or more zoning obstacles," Oscar Swan was just right: a 100-foot "concealed tower" there would "provide immediate relief for 3 of the 4 overloaded sectors," and a property owner on Oscar Swan was "willing to enter into a long-term lease" to that end.  (*Id.* ¶¶ 45–46.)  A good location in hand, Plaintiffs began the process of getting Geneva's go-ahead.

On December 2, 2021, TowerNorth submitted a special-use application to Geneva to build "a stealth 100 foot monopine tower, along with a storage facility on the ground . . . ."  (*Id.* ¶ 51–

---

[2]      The court takes this to mean that, in the broad honeycomb-network of cell sites, any attempts to make up for weaknesses in or around Geneva were confounded by the fact that other nearby sites were already overloaded with transmitted data.

52.)   The tower would be "designed to look like a pine tree with the antennas disguised by 'branches,'" and would be installed in a "ground based equipment compound" surrounded by a fence and arborvitae trees.  (*Id.* ¶ 53.)   The City responded on December 30 with a "Determination of Incompleteness," identifying various deficiencies in the application.   (*Id.* ¶ 58.)   Plaintiffs prepared a supplement and forwarded the supplemented submission to the City on March 15, 2022.  (*Id.* ¶ 60.)   There was no immediate written response, and over the next several weeks, Plaintiffs continued taking steps related to the proposed tower, including "conduct[ing] a 'balloon' test on May 24, 2022, in which a crane was mobilized to a height of 100 feet with a balloon attached to it, so that observers could envision the height of the proposed wireless facility."  (*Id.* ¶¶ 62–63.)  Then, on June 6 and 7, the parties agreed that the Planning and Zoning Commission would consider Plaintiffs' application at its next public hearing on June 23.  (*Id.* ¶¶ 64–65.)

Just nine days before the scheduled hearing, however (and after "notices had been mailed out to the public"), Chayton True, Geneva's city planner, sent an email to Plaintiffs' real estate acquisition-team leader, Ray Shinkle, to report a hiccup.  (*Id.* ¶ 66; *see also* Ex. B. to SAC [11-2] at 2.)  As it turns out, the Oscar Swan location sits on an eight-parcel Planned Unit Development ("PUD"), created by a 1987 City Ordinance that prohibited special uses on all but one of the parcels—not including the Oscar Swan location.  (SAC ¶ 48.)  In their complaint, Plaintiffs allege that the title check they had performed did not reveal this restriction, but that City officials did know about it earlier: Mr. Shinkle testified to the City Council that on June 14, the day of the email from Mr. True, True "told [him over the phone] . . . that the City knew about the PUD (and need for an amendment) at the time of the application, but had forgotten about it until" then.  (*Id.* ¶ 82.)  In fact, Mr. True's June 14 email simply states that "yesterday[,] staff noticed" the ordinance.  (*Id.* ¶¶ 49, 66.)  Regardless of when this information came, or should have come to light, Plaintiffs now faced an additional obstacle.

To clear this hurdle, Plaintiffs needed to submit an additional application—a "PUD amendment form"—seeking a change in the City's ordinance that would allow issuance of a

special use permit on the Oscar Swan location.  (*Id.* ¶¶ 66–67.)  They did so on June 27, and the consideration of both applications was scheduled for July 14, the day of the Planning and Zoning Commission's next meeting.   (*Id.* ¶ 67.)

Plaintiffs appeared at the hearing through Ray Shinkle and other representatives and defended their application, providing evidence about the increasing use of wireless services, including the "specific need" around Geneva, the "fact that Verizon and TowerNorth investigated and found no suitable collocation opportunities within the search ring area,"[3] and a "Property Value Impact Study" they had commissioned from Mark Layne, an appraiser.  (*Id.* ¶ 70.)  In his report, Mr. Layne tracked property sales in Geneva for the eighteen months leading up to the hearing, in residential areas proximate to four cell-phone towers.  (*Id.* ¶ 71.)  As he explained at the hearing, his report found "no difference in value between homes within 500 feet of a cell tower and th[ose] that were 1–2 miles away."  (*Id.*)  City staff also submitted their own report for the Planning and Zoning Commission to consider; that report concluded that Plaintiffs had met the standards necessary to grant a Special Use permit.[4]  (*Id.* ¶ 69.)  Various residents also attended the meeting and spoke in opposition to Plaintiffs' application.  (*Id.* ¶ 72–73.)  Many of those residents feared that a large tower might result in a decrease in property values; others, claiming to be Verizon customers, reported they had "no coverage issues with their phones."  (*Id.*)  More than 100 City residents signed a petition opposing the wireless facility.  (*Id.* ¶ 74.)

At the conclusion of the hearing, the Planning and Zoning Commission unanimously chose "not to recommend" amending the PUD or granting the Plaintiffs' Special Use application.  (*Id.* ¶ 75.)  They cited two reasons:  First, they found that the Special-Use prohibition allowed only for specific, predictable land use that protected "residential investment in the vicinity."  (*Id.* ¶ 76.)

---

[3]    Collocation is the installation of facilities on towers that already exist.  (Pl.'s Resp. in Opp'n to Def.'s Rule 12(b)(6) Mot. to Dismiss Counts I and IV of Pl.'s Second Am. Compl. (hereinafter "Response") [20] at 5.)

[4]    This report was not binding on the Planning and Zoning Commission or the City, which remained free to accept or reject its findings.  (*See* Staff Rep., Ex. C to SAC [11-3] at 4.)

Second, the Commission noted that Oscar Swan was in a "B1 Business District," zoned for "retail, service or office" use; the Commission felt that amending the PUD to permit new uses should be limited to those consistent with the otherwise applicable "land use category of the underlying zoning district"—presumably not including a cell phone tower.  (*Id.*)  As for the Special Use permit, the Commission found that Plaintiffs had "not provide[d] sufficient data to support the claim for an additional tower," and that the "Commission felt that the Verizon network could be at capacity but still operational."  (*Id.* ¶ 77.)

On August 8, 2022, before the City Council had acted on the Commission's recommendations, TowerNorth filed this lawsuit against the City of Geneva, alleging that the City had not acted on Plaintiffs' application within a reasonable time as required by the TCA, 47 U.S.C. § 332(c)(7)(B)(ii).  (*Id.* ¶ 78; Compl. for Declaratory & Injunctive Relief [1] at 1.)  That night, the City Council convened a "special meeting . . . to address" the Plaintiffs' applications, at which the Plaintiffs' representatives appeared and were questioned by council members.  (*Id.* ¶¶ 79–81.) The members pressed Mr. Shinkle about "whether Plaintiffs had ordered a title search as part of their due diligence and knew that the Oscar Swan location was in a PUD and required a PUD amendment to grant a Special Use."  (*Id.* ¶ 81.)  He responded that someone other than he would have reviewed the title, and he "couldn't state what it showed with respect to any PUD."  (*Id.* ¶ 82.)  Some council members stated their belief that Plaintiffs "knew or should have known" about the PUD, and others voiced concerns about property values being affected by the tower.  (*Id.* ¶ 83–84.)  The meeting concluded with the Council unanimously denying Plaintiffs' requests, "rest[ing] upon the evidence adduced" at the July hearing.  (*Id.* ¶¶ 85–86.)

The next day, the Council followed up with a three-page "Resolution" stating its reasons for denial, as required under the TCA.  (*Id.* ¶ 87; *see also* 47 U.S.C. § 332(c)(7)(B)(iii).) Incorporating the Planning and Zoning Commission's findings and the evidence adduced at the hearings, the Council's stated reasons for denial included aesthetic concerns; worries about the tower's effect on property values; and "TowerNorth's demonstrated failure to consider less

6

intrusive alternatives." (City Council Resolution No. 2022-72, Ex. D to SAC [11-4] at 3.) Plaintiffs allege that these "findings" of the City were in fact "nothing more than an attempt to belatedly create a 'record' where none existed." (SAC ¶ 90.) Specifically, Plaintiffs maintain that "[t]here was no evidence to support the City's finding" that other feasible locations might exist beyond Oscar Swan, and that "[t]o the contrary, the only evidence adduced was that there were no other properties" satisfying the City's requirements for cell-tower locations. (*Id.* ¶ 92.)

On September 7, 2022, TowerNorth amended its initial complaint to include three new counts, all arising under the TCA, alleging the City's mishandling of their applications. (*See generally* Am. Compl. [4].) And later that month, TowerNorth successfully amended the complaint a second time, adding Verizon as a co-plaintiff. (*See* SAC.)

## II.    Legal Claims

### A.    Count I

In Count I, Plaintiffs renew their allegation that the City failed to resolve their applications in a "reasonable period of time" in violation of 47 U.S.C. § 332(c)(7)(B)(ii). They point out that the FCC defines a "presumptively reasonable period[] of time" for considering applications like theirs as being 150 days from the application date. (*Id.* ¶ 106; 47 C.F.R. § 1.6003(c)(iv).) Under that time frame, "the City was required to act on TowerNorth's Applications . . . no later than July 14, 2022."[5] (SAC ¶ 106.) Because the City did not officially deny Plaintiffs' application until August 8 (immediately after the Plaintiffs had filed suit accusing them of unreasonable delay), Plaintiffs contend that the City is squarely in violation of this provision. As Plaintiffs see things, this failure "enabl[es] Plaintiff[s] to pursue judicial relief" under 47 U.S.C. § 332(c)(7)(B)(v); specifically, Plaintiffs contend they are "entitled to permanent injunctive relief through an order and judgment"

---

[5]    Plaintiffs allege that the clock was tolled at twenty-eight days when, on December 30th, the City responded with its determination of incompleteness, and it started up again "upon the resubmission on March 15, 2022." (*Id.* ¶ 105.)

both granting their application (essentially overriding the City's untimely denial) and "authorizing Plaintiffs to immediately begin" constructing their tower. (*Id.* ¶¶ 108, 112.)

Defendant moves to dismiss these allegations pursuant to Rule 12(b)(6). Defendant contends that because the City subsequently issued a written report denying their application (as required by 47 U.S.C. § 332(c)(7)(B)(iii)), "Plaintiffs have already received the only relief a court would be authorized to provide for an alleged violation of Section 332(c)(7)(B)(ii) of the TCA— issuance of a written decision on the Application." (Def.'s Rule 12(b)(6) Mot. to Dismiss Counts I & IV of Pl.'s Second Am. Compl. (hereinafter "Motion to Dismiss") [17] at 4.) In other words, regardless of whether the City's decision was late—and the City "maintains [the allegations in the SAC show] it acted . . . within a reasonable period of time"—the issuance of a report moots Plaintiffs' attempts to seek an injunction addressing its untimeliness. (*Id.* at 5.) Defendant argues that "Plaintiffs would have the Court believe Section 332(c)(7)(B)(ii) of the TCA authorizes the Court to effectively overrule the City's August 9, 2022 written denial of Plaintiffs' large tower Application for the sole reason the denial was supposedly issued a few weeks late." (Def.'s Reply in Supp. of Rule 12(b)(6) Mot. to Dismiss Counts I & IV of Pl.'s Second Am. Compl. (hereinafter "Reply") [23] at 4.)

## B. Count IV

Count IV is a substantive challenge to the City's regulations. In Count IV,[6] Plaintiffs invoke 47 U.S.C. § 253(a), which provides that "No state or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." (SAC ¶¶ 141–146.) Plaintiffs claim that the City effectively prohibited their provision of service, and thus violated § 253(a), in two ways: first, through unreasonable delay in denying Plaintiffs' application (*id.* ¶¶ 143–145); and second, because the PUD's "blanket prohibition of Special Use Permits" on the Oscar Swan

---

[6]     The court reserves discussion of Counts II and III for its forthcoming motion on the parties' cross motions for summary judgment.

property "ha[s] the effect of prohibiting the ability of Plaintiffs to provide personal wireless facilities and telecommunications services . . . ." (*Id.* ¶ 146.) As relief, Plaintiffs seek "an injunction or writ of mandamus compelling and ordering the City to grant the amendment to the PUD and the Special Use Permit, and all ancillary approvals and permits necessary for the construction of the proposed Wireless Facility at the Oscar Swan Location," as well as any other proper relief. (*Id.* ¶ 146(e)–(f).)

Defendant argues that Count IV should be dismissed for two reasons: First, because "there is no private right of action for alleged violations of Section 253(a)'"; and second, because Plaintiffs' theory that the City's PUD and its delays on issuing the application denial is "not plausible." (Motion to Dismiss at 7.)

## DISCUSSION

### I.    Count I - Unreasonable Delay

The TCA provides that states and local governments "shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time" after the request's filing. 47 U.S.C. § 332(c)(7)(B)(ii). And the same subsection of the Act entitles "[a]ny person adversely affected by any final action or failure to act . . . that is inconsistent with this subparagraph . . . [to] commence an action in any court of competent jurisdiction." 47 U.S.C. § 332(c)(7)(B)(v). In a later declaratory ruling that the Supreme Court has held is entitled to *Chevron* deference, the FCC defined 150 days as the "reasonable period" for action on the type of requests Plaintiffs made. *See* 47 C.F.R. § 1.6003(c)(iv); *City of Arlington v. F.C.C.*, 569 U.S. 290, 295, 307 (2013) (affirming Fifth Circuit decision deferring to FCC's declaratory ruling). The provision does not specify further what relief is available for an unreasonable delay.

Because injunctive relief "is a forward-looking remedy," a plaintiff has standing to seek an injunction only if the harm they suffer is ongoing or likely to recur. *Swanigan v. City of Chicago*, 881 F.3d 577, 583 (7th Cir. 2018) (citing *Simic v. City of Chicago*, 851 F.3d 734, 738 (7th Cir.

9

2017)).  Here, Plaintiffs allege that Defendant harmed them by delaying its decision long enough to run afoul of the timing requirement in 47 U.S.C. § 332(c)(7)(B)(ii).  The City's delay—the requisite legal harm—is not ongoing, however, because soon after Plaintiffs filed suit, Geneva issued its formal denial of their Application.  (SAC ¶¶ 79–86.)  Plaintiffs, as other courts have recognized, thus "ha[ve] not suffered harm that this court can resolve equitably."  *Clear Wireless, LLC v. City of Wilmington*, No. 10–218–MPT, 2010 WL 3463729, at *4 (D. Del. Aug. 30, 2010); *see also Crown Castle NG E., Inc. v. Town of Greenburgh*, No. 12–CV–6157 (CS), 2013 WL 3357169, at *17 (S.D.N.Y. July 3, 2013) (dismissing similar claim as "moot"); *Omnipotent Commc'ns, Inc. v. Vill. Of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 214 n.7 (S.D.N.Y. Jan. 16, 2004) (same).

Plaintiffs argue that the remedy for failure to act is not limited.  (Response at 9.)  In support, they cite to three FCC Declaratory Ruling and Orders.[7]  First, in a 2014 Order, the FCC states that "a party pursuing a 'failure to act' claim may ask the reviewing court for an injunction granting the application.  As the 2009 *Declaratory Ruling* noted, courts have considered, and in many cases granted, such relief."  2014 Order ¶ 284.  The 2009 Order, in turn, is an FCC Order specifically dealing with "ensur[ing] timely siting review."  *See* 2009 Order ¶ 1 (cleaned up).  And, in a 2018 Order, the FCC reiterated that "[t]he framework reflected in this Order will provide the courts with substantive guiding principles in adjudicating Section 332(c)(7)(B)(v) cases, but it will not dictate the result or the remedy appropriate for any particular case; the determination of those issues will

---

[7]  *In the Matter of Acceleration of Broadband Deployment: Expanding the Reach and Reducing the Cost of Broadband Deployment by Improving Policies Regarding Public Rights of Way and Wireless Facilities Siting* (hereinafter "2014 Order"), 29 FCC Rcd. 12865 (16) (2014);

*In the Matter of Petition for Declaratory Ruling to Clarify Provisions of Section 332(c)(7)(B) to Ensure Timely Siting Review and to Preempt Under Section 253 State and Local Ordinances that Classify All Wireless Siting Proposals as Requiring a Variance* (hereinafter "2009 Order"), 24 FCC Rcd. 13994 (16) (2009);

*In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment* (hereinafter "2018 Order"), 33 FCC Rcd 9088 (14) (2018).

remain within the courts' domain." *See* 2018 Order ¶ 124; *see also* 2014 Order ¶ 284 n. 759 (compiling cases granting applications in the face of violations of other provisions of 332(c)(7)(B)).

The problem is that none of these Orders discuss—let alone endorse—entry of the injunction Plaintiffs seek here. Instead, as the court reads them, these Orders say, at most, that a court *might* be within its power under the TCA to force a city to grant a Plaintiffs' application when an unreasonably long time has elapsed, and the city *continues* to drag its feet for so long as to be an effective denial of their application. *See NY SMSA Ltd. Partnership v. Town of Clarkstown*, 99 F. Supp. 2d. 381, 395 (S.D.N.Y. May 26, 2000) (noting that "[a] failure to act resulting from delay [may] give[] rise to a claim of unreasonable delay and constructive denial"). Even that theory, however, might be a stretch. As the 2009 Order points out, "[t]he State or local authority's exceeding a reasonable time for action would not, in and of itself, entitle the siting applicant to an injunction granting the application." 2009 Order ¶ 32 n.99.[8]

In this case, the City actually denied Plaintiffs' application, albeit after the 150 days had run. Plaintiffs point to no case in which a court overrode such a denial solely for its tardiness. And in a slew of cases courts have found, in similar situations, that the (late) issuance of a written decision mooted plaintiffs' claims under § 332(c)(7)(B)(ii). For example, in *Town of Greenburgh*, the district court for the Southern District of New York noted that "the only reasonable relief" for delay in issuing a decision would be "to require a written decision," and the town "had already provided" one. 2013 WL 3357169, at *17. And in *Up State Tower Co, LLC v. Village of Lakewood*, a 2020 case, the same court found that the fact that the town's zoning board had "issued a written

---

[8]    Confusingly, the same Order also explained the FCC's creation of its "shot clock deadline"—which frames the timeframes deemed "reasonable" under § 332(c)(7)(B)(ii)—as providing "a strong incentive to resolve each application within the timeframe defined as reasonable, or they will risk issuance of an injunction granting the application." *Id.* ¶ 38. One way to reconcile these statements would be to assume that delay would increase the "risk" of an injunction, but only entitle a plaintiff to one if tied to other, independent violations of different provisions of § 332(c)(7)(B). This court sees no support in these authorities for the notion that an injunction must issue if there has been no action by day 151.

decision shortly after Plaintiffs brought this action" mooted their claim. 431 F. Supp. 3d 157, 170 (W.D.N.Y. Jan. 6, 2020).

The court agrees that the relief Plaintiffs seek is no longer necessary; an injunction would, at most, order the City to act, which it has now done. Any relevance to the City's delay, at this point, will arise only in determining whether, should Plaintiffs prevail on Counts II or III of their Second Amended Complaint, the court should remand or simply overrule the City's denial. In other words, the City's delay may still undermine its position on the merits; but it does not constitute the basis for the relief sought here.

## II.     Count IV - § 253(a)

In disputing Count IV, the parties address complicated questions about *Chevron* deference, implied causes of action, and statutory interpretation. The court recognizes the possibility that Plaintiffs' case could be resolved without reaching these issues, depending on the outcome of Counts II and III of their Second Amended Complaint. Accordingly, the court will decline to decide all of those issues, and instead denies Defendant's motion without prejudice, reserving substantive rulings to the summary judgment decision. The court will, however, comment on some of the issues addressed in the parties' briefs on this motion.

### A.     Whether § 253(a) confers a private right of action

A claim may be dismissed under Rule 12(b)(6) if the Plaintiffs' claim for relief arises from a statute that does not provide a private right of action. *Israel Aircraft Indus. Ltd. V. Sanwa Bus. Credit Corp.*, 16 F.3d 198, 199–200 (7th Cir. 1994). Whether a private right exists to enforce 47 U.S.C. § 253 has been litigated in other circuits in the past and presents a "difficult question[]." *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1186 (11th Cir. 2001). Thus, in *BellSouth*, the Eleventh Circuit found no private right existed for Section 253(a) (which bans state or local laws that can prohibit the ability of an entity to provide telecommunications service), meaning that a telecommunications provider seeking to challenge a state of local law could only do so under 253(c) (which allows local governments to require reasonable compensation from

telecommunications providers). *Id.* at 1189–91. Because a private right of action to enforce federal law must be created by statute, a court's first step must be to "interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). In *Sandoval*, the Court concluded that Title VI of the 1964 Civil Rights Act does not allow private individuals to sue to enforce disparate impact regulations promulgated by federal agencies pursuant to Section 602 of that Act. *Id.* at 286–93. And in making that determination, the Court "beg[a]n . . . [its] search for Congress's intent with the text and structure" of the statute. *Id.* at 288.

To address this preliminary question here, then, the court begins with the text of the TCA. Section 253 contains four relevant subparts:

(a) IN GENERAL

No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

(b) STATE REGULATORY AUTHORITY

Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis . . . requirements necessary to preserve and advance universal service, protect the public welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

(c) STATE AND LOCAL GOVERNMENT AUTHORITY

Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for the use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

(d) PREEMPTION

If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b), the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

13

47 U.S.C. § 253(a)–(d). Defendant points out that Section 253(d) states only that the "Commission shall preempt the enforcement of" local regulations violating Section 253(a), and makes no mention of private parties doing so. (Motion to Dismiss at 8–9.)

The court agrees with the City that the statute does not create a private cause of action. First, the text of Section 253(a) reads as a restriction on local governments' activities, not the creation of a private right for telecommunications companies. *See Sandoval*, 532 U.S. at 289 ("Statutes that focus on the person regulated rather than the individuals protected create 'no implication of an intent to confer rights on a particular class of persons.") (quoting *California v. Sierra Club*, 451 U.S. 287, 294 (1981)). Second, the fact that Section 253(d) locates enforcement of Section 253(a)—and 253(b)—specifically and explicitly in the Commission casts doubt on the idea that the statute contemplates individuals doing so as well, as "[t]he express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Sandoval,* 532 U.S. at 290. And Section 253(d)'s specificity as to the FCC's preemption procedure—locating it "after notice and an opportunity for public comment" and after a determination of a violation by the Commission—further suggests that Congress had a specific means of enforcing the statute in mind which did not include Plaintiffs' cause of action.

Nor, to the extent they are relevant,[9] do the TCA's legislative history or expressed purpose provide obvious support for Plaintiffs' reading of Section 253. In their Second Amended Complaint, Plaintiffs stress that the TCA came from a "need . . . to foster [a] pro-competitive, deregulatory national policy" in the telecommunications space. (SAC ¶ 7.) Echoing this, the TCA's preamble announces that its purpose is to "promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications

---

[9] The Supreme Court recognizes limitations on the use of legislative history in interpreting statutes. *See Bostock v. Clayton County, Georgia*, 590 U.S. __, 140 S. Ct. 1731, 1749 (2020) ("Of course some Members of this Court have consulted legislative history when interpreting *ambiguous* statutory language."); *Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011) ("Legislative history, for those who take it into account, is meant to clear up ambiguity, not create it.").

consumers and encourage the rapid deployment of new telecommunications technologies." Pub. L. No. 104-104, 110 Stat. 56, Preamble (1996). But the Act provides multiple means of accomplishing this, including granting individual carriers the ability to sue under § 332(c)(7)(B) in various circumstances. And in *BellSouth*, the Eleventh Circuit pointed out that in discussions of Section 253(d), Senator Slade Gorton, who spearheaded the language from which the legislation took its codified form, stressed that Section 253(c) would stay "primarily [of] local concern" while Sections 253(a) and (b) enforcement should be concentrated in the FCC:

> The States retain the right under subsection (d) to pass all kinds of legislation that deals with telecommunications providers, subject to the provision that they cannot impede competition. The determination of whether they have impeded competition, not by the way they manage trees or rights of way, but by the way they deal with substantive law dealing with telecommunications entities. That conflict should be decided in one central place, by the FCC. The appropriate balance is to leave purely local concerns to local entities, but to make decisions on the natural concerns which are at the heart of this bill in one central place so they can be consistent across the country.

*BellSouth*, 252 F.3d at 1191 (quoting 141 Cong. Rec. S8306, S8308 (daily ed. June 14, 1995)). Senator Gordon's understanding of Section 253(d)'s language thus comports with the court's interpretation of the TCA's text. Moreover, providing for a uniform, nationwide enforcement regime around Section 253 broadly comports with the TCA's purpose of streamlining certain regulation of the telecommunications industry.

In taking this view, the court has company. As the Sixth Circuit recently observed, the "majority of other circuits to address this question have concluded that § 253(a) does not grant a private right of action . . . ." *Superior Commc'ns v. City of Riverview, Michigan*, 881 F.3d 432, 443 (2018) (where radio station accused the city of violating a licensing agreement and brought claim under 253(a), affirming summary judgment for city because the statute created no private cause of action)). Indeed, the Second, Fifth, Sixth, Eighth, Ninth, Tenth, and Eleventh Circuits have all found no private right of action to enforce Section 253(a). *See id.* at 443–44 (compiling cases).

Plaintiffs seek to distinguish these cases on the grounds that they concerned suits for damages; Plaintiffs contend that, by contrast, "no private cause of action under Section 253 is

needed to obtain declaratory and injunctive relief . . . ." (Response at 15.) But this is not entirely true. In *BellSouth*, for example, the Eleventh Circuit faced a complaint seeking declaratory and injunctive relief like this one and concluded that a private cause of action existed only with respect to Section 253(c), which is the only subparagraph excluded from 253(d)'s enforcement language. 252 F.3d at 1191. The court determined that "[a]ll other challenges brought under § 253 must be addressed to the FCC." *Id.* And, in the one case Plaintiffs do cite in which a district court granted declaratory and injunctive relief to a private party under Section 253(a), it appears that the Defendant never argued that equitable relief was also precluded by the statute. *See Coastal Commc'ns Serv., Inc. v. City of New York*, 658 F. Supp. 2d 425, 440–41 (E.D.N.Y. 2009) (noting agreement with the City's argument "that the TCA does not authorize monetary damages" and turning immediately to the "City's second line of attack . . . [which] argues that plaintiffs' claims under § 253 must fail because the market lacks sufficient demand to support the PPT business on its own"—in other words, a merits dispute).

Plaintiffs cite the FCC's 2018 Order, as well, but that Order does not satisfy this court that a private right of action is available here. Plaintiffs read the Order as "stat[ing] that Section 253(d) provides 'one non-exclusive mechanism' to obtain a determination whether a requirement is preempted under 253(a)." (Response at 16–17.) They cite to a paragraph of the Order that the court reproduces here in full:

> We start our analysis with a consideration of the text and structure of Section 253. That section contains several related provisions that operate in tandem to define the roles that Congress intended the federal government, states, and localities to play in regulating the provision of telecommunications services. Section 253(a) sets forth Congress's intent to preempt state or local legal requirements that "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." Section 253(b), in turn, makes clear Congress's intent that state "requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers" are not preempted. Of particular importance in the fee context, Section 253(c) reflects a considered policy judgment that "[n]othing in this section" shall prevent states and localities from recovering certain carefully delineated fees. Specifically, Section 253(c) makes clear that fees are not preempted that are "fair and reasonable" and imposed on a "competitively neutral

> and nondiscriminatory basis," for "use of public rights-of-way on a "nondiscriminatory basis," so long as they are "publicly disclosed" by the government. *Section 253(d), in turn, provides one non-exclusive mechanism by which a party can obtain a determination from the Commission of whether a specific state or local requirement is preempted under Section 253(a)—namely, by filing a petition with the Commission.*

2018 Order ¶ 52 (emphasis added). The City points out that this Order deals with "Small Wireless Facilities" as opposed to the 100-foot tower at issue in this case, and thus "is inapplicable when the telecommunications facility at issue is not a Small Wireless Facility . . . ." (Reply at 3.) Additionally, Defendant argues that *Chevron* deference is inappropriate because the plain text of Section 253 unambiguously rejects a private cause of action. (*Id.* at 8.) But regardless of whether Defendant is correct, the paragraph of the Order that Plaintiffs cite does not provide any convincing support for their position. The Order refers to "filing a petition with the commission" as one, "non-exclusive" way to "obtain a determination [of Section 253(a) violations] *from the Commission*." 2018 Order ¶ 52. It says nothing about mechanisms for obtaining *a court's* determination of the same.[10]

At the broadest level, Defendant points out that a contrary reading of Section 253 could grant telecommunications companies the ability to invoke the FCC's authority and challenge, in federal court, city ordinances as slight as an eight-parcel Planned Use Development. (Reply at 10). In doing so, private companies could override localities' minute decisions as to the regulation of their land any time those decisions potentially interfered with preferred cell-tower location sites.

---

[10] In support of their different reading of the statute, Plaintiffs also point to an amicus brief the FCC filed in a 2002 Second Circuit case, *TCG New York, Inc. v. City of White Plains*. (Response at 17 (citing 305 F.3d 67 (2d Cir. 2002).) In its amicus brief, "[t]he FCC did not definitively state an opinion on whether it has concurrent jurisdiction with the district courts over § 253, but it did outline several reasons to think that jurisdiction should be concurrent," including the fact that § 253 does not explicitly say that the Commission's jurisdiction is "exclusive." *White Plains*, 305 F.3d at 74. As Defendant points out, an amicus brief is not any kind of formal rulemaking which would warrant the court to apply *Chevron* deference. (Reply at 8 (citing *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1179–80 (9th Cir. 2015).) And beyond that, *White Plains* concerned whether the statute conferred exclusive jurisdiction over § 253 claims to the FCC—not whether a private right of action existed. 305 F.3d at 74 (noting that "since White Plains does not argue that there is no private cause of action, we need not reach the issue").

(*Id.*)  The court agrees that the odd result threatened by drawing such a conclusion, paired with the plain language of the statute indicating the opposite, supports Defendant's view.

> **B.  Whether the Supremacy Clause nonetheless allows this court to hear Plaintiffs' case**

In their Response Brief, Plaintiffs also gesture toward the possibility that even if the statute does not create a cause of action, "no private cause of action under Section 253 is needed to obtain declaratory and injunctive relief" on preemption grounds.  (Response at 15.)  They cite a footnote from *Shaw v. Delta Airlines, Inc.*, which states:

> [A] plaintiff who seeks injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute which, by virtue of the Supremacy Clause of the Constitution, must prevail, thus presents a federal question which the federal courts have jurisdiction under 28 U.S.C. § 1331 to resolve.

463 U.S. 85, 96 n.14 (1983).  They also point to *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 326–27 (2015), characterizing that case as "h[olding] that a federal court has inherent equitable power to [issue injunctions], unless the court is prohibited from doing so by statute." (Response at 16.)  According to Plaintiffs, Section 253 does not explicitly prohibit equitable relief, or the court's jurisdiction, and thus the court here has jurisdiction to determine whether the PUD is preempted by the TCA.  (*Id.*).  Plaintiffs also point to a new case from the Fifth Circuit, *Crown Castle Fiber, L.L.C. v. City of Pasadena, Texas*, which comes to the same conclusion in the specific context of Section 253.  76 F.4th 425 (7th Cir. 2023).  In that case, the Fifth Circuit decided that, notwithstanding the lack of a private cause of action for damages, Fifth Circuit law allowed the court to hear a telecommunications company's claim in equity seeking preemption of a local ordinance as violative of Section 253(a).  *Id.* at 434–35.

These authorities, while useful, do not satisfy this court that Congress intended to authorize a private right of action in these circumstances.  As Defendant points out, the Court notes in *Armstrong* that federal courts' "power . . . of equity to enjoin unlawful executive action is subject to express and implied statutory limitations."  575 U.S. at 328.  The *Armstrong* Court

pointed to the Medicaid Act's own enforcement scheme—the withholding of federal funds—as inconsistent with a conclusion that plaintiffs have private enforcement authority. *Id.* at 331–32. In other words, "the explicitly conferred means of enforcing compliance with § 30(A) [of the Medicaid Act] by the Secretary's withholding funding . . . suggests that other means of enforcement are precluded." *Id.* (citing *Sandoval*, 532 U.S. at 290). Given that Section 253(d) also appears to contemplate only the Commission's enforcing compliance with Section 253(a), it is unlikely, in the court's assessment, that this provision of the TCA allows for enforcement by Verizon and TowerNorth. Moreover, for the reasons expressed above, the court worries that "[c]reating . . . a right of action to *evade* principles (including an express preemption clause) that commit to official rather than private hands the decision whether to litigate would be unseemly." *Israel Aircraft*, 16 F.3d at 200.

Finally, without deciding the issue, the court notes a question about standing. To have Article III standing, a plaintiff must have an injury "fairly . . . trace[able] to the challenged action," and "it must be 'likely, as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560–61 (1992). Plaintiffs here appear to be challenging both the PUD ordinance, and the City's independent decision to deny Plaintiffs a special-use permit. Presumably recognizing that Section 253(a) applies only to local "statute[s] or regulation[s]," rather than individual actions, Plaintiffs allege that "their claim for a declaration that the City's regulations are preempted under Section 253(a)" is not a challenge to the decision to deny Plaintiffs' own application. (Response at 18; *see also Superior Commc'ns*, 881 F.3d at 444 (finding that a City's "denying [the plaintiff's] upgrade request" was not a "regulation" within the meaning of Section 253).) In other words, they purport to seek relief under Section 253(a) of the TCA only from the PUD ordinance and are challenging the City's denial separately in Counts II and III of their complaint, under 47 U.S.C. §§ 332(c)(7)(B)(iii) and 332(c)(7)(B)(i)(II). (See SAC ¶¶ 113–40.)

19

It appears, then, that the harm Plaintiffs suffer—the inability to fill their coverage gap—is not necessarily traceable to *only* the PUD ordinance. A finding that the ordinance violates Section 253(a) would redress Plaintiffs' harm only if it is "likely" that in the PUD's absence their special-use application would have been approved. Plaintiffs may thus only have standing to attack the regulation if it is the sole bar to their tower's placement; in other words, without the additional special-use permit denial in their way. Resolving the latter question—whether the City's decision to deny their requested permit was supported by "substantial evidence"—may therefore be a prerequisite to assessing Plaintiffs' standing to seek declaratory relief under Section 253(a). *See* 47 U.S.C. § 332(c)(7)(B)(iii) (requiring denials of telecommunications sites be supported by "substantial evidence").

One final observation: 47 U.S.C. § 332(c)(7)(B)(i)(II), which forms Count III of Plaintiffs' complaint, employs the same standard as Section 253(a) and allows for a private cause of action to challenge a city's "regulation of the placement . . . of personal wireless service facilities" which "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Because the two standards are identical (and simply challenge broader regulations as opposed to decisions related to individual facilities), the court may be able to resolve issues related to Section 253(a) in the context of Count III without addressing some of the difficult justiciability questions Defendant has raised.

## CONCLUSION

Because Plaintiffs' claim under § 332(c)(7)(B)(ii) is moot, the court denies Count I of their Second Amended Complaint. The court denies the motion to dismiss Plaintiffs' claim under §253(a) without prejudice, but notes concerns about its justiciability and declines to enter a final ruling on Count IV until after a summary judgment ruling on Counts II and III. Defendant's motion to dismiss [17] is granted in part and denied in part without prejudice.

ENTER:

Dated:  September 30, 2023

_____
REBECCA R. PALLMEYER
United States District Judge