**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **TOWERNORTH DEVELOPMENT, LLC,** | ) | |
| **and CHICAGO SMSA LIMITED** | ) | |
| **PARTNERSHIP d/b/a VERIZON** | ) | |
| **WIRELESS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 22 C 4151** |
| | ) | |
| **CITY OF GENEVA,** | ) | **Judge Rebecca R. Pallmeyer** |
| | ) | |
| **Defendant.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs TowerNorth Development, LLC ("TowerNorth") and Chicago SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon") seek to build a cell tower on a parcel of land called the "Oscar Swan" location in the City of Geneva, Illinois. But the City of Geneva has denied Plaintiffs' application, resulting in this five-count lawsuit under the Telecommunications Act of 1996 ("TCA"). In a previous ruling, this court dismissed Plaintiffs' claim that the City's failure to act promptly on the application required that it be deemed granted, but denied without prejudice the City's motion to dismiss Plaintiff's claim for an order of mandamus granting their application. *See TowerNorth Dev. LLC v. City of Geneva*, No. 22 C 4151, 2023 WL 6388257 (N.D. Ill. Sept. 30, 2023). Both sides now move for summary judgment on all remaining claims: In Count II, Plaintiffs allege that the City lacked substantial evidence to deny their application to build the Tower on the Oscar Swan Location. In Counts III and IV, they claim that the City's decision and its land-use restrictions effectively prohibited Plaintiffs from providing wireless services, in violation of the TCA.

As explained here, the court concludes that substantial evidence supported the City's denial of Plaintiffs' applications, but there remain material factual disputes concerning whether

those denials materially inhibited Plaintiffs from providing telecommunications services. The court thus grants summary judgment for Defendant as to Count II, but denies both parties' motions for summary judgment on Counts III and IV.

## BACKGROUND

The Plaintiffs work in telecommunications. TowerNorth is a company that develops, owns, and leases wireless communications facilities, and Verizon is a telecommunications carrier. (Def.'s LR 56.1(d) Statement of Material Facts (hereinafter "DSOF") [30] ¶¶ 6–7.[1]) Carriers like Verizon use the wireless facilities TowerNorth constructs as "cell sites," through which they transmit radio signals and thus provide wireless services for customers. (Pl.'s LR 56.1(d) Statement of Material Facts (hereinafter "PSOF") [33] ¶¶ 2, 7.) Carriers rely on interlocking networks of cell sites, overlapping in "honeycomb pattern[s]," to ensure that customers' phone calls or other communications are not disconnected or dropped. (*Id.* ¶ 8.) Without correctly placed cell sites, the carrier's network and customers suffer. (*Id.*)

To keep that from happening, carriers employ radio frequency ("RF") engineers to tend to their networks; the engineers do field testing, make "propagation stud[ies]" (that is, maps charting differences in coverage according to cell-site placement) and use other techniques to spot weaknesses or gaps in the network and determine where new wireless facilities are needed. (*Id.* ¶ 14; see also Appendix [27] at 315, 322–23.[2]) These searches enable the RF engineers to

---

[1] The parties each submitted statements of material facts as mandated by Local Rule 56.1(d). The court relies on statements that are admitted by both parties, and quotes from record evidence where appropriate.

[2] The Appendix contains the entire record of proceedings before the Planning and Zoning ("PZ") Commission and the City Council, including Plaintiffs' applications, other materials both sides submitted as part of the decision-making process, transcripts, and the City's resolution. (DSOF ¶ 61). The parties agree that this record is the "true and correct" copy of the application, the PZ Commission's hearing and decision, and the City Council's hearing and decision. (Pl.'s Resp. to Def.'s LR 56.1 Statement of Material Facts (hereinafter "Pl.'s Resp. – DSOF") [35] at 15.) Both parties' Rule 56.1 statements make use of Bates numbers in reference to the Appendix, and the court does so as well. Additionally, for convenience, the court uses internal pagination and

identify and delineate a "search ring," which is "basically a circle on a map" outlining the geographic area within which a cell-site will have a "high probability of addressing and meeting . . . coverage and/or capacity objectives." (Tr. of City of Geneva Planning & Zoning Comm. Meeting, Appendix Pt. 6 (hereinafter "PZ Hearing") [27-6] at 10:8–12; PSOF ¶ 14.)

## I.     Plaintiffs' Search and Application

On December 2, 2021, Plaintiffs applied for a special-use permit to construct a Tower and Wireless Facility in Geneva.[3] (PSOF ¶¶ 31–32.) According to Plaintiffs, Verizon's RF engineer had conducted a search in and around Geneva to address what Plaintiffs claim is "a significant gap in service" there. (Appendix at 312; DSOF ¶ 33.) In their application, Plaintiffs claimed that Verizon's network capacity was already past its limit in the area, with four of the six nearby sectors "exhausted and requir[ing] immediate relief," and "[d]ata consumption . . . increasing at an exponential rate . . . ." (Appendix at 315.) Verizon's RF engineer determined that a new cell site was required, to be located within a quarter-mile radius of a segment of Geneva known as Geneva Commons. (Id.) Plaintiffs sought an appropriate location within that area, prioritizing potential sites "[i]n accordance with" Geneva's City Code. (Id.) That Code adopts a hierarchy of "siting preferences" for wireless facilities, from most to least desirable, spanning from small "[a]ttached" and freestanding "small-cell facilities"—the most desirable, labeled "(a)"—down to different types

---

line numbering when referencing the PZ hearing, City Council hearing transcripts, and summary judgment briefing.

[3]     The Geneva Code requires those building or maintaining wireless communication facilities to obtain special use permits. See GENEVA CODE § 11-3-12(C). The Geneva Code defines a "special use" as "[a] use, either public or private, which, because of its unique characteristics, cannot be properly classified as a permitted use in a particular [zoning] district or districts." GENEVA CODE § 11-2-2. Permits for such special uses may be granted "[a]fter due consideration, in each case, of the impact of such use upon neighboring land and of the public need for the particular use at the particular location . . . ." Id. The PZ Commission makes recommendations concerning whether to grant or deny a special use permit, and the City Council makes the final decision on the request. See GENEVA CODE § 11-14-2.

of concealed and non-concealed towers—at "(f)"–"(i)," the least desirable.  Geneva Code § 11-3-12(E)(2).[4]

As set forth in their application, Plaintiffs reviewed the Code's list but were unable to find suitable sites falling within the City's most-preferred categories.  (*See* Appendix at 315–16.) Small-cell facilities (preferred category (a)) were inadequate; they function only to supplement a "sufficiently robust existing" coverage network, and, unlike the lower frequencies transmitted by towers, high-frequency transmissions from small-cell facilities do not travel through walls.  (*Id.*) Verizon's team could not find any "base station[s]"—in other words, buildings—of "adequate height" (categories (c) and (d)) to make use of a concealed antenna.  (*Id.* at 316.)  Finally, there were no pre-existing wireless facilities in the ring that Plaintiffs could replace or on which they could co-locate[5] (categories (b) and (e)).  (*Id.*)

Having exhausted options (a) through (e) in the Code, Plaintiffs turned to option (f) and searched for sites on which they could build a concealed freestanding tower.  Unnamed "[r]eal estate specialists" working for Plaintiffs found no city-owned or otherwise public properties zoned for non-residential use that would accommodate such a tower.  (Appendix at 316.)  Additionally, the real-estate team considered "several non-public properties in non-residential zoning districts" but reported that it "could not come to terms with the property owners."  (*Id.*)  Finally, Plaintiffs zeroed in on Oscar Swan—which their application calls the "only successful candidate." (*Id.*) Oscar Swan is in a "Business District" that is nested within an eight-parcel planned unit development created by a 1987 City ordinance (the "PUD").  (DSOF ¶ 17.)  A 7.53-acre "open swath of land," Oscar Swan contains, in part, the "Oscar Swan event grounds," on which a bed-

---

[4]     The complete list of the Geneva Code's hierarchy appears in an Appendix to this opinion.

[5]     Co-location (or "piggybacking") involves sharing space on facilities or towers already in existence.  (Pl.'s Resp. in Opp'n to Def.'s Rule 12(b)(6) Mot. to Dismiss Counts I and IV of Pl.'s Second Am. Compl. [20] at 5.)

and-breakfast called the "Oscar Swan Country Inn" sits.  (Appendix at 302; DSOF ¶¶ 13–15.)  The property abuts residential areas and is zoned for uses like "large outside gatherings, including weddings, and other indoor and outdoor activities."  (DSOF ¶¶ 13, 15; PSOF ¶ 26.)  Oscar Swan's borders are within 500 feet of 125 residential properties.  (Appendix at 53–64, 302.)  Plaintiffs proposed locating a Tower about seventy feet from the Oscar Swan property line, and, according to Plaintiffs, "between 160-200 feet" from the nearest home.  (Pl.'s Resp. – DSOF at 5.)  And though the parties dispute the exact number, the Tower would stand within a half-mile—or 2640 feet—of dozens of homes.  (*See id.* at 4; Appendix at 152–54.)[6]  According to Plaintiffs, all other possible concealed tower locations "were either not suitable for building, did not have a willing landlord, or were smaller tracts of land that presented the same or more zoning obstacles than [Oscar Swan]."  (PSOF ¶ 25.)  Plaintiffs did not clarify what they meant by a "willing landlord," either in their proposal or at any other point in the process, and did not provide further details considering the obstacles other properties presented.

Plaintiffs proposed to build a 100-foot tower (the "Tower") and an adjacent "20-foot by 40-foot storage facility" (the "Wireless Facility") near the southwestern edge of Oscar Swan.  (DSOF ¶¶ 11, 13; Appendix at 302.)   The plan was for a "monopine tower"—that is, one that would be built to resemble a pine tree, with four rows of immobile, fake "branches" at varying heights.  The rows of branches—at sixty, seventy, eighty, and ninety feet up the "tree"—would accommodate various carriers, with Verizon's antennae occupying the ninety-foot perch.  (PSOF ¶ 33.)  The disguised tree would need to be tall enough to "allow transmission of radio frequency signals

---

[6]        The Oscar Swan location appears to be about 520 feet by 575 feet.  The diagonal across the property, then, is about 775 feet long (the square root of 520^2 + 575^2).  The parties agree that 125 homes are within 500 feet of any border, so the Tower, which cannot be more than about 775 feet from any border, should be within 2,640 feet (a half mile) of at least those 125 homes.

above trees, buildings, and other natural or man-made structures that can diminish signals."[7] (*Id.* ¶ 11.) And the planned "compound" surrounding the tower would sit behind a six-foot fence, around which TowerNorth would plant (real) arborvitae trees. (*Id.* ¶ 34.) Documents submitted in support of Plaintiffs' application included the plans for the project; Verizon's RF engineer's affidavit; a letter noting that the Tower would collapse if wind speeds exceeded 107 miles per hour and that its resulting "fall zone" would be about forty feet; "photographs and photosims depicting a before and after look" of the Tower's new, anticipated home; and a "Localized Property Value Impact Study"—that is, an appraisal of the impact the Tower would have on local property values. (PSOF ¶¶ 36–37; Appendix at 310–98.)

That study document was prepared by Mark J. Layne, a real-estate appraiser. (Appendix at 329.) Mr. Layne identified four wireless towers already standing in or near Geneva and compared the prices of homes sold in the preceding eighteen months within a one-half mile radius of each tower to those sold within one mile and two miles of each tower. (*Id.* at 330–34.) Mr. Layne found that homes' sale prices, per square foot, were largely similar, regardless of whether they were within the half-mile or two-mile radius of the cell tower. (*Id.* at 335.) The study concluded that "[t]he data shows relative uniformity among unit sale prices within each sample," such that "sale prices . . . appear unaffected by proximity to the tower." (*Id.* at 337.)

Within one month of its submission, City officials returned the application to Plaintiffs with comments, identifying "application deficiencies and missing information necessary for Plaintiffs' application to proceed forward." (DSOF ¶ 20.) A sampling of the deficiencies included: "Applicant needs to address lighting"; "Balloon test information is missing"; "Sounds. Applicant has not addressed this item"; and so on. (Appendix at 76–77.) Plaintiffs submitted a response

---

[7]    The court presumes the Tower's height is a function of the need for "branches" to be at or above the tree line, thus minimizing signal interference. So far as the court is aware, other carriers, who could presumably lease and benefit from space on the proposed Tower, have not weighed in on the merits of Plaintiffs' proposal.

supplementing their application with additional information on March 16, 2022.  (DSOF ¶ 21; PSOF ¶ 40.)  The back-and-forth continued, with Geneva sending a follow-up "set of review comments" to Plaintiffs the following month, and Plaintiffs providing further information in May. (DSOF ¶¶ 22–23.)  Left undone was the "balloon test," in which Plaintiffs would tie a balloon to a crane "mobilized to a height of 100 feet" to give community members a sense of how a cell tower of that height might look in the area.  (See PSOF ¶ 42.)  In their initial response to Geneva's review comments, Plaintiffs had asserted that "near perfect weather" was necessary for the test and that they would schedule it "subsequent to the second [application] review" (Appendix at 76); on May 24, 2022, they finally went ahead with it.  (DSOF ¶ 24.)  With that final hurdle cleared, the parties were able to schedule a public hearing before the Planning and Zoning ("PZ") Commission for June 23, 2022.  (PSOF ¶¶ 43–44.)

Just nine days before the scheduled hearing, however, Geneva's City Planner Chayton True—who supervised the City staff's handling and assessment of Plaintiffs' application—emailed Ray Shinkle, a member of Plaintiffs' real-estate acquisition team,[8] to report an unexpected additional requirement:

> Ray, . . . yesterday staff noticed the property you seek to place the proposed tower upon is in a Planned Unit Development (PUD).  The PUD states no special uses are allowed.  Therefore, an application to amend the Blackberry PUD (Ordinance Attached) is necessary with the submitted special use application for the communication tower.  Both requests will be reviewed together for the project.

(PSOF ¶ 45 (quoting Ex. B to Pl.'s Second Am. Compl. [11-2] at 2).)  As it turned out, the PUD prohibited special uses "of any kind" on seven of its eight parcels, including the two comprising Oscar Swan.  (PSOF ¶ 27; DSOF ¶ 26.)  Because the Geneva Code classified essentially all wireless facilities as special uses, the PUD by its terms foreclosed erection of the Tower on Oscar

---

[8]    Mr. Shinkle is the President of a company called Insite that "assists wireless telecommunications companies [like Verizon] and build-to-suit tower companies [like TowerNorth] in site acquisition for new and existing wireless antenna facility sites." Decl. of Ray Shinkle in Supp. of Pl.'s Mot. for Summ. Judgment, Ex. 2 to Pl.'s Mot. for Summ. Judgment (hereinafter "Shinkle Decl.") ¶¶ 1–6.)  He led Plaintiffs' application process.  (Id.)

Swan.  *See* GENEVA CODE § 11-3-12(C).  In later testimony to the Geneva City Council, Mr. Shinkle recalled that Mr. True called him that morning and told him that City staff "did catch" the issue regarding the PUD's restrictions back when Plaintiffs had originally filed their application, but "forgot about it" until the application was slated to go before the PZ Commission.  (Tr. of City Council Special Meeting (hereinafter "CC Hearing") [27-7] at 75:17–76:5.)  Regardless of who knew what when, this restriction meant that Plaintiffs would need to spend time drafting and submitting an additional application, one for an amendment to the PUD.  So, scrapping the June 23 hearing, the parties agreed that the PZ Commission would entertain *both* requests—the PUD amendment and the special use application—at its next hearing on July 14.  (PSOF ¶¶ 45–46.)  And on June 24, Plaintiffs submitted their PUD-specific application.  (PSOF ¶ 46; DSOF ¶¶ 25–26.)  Apart from the brief delay, the parties did not view the requirement for a PUD amendment as a significant obstacle: Mr. Shinkle noted that "the [City] staff did not seem concerned with the PUD amendment" and "knowing what we were applying for, we were not concerned either."  (CC Hearing at 77:20–78:1.)

Before the July hearing, Geneva's Community Development Department ("CDD"), led by Mr. True, compiled and presented a report for the Commission sharing its own findings as to whether Plaintiffs had satisfied the City's requirements for a special use permit.[9]  (PSOF ¶ 48.)  The CDD's report, which was presented to the PZ Commission, was not binding; it stated that "[b]ased on evidence and testimony provided at the public hearing, the Planning & Zoning Commission may choose to use this analysis as the basis for its findings of fact, use the applicant's analysis as the basis for its findings, or formulate its own findings."  (Appendix at 207.)

---

[9]     Under the Geneva Code, the CDD's role is advisory—that is, the CDD "provide[s] the planning and zoning commission and city council with assistance and with such information as may be required or requested" to make zoning decisions.  GENEVA CODE § 11-14-2(E).  The Code explains that the CDD "provide[s] the public and applicants" with information related to applications for special-use and other zoning permits, "review[s] applications" for such permits and "determine[s] [the applications'] compliance" with Geneva's zoning requirements.  *Id.*

Its advisory nature aside, the report's findings broadly supported Plaintiffs' proposed Tower and Wireless Facility. (*See* Appendix at 207–11.) The CDD concluded that the proposal satisfied the PZ Commission's standards for evaluating special-use permits. Thus, the CDD concluded that the Tower and Wireless Facility would have a "minimal visual impact [which] is not expected to impact the value of adjacent and nearby properties"; that the Tower and Facility would "not adversely affect or change the character of the area"; that Plaintiffs had designed the Tower so as to minimize any "visual irregularities"; that the area was "densely wooded" with trees "reaching estimated heights of 40 to 60 ft." that would "aid in the seclusion of the 100 ft. proposed tower" because the "height of mature trees surrounding the proposed tower site will provide a buffer between the surrounding neighborhoods and the tower"; that the Tower was "not anticipated to adversely affect the use and development of nearby properties"; and that the "combination of screening, landscaping, and the tower design as a 'mono-pine' in the proposed setting is not anticipated to cause a substantial depreciation in property values within the surrounding neighborhoods." (Appendix at 208–11.)

Many local residents disagreed, however. In the weeks leading up to the hearing, several sent written objections to Plaintiffs' proposal, all of which were "logged into the record" in anticipation of the PZ Hearing. (DSOF ¶ 30; PSOF ¶ 53.) Among the documents was a petition opposing the development, which gathered some 160 signatures. (DSOF ¶ 30; Appendix at 401–18.) Additionally, some forty residents sent emails and letters to City staff voicing opposition to the Tower for various reasons, including impact on property values and aesthetic concerns. (DSOF ¶ 30; Appendix at 419–502.) Among them, a real estate agent wrote that proximity to cell towers presents concerns for some potential buyers; she also attached a form used by realtors to estimate likely sales price which lists proximity to "radio towers" among the criteria to consider. (Appendix at 460–62.) A woman named Sylvia Stern wrote an email criticizing the methodology used in Mr. Layne's study; she attached photographs from Google Maps of the four towers he

had used as the basis for his comparisons with the Oscar Swan location, all of which appeared to be far from residential areas.  (*Id.* at 423–27.)  Multiple other residents referenced studies challenging Mr. Layne's conclusion that homes surrounding cell towers did not decline in value. (*Id.* at 452–55.)   And one resident attached three specific studies—from Alabama, Florida, and Georgia—showing cell towers negatively impacting surrounding properties' sales prices.[10]  (*Id.* at 502–46.)

## II.    The Planning & Zoning Commission Hearing

On July 14, 2022, the PZ Commission convened the public hearing on Plaintiffs' two applications.  (PSOF ¶ 47.)

Mr. Shinkle testified first before the Commission, together with Mark Layne, the real-estate appraiser; Ari Rosenthal, Verizon's lawyer; and Jesse McDaniel, Verizon's RF Engineer.  (*See* Shinkle Decl. ¶¶ 1–4, 7;[11] PZ Hearing at 5:15–6:22; Appendix at 329.)   Echoing Plaintiffs'

---

[10]    As the court understands Layne's data, it included all homes within 2640 feet (half a mile) from the cell tower.  His findings are thus not obviously at odds with those cited by residents, which zeroed in on homes closer than a half-mile to towers.  One such study found "homes closer to cell towers selling at (generally) larger discounts," such that homes within 500 feet of a tower sold at a 7.6% discount, and that homes suffered a "still negative and statistically noticeable" effect up to 1500 feet away from a tower.  Joseph Hale & Jason Beck, *The Disamenity Value of Cellular Phone Towers on Home Prices in Savannah, Georgia*, 18(8) THE EMPIRICAL ECON. LETTERS 871, 875 (Aug. 2019).  Another found a decline in housing prices for residences within 0.72 kilometers of clearly visible cell towers, ranging from between 2.46% and 9.78%. Ermanno Affuso et al., *Wireless Towers and Home Values: An Alternative Valuation Approach Using a Spatial Econometric Analysis*, 56 J. REAL EST. FIN. ECON. 653, 670 (2018).  A third found that "prices of properties decreased by just over 2%, on average, after a tower was built," which effect "diminished with distance from the tower and was almost negligible after about 656 feet." (Appendix at 537; Sandy Bond, *The effect of distance to cell phone towers on house prices in Florida*, APPRAISAL J. (2007).)

[11]    Geneva points out that the Shinkle Declaration, as well as declarations by two other people involved in the application dispute, were not evidence the City considered in denying Plaintiffs' application.  (Def., City of Geneva's Resp. to Pl.'s 56.1 Statement of Material Facts (hereinafter "Def.'s Resp – PSOF") [37] at 1–2.).   Instead, Plaintiffs have attached these declarations for the first time to their motion for summary judgment.  (*See* Pl.'s Mot. for Summ. J. (hereinafter "PSJ") [31].)   The court relies on the declarations only where their relevance is distinct from an assessment of the evidence on which the City based its decision.  In particular, the court treats the declarations as evidence in its analysis of Count III, because the consideration of that

application materials, Mr. Shinkle began by stressing that "Verizon's trying to keep up with the insatiable demand that this country has for seamless wireless coverage." (*Id.* at 7:3–5; *see also* Appendix at 313.) The demand, according to Mr. Shinkle, was only increasing. He noted that about 90 percent of Americans now own a wireless phone; that 85 percent of those wireless phones are "smart phone[s]" used for emails, video calls, streaming, and the like; and that the "smart phone" numbers reflect a 35 percent increase over ten years, meaning that people increasingly "have their entire li[ves] on th[ese] phone[s]." (*Id.* at 7:16–22.) In light of this explosion in phone use, and the need for people to reliably call police in emergencies, Mr. Shinkle characterized Verizon's ability to "keep up with the network for their customers and subscriber's [sic]" as a "matter of health and safety to the public." (*Id.* at 8:4–12.)

Mr. Shinkle then described Plaintiffs' findings of a gap in service coverage and the search process that resulted in selection of the Oscar Swan location "as [thei]r primary." (*Id.* at 6:6–8.) Referencing Mr. Layne's application materials, Shinkle testified that Plaintiffs concluded that the Oscar Swan location "[wa]s the most obvious site that meets [the City's] requirements" (*id.* at 13:2–4), and "is a solid site" (*id.* at 116:6–7). Mr. McDaniel, the Verizon engineer, later testified that the site was "a home run for us" that would "have an immediate impact to our network," such that "I can't stress how, you know, excited we are about this site, if we can get this site on air and improve our network and improve our coverage and performance for our customers." (*Id.* at 33:10–16.) Late in the hearing, Mr. Shinkle stated that "[i]f we can't go here, I don't know where we could go." (*Id.* at 117:11–12.)

Plaintiffs were clear about their conclusion, but did not offer significant additional detail about their needs or the site search they had conducted. Mr. McDaniel testified that he was

---

claim is not restricted to evidence the City had before it when making its denials. *See VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 833 (7th Cir. 2003) (noting that resolving "effective prohibition" claims can involve evidence "outside of the administrative record compiled by the local authority").

unable to provide information concerning Verizon's "coverage deficiency": "I can't give you guys those metrics because they're part of our competitive advantage proprietary to Verizon." (*Id.* at 33:1–4, 34:2–13.) This applied to data related to "dropped calls . . . slow uploads, downloads" and other transmission failures stemming from the four offloaded sectors of the six on which Verizon then relied to supply coverage to customers within the gap. (*Id.* at 36:1–6.) The proprietary shield also applied more broadly to details of Plaintiffs' search for a site, including potential deals with other lessors and the exact locations of other possible sites; the most Plaintiffs would say is that "Verizon . . . [was] offering average to above average market rates" in their ultimately failed negotiations with other potential landlords in the area. (*See id.* at 114:10–19, 121:10–21.)

Maintaining confidentiality about this information was necessary, according to Plaintiffs, because as their lawyer, Mr. Rosenthal, explained later in the hearing, "[i]f in fact they allow their proprietary data to be basically published out there, their competitors not only will use it, but will use it to try and block them from acquiring sites to prevent them from getting customers or to hopefully lose customers." (*Id.* at 136:4–12.) Accordingly, Verizon was "very protective" of the details. (*Id.* at 136:13–14.) This frustrated the Commission and at least some residents, who, according to a member of the Commission, were "rubbed the wrong way" by the lack of transparency; more specific details would "allow[] people to understand . . . and maybe have some empathy for what you're trying to request." (*Id.* at 137:5–16.)

When the Commission opened the hearing for public comment, multiple residents voiced objections to the Tower. Chuck Chilicki, the first resident to speak, bewailed the plan to "put[] a cell tower 70 feet from my neighbor's back yard" and asked "How's he ever going to sell this place?" (*Id.* at 37:18–22, 38:11–13.) Mr. Chilicki asked Mr. Layne, the author of the property value impact study, "[w]hat happened to the data from zero feet to half mile? And this is 70 feet, so I'd like some data on 70 feet from a cell tower, does that affect your property value?" (*Id.* at

39:5–10.)   Chillicki, a thirty-year resident of the area, stressed that "we're fighting to preserve" the "character" and "tradition" of the neighborhood, which would be threatened by the "terrible" appearance of cell-towers disguised as trees; he predicted that "[o]ur property values are going to get affected, especially my neighbor who's going to be on top of it."  (*Id.* at 39:17–23, 41:13–20, 42:2–6.)

Other residents expressed similar views.  Multiple people said that they would likely not have moved to Geneva, had they known about the tower.  (*Id.* at 42:11–16, 71:3–9, 109:1–20.) A resident named Mr. Miller claimed that he and his wife had "spent time looking at the PUD" before moving into their Geneva home and had assumed they would "never . . . see a tower or a junk yard or anything else in our backyard."  (*Id.* at 45:21–46:8.)  Another resident, Mr. Van Bredan, claimed that "if it was constructed at that point in time, I would not have bought that property, and neither would my wife."  (*Id.* at 77:6–11.)  At least one resident claimed that "if this deal goes through . . . we talked about strongly considering leaving Geneva . . . ."  (*Id.* at 102:3–5.)

Other residents felt the Tower threatened their community's "character" or aesthetics. (*See id.* at 65:15–22.)   One complained that "we're taking a community – a residential area and we're putting a cell site in there where the cell sites normally are somewhere behind a business." (*Id.* at 45:7–10; *see also id.* at 76:4–17.)  He added that "I've been around cell sites" and had heard promises that "'it's going to be beautiful,'" but believed that instead, "about a year from now the mice will be in there, could be homeless people in there."  (*Id.* at 45:2–6.)  Another resident expressed concerns that the Tower, modeled as a tree, would stand out during the winter because, unlike many of the trees around it, it would not shed its leaves.  (*Id.* at 47:1–5.)  Another noted that he saw the balloon test from his home and that it confirmed for him that the Tower would "stick out like a sore thumb."  (*Id.* 72:1–19.)

Some residents questioned the need for the Tower. Three residents said they were Verizon customers and had not experienced dropped calls. (*Id.* at 52:19–20, 57:11–15, 82:15–19.) Many also questioned Plaintiffs' conclusion that the Tower would not impact property values. One resident—Mr. Miller—pointed to multiple studies submitted before the hearing which showed property-value declines for homes near cell towers. (*Id.* at 48:13–17; Appendix at 502–46.) And at least one resident suspected that the ugliness of the Tower would "draw[] business out of our town . . . ." (*Id.* at 91:17–92:11.) Sylvia Stern reported that she and her husband had driven to the four cell-tower locations Mr. Layne used for his study and found that (as reflected in photos she had emailed earlier) all four sat on undeveloped land with "no adjacent residential properties." (PZ Hearing at 59:23–61:4; Appendix at 423–27.) In contrast, Ms. Stern pointed out that numerous residential areas sat within a few hundred feet of Plaintiffs' proposed site for the Tower. (*Id.* at 61:5–62:11.)

Mr. Shinkle and Mr. Layne both tried to address the public comments. Relying on the Layne study, Mr. Shinkle disputed residents' claims about property values and stressed that the wooded area of Oscar Swan presented the most appropriate location for the Tower—the unappealing (in his view) alternative being a "Christmas Tree in a parking lot." (*Id.* at 114:20–115:1.) Defending his conclusion that the Tower would not reduce property values in Geneva, Mr. Layne observed that as both a "state certified general real estate appraiser" and an employee of Insite (Shinkle's firm), he "wear[s] different hats" when doing appraisal versus representing clients in tower acquisitions, such that he "ha[s] to be impartial and objective" in his valuation practices. (*Id.* at 122:19–123:10.) Next, he claimed that studying home prices exclusively within boundaries closer than a half mile from the already existing cell-towers in the area "limit[ed] the pool of data," making it statistically useless.[12] (*Id.* at 123:11–18.) He admitted that Geneva's four

---

[12]     Layne did not clarify exactly how large his data pool was—or, in other words, how many sold properties lay within a half-mile of the four towers he used as comparators. (*See* Appendix at 114–23.)

then-existing towers were all in "commercial industrial areas," but asserted that there are "some, you know, areas" nearby each of them which contained residential property. (*Id.* at 124:12–24.) He described another, more detailed study he had conducted in Wilmette, Illinois, in which "the tower is located right in the middle of a. . . residential neighborhood," but where he reached a similar conclusion about its effect on property values. (*Id.* at 125:11–21.) And, in response to a question about whether the proposed Tower looked different from the existing ones Layne used for his study, Layne admitted that the other cell towers in Geneva were not designed to look like pine trees, but assumed this only strengthened his conclusion because a monopine tower would be more attractive than a naked metal pole. (*Id.* at 129:8–131:2.)

CDD members responsible for evaluating zoning applications also spoke about the proposal. One of their representatives, a Mr. DeGroot, acknowledged that the City had not proposed alternative sites for Plaintiffs but explained that this was not possible and was not the City's responsibility: "I think it's difficult for the city to do that without having the proprietary data to understand where a tower may be needed." (*Id.* 131:10–18; 132:3–4.) As to fears about dropped 911 calls, Mr. True acknowledged that the CDD had received no such reports and that "the fire department and the police department, they get the reviews for these applications, so usually that's the opportunity for them to chime in if there are any issues and we didn't receive any specific information about that from them at that time." (*Id.* at 132:7–17.)

Ben Evans, a member of a separate consultancy company called "CityScape," which the City regularly contracted to advise on cell-tower applications, also spoke to address comments made at the hearing and defended Plaintiffs' proposal against residents' concerns. As to the Tower's appearance, Evans sought to allay residents' fears by noting that a large number of branches could be added to the tree to make it look "pretty close" to perfect. (*Id.* at 87:15–88:17.)

Near the end of the hearing, but before the vote, the Commissioners shared their own views. Multiple Commissioners criticized Verizon's unwillingness to provide proprietary data. Take the following comments from Commissioner Moran:

> Just a comment to follow up on both Commissioner Evans and Commissioner Mead's thoughts. I understand proprietary data. I understand your unwillingness and frankly legal obligation not to disclose certain things, but it leaves us only with the anecdotal data, the anecdotal evidence that the community has brought to us tonight, a number of whom have indicated they're Verizon customers, that they're not having a problem from their basement, from their porch. It also causes us to draw negative inferences, for instance, from the businesses that you have put emphasis on that would benefit from this. . . . And so without that data, I – I'm struggling to see the need for this.

(*Id.* at 142:14–143:21.) Still, at least one Commissioner pointed out that "since I've been on the commission, we've had at least one cell tower site [proposed by Verizon], maybe two that have been denied in the past." The Commissioner concluded from these requests that demand is "clearly there, you know . . . . there's a service need." (*Id.* at 55:16–56:1.)

At the close of the meeting, the PZ Commission voted unanimously against Plaintiffs, recommending denial of their applications both to amend the PUD and to grant the special-use permit. (DSOF ¶¶ 50–51.) An "Executive Summary" of the PZ decision supplied to the City Council in anticipation of their final decision summarized the Commission's reasons for denying the PUD amendment and special-use permit as follows:

> The Commission found the prohibition of Special Uses upon the Oscar Swan property was intended to maintain very specific and predictable uses to protect residential investment in the vicinity. The Commission also found that PUD Amendments seeking the addition of new uses should be considered when the proposed new use in question could fall within the land use category of the underlying zoning district. In this case, the underlying zoning is the B1 Business District, which supports retail, service, or office.[13] The proposed wireless communication facility does not provide on-site commercial sales or service and therefore should not be considered as a new use in the PUD. Additionally, the Commission found the applicant did not provide sufficient data to support the claim

---

[13] As best as the court can tell, by "new use," the Commission was referring to any use of land that would require amending the PUD. Such "new uses" could either be consistent with the PUD's commercial zoning—retail, say—or divergent, as the Commission evidently felt was the case with regard to a telecommunications facility.

for an additional tower due to existing poor service conditions. Without sufficient data, it was thought the Verizon network could be at capacity, but still operational.

(Appendix at 289–90.)

### III. The City Council Hearing and Decision

On August 8, 2022, a few weeks after the PZ Hearing, TowerNorth sued the City for failing to act within "a reasonable period of time" as required by 42 U.S.C. § 332(c)(7)(B)(ii).[14] (PSOF ¶ 60.) That same night, the City held a special meeting to consider Plaintiffs' applications. (*Id.* ¶ 61.) The Council considered a second report that City staff had prepared, which parroted the Tower-friendly conclusions it drew in the report it presented to the PZ Commission. (*Id.* ¶ 62.) The Council also heard testimony from its own City Manager, as well as three representatives for Plaintiffs who had testified at the PZ Hearing: Mr. Shinkle, Mr. Layne, and Mr. McDaniel. (*Id.* ¶ 64.)

Plaintiffs introduced no new evidence at the hearing, instead emphasizing arguments made earlier concerning the public's increasing reliance on cellphones, worries about the availability of service for emergency calls, their appraiser's conclusions regarding property values, and the like. (CC Hearing at 9:6–15:15.) Mr. Shinkle added that the PUD had been adopted "nine years before the Telecom[munications] Act." (*Id.* at 18:12–16.) With an eye to the TCA's generous language favoring development of wireless telecommunications facilities (and in a preview of the litigation now before this court predicated on that Act), Mr. Shinkle stated, "I don't think it's fair to have the PUD restrict something and overrule what is spelled out . . . in the standards . . . ." (*Id.* at 14:10–15.)

---

[14] The court has since dismissed Plaintiffs' untimeliness claim as moot. (Mem. Op. and Order [43].)

Multiple Council members questioned Mr. Shinkle about Plaintiffs' awareness of the PUD.[15]  (*See id.* at 17:15–16, 57:13–15; 60:18–61:2.)  Mr. Shinkle insisted that Plaintiffs had only learned about it shortly before the first planned PZ Hearing in June 2022.  He stated that Plaintiffs had assumed the City Council and PZ Commission would understand that the 1987 PUD was "outdated" and simply "go by the special use standards" in evaluating their application instead.  (*Id.* at 17:17–18:19.)  In response, one member asked Mr. Shinkle "with you developing these [towers] and – and doing this regularly, whose responsibility is it to know what forms or requests are going to be needed for a specific project?"  (*Id.* at 41:20–42:4.)  Others asked Mr. Shinkle whether Plaintiffs had done a title check on the property, which presumably would have uncovered the PUD; he answered that they had, but did not say whether the title check referenced the PUD, since he had "not review[ed] that personally," and the team that had done so was not present at the hearing.  (*Id.* at 57:13–58:3; 73:10–74:18.)  In the end, Mr. Shinkle characterized the failure to uncover the PUD as "probably a miss on both parts," but explained that Plaintiffs had assumed that "federal law would . . . override" any restrictions like the PUD.  (*Id.* at 42:5–13.)  Later, when pressed as to whether "it is fair to say that the . . . omission was and is owned by TowerNorth," Mr. Shinkle admitted "I think that when we filed in December and we were working with the city, I think we should – yes.  We should have . . . ."  (*Id.* at 76:22–77:9.)

Other Council members echoed citizen concerns about Mr. Layne's property study.  One, questioning the study's focus on towers in Geneva—all of them in areas at greater distance from residents than the Oscar Swan location—noted that "what I'm saying is it doesn't matter to me that – if it's in Geneva or Batavia or St. Charles.  What matters to me is that what happens when you have a cell tower 50 feet from your backyard."  (*Id.* at 39:13–17.)  Another challenged Mr.

---

[15]     The parties have devoted considerable attention to this issue; the City perhaps believes Plaintiffs' tardy discovery of the PUD explains the City's delay in acting on Plaintiffs' application—a delay that Plaintiffs have asserted requires a ruling approving their proposal.  So long as the provisions of the PUD are enforceable, the court is less certain that the timing of Plaintiffs' knowledge of the PUD is directly relevant to the issues in this motion.

Layne's methodology, noting that it "could've been a lot of factors, you know," that influenced property values, such that even if the properties were of similar values nearer to the tower, "[m]aybe [a property] would've increased more without the tower." (*Id.* 48:20–49:3.) In response to these challenges, Mr. Layne maintained that it was not possible for a study to get at such nuances due to insufficiencies in the data. (*See id.* at 49:14–21.)

Council members also challenged Plaintiffs' statements concerning the allegedly imperiled state of Verizon's network in the area. (*Id.* at 44:10–46:16.) One elicited an admission from Verizon's RF Engineer, Mr. McDaniel, that "911 calls [are] prioritized [over other calls] on the cellular network" (*id.* at 45:4–9), and observed: "I just think it's a little frustrating to hear you use those emotional sort of context[s] there, talking about elderly people having cell phones and things like that when, you know, we know that 911 calls are prioritized, and that's really not an issue here that is going to make a difference probably with the new tower." (*Id.* at 46:10–16.)

Finally, the importance of the Oscar Swan location—as opposed to alternative sites—drew scrutiny. When asked if "there is no alternative" to the Oscar Swan location, Mr. Shinkle replied "Well, what I'm saying is that this meets all the requirements. And we think it's a great site. It's in the area and it checks all the boxes." (*Id.* at 19:10–20.) The lack of details continued to frustrate the Council. For example, when pressed on the fact that the propagation study (which mapped how and where coverage would expand after placing the Tower at Oscar Swan) did not appear to show that siting the Tower there would prompt a "significant[] [coverage] improve[ment]" in the Geneva Commons area, Mr. McDaniel stressed that "[w]ell, based on our analysis, it will. It will be the dominant server . . . in that location." (*Id.* at 32:14–17, 34:12–14.) Taking up the mantle, Mr. Shinkle then described the map as "just to help – it's a guide to show. It's not specific. It's not as detailed as the actual coverage. It's the – the narrative that [Mr. McDaniel] provided in the affidavit and in [his] testimony that [sic] how Oscar Swan meets it. We shouldn't – the guide – the map isn't carved in stone . . . ." (*Id.* at 34:18–35:1.) To this, a Council member responded: "Okay.

I typically like my guidance to be fairly accurate when I'm looking at it to make a decision." (*Id.* at 35:7–9.)

The Council voted unanimously to deny Plaintiffs' applications, both as to the PUD and as to the special use permit. (DSOF ¶ 59; PSOF ¶ 65.) The following day, the Council followed up with written findings justifying its denials. (PSOF ¶ 66; Appendix at 554–56.) The document's findings read as follows:

> 1. The City Council adopts and incorporates herein by reference each of the specific reasons and findings set forth in the Prior Denial issued by the Planning and Zoning Commission on July 14, 2022.

> 2. The City Council specifically further finds that TowerNorth presented no evidence or rationale to amend the PUD's Special Use prohibition.

> 3. In rendering its decision, the City Council has again specifically excluded from its consideration or reasoning for denial any comments, statements, submissions, or any other materials or information regarding any potential adverse health concerns or effects over radio frequency (RF) emissions, other than to seek certification from TowerNorth that TowerNorth's application complies with applicable federal standards contained in 47 CFR 1.1310.[16]

> 4. Without limiting any of the foregoing, the City Council's findings are further reinforced and supplemented by the additional non-health related statements, representations and comments received from the public at the public hearing on July 14, 2022, with respect to the adverse aesthetic and visual impacts of [the] proposed Cell Tower stemming from the unique and undisturbed natural and bucolic nature of the proposed location which immediately abuts a residential neighborhood, the visual eyesore associated therewith, the adverse impacts on local property values, and TowerNorth's demonstrated failure to consider less intrusive alternatives.

> 5. Without limiting any of the foregoing, the City Council's findings are also reinforced by additional statements, representations and comments received from TowerNorth at the City Council meeting on August 8, 2022, including, without limitation:

> > a. TowerNorth's admission that TowerNorth had a title report run on the Property and knew, or should have known, of the prohibition of Special Uses on the Property;

---

[16] The Telecommunications Act prohibits State and local governments from considering health and other effects of RF emissions in making decisions about wireless-facility placement, as long as the facility's emissions fall within the limits the FCC has announced. 47 U.S.C. § 332(c)(7)(B)(iv); *see also* 47 CFR 1.1310 (announcing emissions standards).

b. TowerNorth did not genuinely consider one or more other site alternatives; and

c. That upon further review and consideration it may be feasible for TowerNorth to achieve the same or substantially similar coverage objectives via a more appropriate location and/or via other less intrusive means and alternatives, [but] TowerNorth was not prepared to further consider, amend or negotiate the final proposed location, or design.

(Appendix at 555–56.)

## IV. Procedural Background

After the Council's denial of its application, TowerNorth filed this lawsuit. Count I alleged that the City's decision was untimely under 47 U.S.C. § 332(c)(7)(B)(ii), which requires that a government unit act on a request like Plaintiffs' "within a reasonable period of time after the request is duly filed . . . ." Count II alleged that the City's refusal to amend the PUD (and its delay in making its decision on the application) violated 47 U.S.C. § 253(a), which prohibits state and local regulations from "prohibit[ing] or hav[ing] the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." (*See* Compl. [1].) A month later, TowerNorth amended its complaint to add two new counts. As before, Count I alleged unreasonable delay; Count II alleged that the City's denial of the special use permit was not supported by substantial evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii); Count III alleged that the City's denial of the special use permit violated 47 U.S.C. § 332(c)(7)(B)(i)(II), which prohibits State and local decisions about the placement of wireless facilities from "prohibit[ing] or hav[ing] the effect of prohibiting the provision of personal wireless services"; and Count IV restated TowerNorth's claim under 47 U.S.C. § 253(a). (*See* First Am. Compl. [4].) On September 27, 2022, the court granted TowerNorth leave to add Verizon as a plaintiff in a second amended complaint. (Second Am. Compl. [11]; Minute Entry [10].) Plaintiffs asked the court to "[i]ssue an injunction or writ of mandamus compelling and ordering the City to grant the amendment of the PUD and the Special Use Permit," along with any other relief the court deems proper. (Second Am. Compl. at 29–30.)

Defendant moved to dismiss Counts I and IV under FED. R. CIV. P. 12(b)(6). (Mot. to Dismiss for Failure to State a Claim [17].) On September 30, 2023, the court granted Defendant's motion to dismiss Count I as moot, while noting that the City's allegedly unreasonable delay would be relevant "only in determining whether, should Plaintiffs prevail on Counts II or III . . . the court should remand or simply overrule the City's denial." (*See* Mem. Op. and Order [43] at 9–12.) Defendant had also moved to dismiss Count IV on the grounds that there is no private right of action to enforce 47 U.S.C. § 253(a). The court denied that portion of the motion without prejudice, postponing definitive ruling on the Count IV private-right question until the summary-judgment stage. (*Id.* at 12–20.)[17] Accordingly, before the court are the parties' cross-motions for summary judgment on Counts II–IV of Plaintiffs' Second Amended Complaint.

## DISCUSSION

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," the dispute is genuine. *Lord v. Beahm*, 952 F.3d 902, 903 (7th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In making such a determination, the court views the facts "in the light most favorable" to the nonmoving party. *Lord*,

---

[17] The court did, however, note several concerns about this issue. First, § 253(a) does not appear to create a private right of action for its enforcement. (*Id.* at 12–18.) Nor is it clear that, as Plaintiffs argue, the Supremacy Clause nonetheless permits the court to hear a preemption case through its equitable powers. (*Id.* at 18–19.) There was, however, no obvious need to resolve Count IV, which dealt only with the PUD amendment, absent a definitive resolution in Plaintiffs' favor on the special-use denial, addressed in this opinion. (*Id.* at 19–20.)

952 F.3d at 903.  Finally, whether facts are material is dictated by the substantive law at issue in the case.  *Anderson*, 477 U.S. at 248.

## I.      Overview of the TCA

In 1996, Congress passed the TCA to "reduce regulation . . . and encourage the rapid deployment of new telecommunications technologies."  Pub. L. No. 104-104, 110 Stat. 56, Preamble (1996); *see also Reno v. ACLU*, 521 U.S. 844, 857 (1997).  The Act "fundamentally restructures local telephone markets."  *AT & T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 371 (1999).  Though the Act is aimed at minimizing regulatory hurdles to development, it maintains, subject to limitations, "the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities." 47 U.S.C. § 332(c)(7)(A).

Both counts that the court resolves below arise under the TCA, and each requires a hard look at the City's decision to deny the permits Plaintiffs sought.  However, each count requires assessing the City's decision under a different evidentiary standard.

## II.     Count II – Substantial Evidence

The TCA demands that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record."  47 U.S.C. § 332(c)(7)(B)(iii).  Rather than limiting local regulatory power, "[t]he TCA's substantial evidence test is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable [local] zoning requirements."  *VoiceStream*, 342 F.3d at 830 (quoting *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002)).

The substantial evidence standard is the same as that which applies to a court's review of administrative agencies' decisions.  *Helcher v. Dearborn County*, 595 F.3d 710, 723 (7th Cir. 2010) (citing *PrimeCo Pers. Commc'ns, L.P. v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir.

2003)).  That standard is "highly deferential" to local authority.  *Helcher*, 595 F.3d at 723 (citing *VoiceStream*, 342 F.3d at 830).  To survive challenge, the decision need only be backed by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *VoiceStream*, 342 F.3d at 830 (quoting *Aegerter v. City of Delafield, Wisconsin*, 174 F.3d 886, 889 (7th Cir. 1999)).  The court looks to the "evidence in the record support[ing] the Board's decision" to determine whether the City "clearly erred in refusing to issue the permit."  *Helcher*, 595 F.3d at 723.  The clear-error standard implies "less than a preponderance, but more than a scintilla of evidence."  *Cellular Tel. Co. v. Tower of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999) (quotations omitted).

Unlike typical summary judgment motions, when a court reviews a regulatory body's decision under a substantial evidence standard, "the 'trial' has already taken place" and a closed factual record already exists.  *Helcher v. Dearborn County*, 500 F. Supp. 2d 1100, 1108 (S.D. Ind. 2007), *aff'd*, 595 F.3d 710 (7th Cir. 2010).  "Essentially, the district court serves in an appellate function [as] the trial of sorts has already occurred through the local board's decision."  *New Cingular Wireless PCS, LLC v. Monroe Cnty. Bd. of Comm'rs*, 632 F. Supp. 3d 845, 849 (S.D. Ill. 2022).  Looking to that record, the court thus asks whether the municipality's record demonstrates that substantial evidence supported its denials, not whether there is a genuine issue of material fact.

Neither party devotes great attention to whether substantial evidence justified the City's decision not to amend the PUD.  Instead, the parties focus on the denial of Plaintiffs' special-use application.  While the two inquiries are intertwined, the court addresses the City's reasons for each denial separately.

24

### A.      Refusal to Amend the PUD

The City gave multiple reasons for refusing to grant Plaintiffs' application to amend the PUD.  First, the City adopted the PZ Commission's findings (Appendix at 555), which, in relevant part, read as follows:

> The Commission . . . found that PUD Amendments seeking the addition of new uses should be considered when the proposed new use in question could fall within the land use category of the underlying zoning district.  In this case, the underlying zoning is the B1 Business District, which supports retail, service, or office.  The proposed wireless communication facility does not provide on-site commercial sales or service and therefore should not be considered as a new use in the PUD.

(*Id.* at 290.)  Beyond approving that finding, the City Council offered several additional comments relevant to its decision.   First, Plaintiffs "presented no evidence or rationale" to justify the requested amendment.  Second, without explicitly explaining the significance of this issue, the City asserts that because Plaintiffs had run a title report on the Oscar Swan property, they "knew, or should have known" of the PUD.  And, finally, the City noted that Plaintiffs might achieve "the same or substantially similar coverage" in a location "more appropriate" for their purposes, but they had not looked for or seriously considered one.  (*Id.* at 555.)  As the court understands it, then, the City denied Plaintiffs' request for an amendment to the PUD for two reasons:  that a cell tower would be a significant departure from the land uses for which the PUD was established, and that Plaintiffs had not mounted evidence sufficient to justify such a change.

With respect to the City's first reason, there is adequate evidence to support the conclusion that a wireless facility would mark a significant departure from the zoning purposes to which the Oscar Swan location was subject, regardless of whether special uses as a whole are permitted. The two parcels on which the property sits are zoned as "B-1" for business purposes, with the land use dedicated to "[c]ommercial [r]etail," and the zone's comprehensive plan encompassing "[c]ommercial [s]ervice, [r]etail, [and o]ffice" use.  (Appendix at 302, 555; PSOF ¶ 26.)   In an exchange at the City Council hearing, Mr. Shinkle admitted that wireless facilities did not fall into these categories:

[Council Member] MALADRA: What – what made you think that [the PUD's] restrictions would be no longer applicable?

MR. SHINKLE: Well –

MR. MALADRA: Aside from the fact that you want to put a cell phone tower there?

MR. SHINKLE: Well . . . what we felt was that the PUD was back in the '80s nine years before the Telecom Act and it didn't account for the need for a wireless network or the need for new wireless facilities that we're proposing. So we thought that the planning and zoning commission and city council would see that as outdated and go by the special use standards.

MR. MALADRA: But the – the cell tower, in – in terms of use type, it's not a commercial use, it's not a retail use, it's not a residential use. The closest comparison would be it's a utility use.

MR. SHINKLE: Mm-hmm.

(CC Hearing 18:5–19:3.) Because the cell tower did not fall within the "land use category of the underlying zoning district," the amendment to the PUD Plaintiffs sought was a departure from the land uses the PUD sought to preserve. (*See* Appendix at 555.)

Plaintiffs point to the fact that the Geneva Code allows for "a wireless communications facility [to] be located in a B-1 district as a special use." (Pl.'s Mem. of Law in Support of Mot. for Summ. J. on All Counts (hereinafter "PSJ") [32] at 15–16; *see* GENEVA CODE § 11-3-12(E)(2)(f)(iii) (accepting, near the bottom of the City's hierarchy of siting possibilities, "[c]oncealed freestanding towers" on "non-public property in any zoning district").) They also stress that the City staff report concluded that, though the cell tower would fall outside the retail-related land-use categories appropriate to a B-1 district, it would be a "utility" and that it "would be considered more of an ancillary use with the potential to support communication and commerce in the vicinity with the increase in wireless communication service." (PSJ at 16 (quoting Appendix at 304).)

Neither of these concerns satisfies the court that the City lacked evidence sufficient to support denial. That the Code contemplates the possibility that a cell tower could exist in "any zoning district" says nothing about whether the tower's placement would harmonize with land

26

uses associated with the particular zoning district at issue.  And the City staff's statement, read as a whole, explicitly concludes that placing the Tower on Oscar Swan would stray from the typical uses of the land:

> The Geneva Comprehensive Plan identifies the subject property as "Commercial Service, Retail, Office".  The Comprehensive Plan does not provide specific details as to the desired character for the subject property or surrounding area, aside from the designated land uses.  Generally, the Commercial Service, Retail, Office designation is intended to support neighborhood vitality by supporting small-scale retail and service options to the surrounding community.

(Appendix at 304.)  Further, as noted, the City described the proposed Tower as a "utility service that will not generate commerce" but would instead "support communication and commerce . . . ."  *Id*.  The City thus concluded that the special use at issue was not in keeping with the PUD's underlying goals.  The court cannot say the City clearly erred in concluding that amending the PUD to allow a cell-tower on the property was unjustified on that basis.

Secondly, the City did not clearly err in concluding that Plaintiffs had failed to establish sufficient need to justify amending the PUD.  At least some record evidence suggests that there were potential alternative sites for the Tower, outside the PUD, and that residents were not in fact having difficulty with telecommunications access.  At the PZ hearing, Mr. Shinkle called the Oscar Swan location Plaintiffs' "primary" spot, the "most obvious site that meets [City] requirements," and "a solid site."  (PZ Hearing at 6:6–8, 13:2–4, 116:6–7.)  But when asked directly at the City Council hearing whether there was "no alternative" to the Oscar Swan site, Shinkle responded by saying simply "[w]ell, what I'm saying is that this meets all the requirements.  And we think it's a great site.  It's in the area and it checks all the boxes."  (*Id.* at 19:10–20.)  These statements could reasonably be understood to imply that Plaintiffs had considered but rejected alternative sites.

Moreover, Plaintiffs' comments about their coverage gap and the need for the Tower were often equivocal or vague.  For example, they repeatedly refused to provide further details about their site search, calling those details proprietary information.  (PZ Hearing at 33:1–4, 34:2–13, 36:1–6, 114:10–19, 121:10–21).  Mr. Shinkle described Plaintiffs' propagation study, which

showed the coverage gap—and purports to show how siting the Tower at Oscar Swan would fill that gap—as "a guide" that was "not specific . . . not as detailed . . . [and not] carved in stone . . . ." (CC Hearing at 34:18–35:1.) The City also heard testimony from multiple Geneva residents at the PZ hearing who averred that they were Verizon customers and had experienced no dropped calls. (PZ Hearing at 52:19–20, 57:11–15, 82:15–19.) Given this evidence, it was not clear error for the City to discount, at least to some degree, Plaintiffs' claimed need to overwrite the PUD ordinance. *See Helcher*, 595 F.3d at 723 (noting there is "no practical difference" between the TCA's substantial evidence standard and clear error review).

As noted, the parties devote substantial attention to the question of when Plaintiffs learned about the PUD restrictions. Plaintiffs admitted at the City Council hearing that the burden fell on them to uncover land restrictions on the property they sought. Mr. Shinkle reported that Plaintiffs had in fact run a title check on the property; they did not, however, share the title report with the City Council at any time. (*See* CC Hearing at 57:13–58:3.) Mr. Shinkle further admitted that the failure to uncover the PUD was "a miss on both parts" and, in response to a Councilmember's asking about Plaintiffs' own responsibility for this miss, agreed that Plaintiffs "should have" discovered it before they did. (*Id.* at 42:5–13, 76:22–77:9.) The parties have not explicitly addressed the relevance of this concern (presumably the PUD restrictions are enforceable whether or not the Plaintiffs were aware of them), but perhaps the City concluded that, had Plaintiffs known Oscar Swan was subject to the PUD, Plaintiffs might not have discounted alternative sites that were otherwise "more appropriate" during their initial search. (*See* Appendix at 555.)

Plaintiffs argue that the record demonstrated ample need for the Tower. They point out that the wireless landscape has changed, stressing that cell-phone use has risen dramatically in the decades since the PUD was created in 1987. (PSJ at 9.) They also highlight Verizon's RF Engineer's affidavit recounting Plaintiffs' coverage deficiencies in Geneva, and Mr. Shinkle's

testimony at the hearing to the same effect, as evidence of Verizon's compelling need to place the tower on the Oscar Swan location. (*Id.*) And Plaintiffs stress that "Illinois courts have long held that amendments to zoning ordinances can be made, particularly if required for the public good." (*Id.* at 16.) The Illinois Supreme Court case they cite supports this assertion only in an oblique way. See *Bohan v. Village of Riverside*, 9 Ill.2d 561, 567, 138 N.E.2d 487, 491 (1956) (observing that "plaintiffs have a right to rely upon the classification of property and that classifications will not be changed unless required for the public good"), Plaintiffs also note language in an Illinois appellate case, but that case says only that residents have "no absolute right in the continuation of a zoning classification." *Thompson v. Cook Cnty. Zoning Bd. of Appeals*, 96 Ill. App. 3d 561, 577, 421 N.E.2d 285, 298 (1st Dist. 1981).

None of these arguments neuter the evidence the City had before it when considering Plaintiffs' request for a PUD amendment. As stated, Verizon customers who reside in Geneva denied having experienced dropped calls, and Mr. Shinkle's testimony fairly implied the existence of alternative sites. A reasonable mind could hear this evidence—which cast at least some doubt on Plaintiffs' need for the site—and conclude that the public good did not *require* amending Geneva's zoning laws to allow construction of a wireless tower on the Oscar Swan location. *See VoiceStream Minneapolis, Inc. v. St. Croix County*, 212 F. Supp. 2d 914, 933 (W.D. Wis.), *aff'd*, 342 F.3d 818 (7th Cir. 2010) ("[R]easonable minds could conclude that the board had adequate evidence before it to support its decision to deny plaintiff's application . . . .").

In sum, to the extent their asserted need to fill a coverage gap militates toward overriding the PUD, Plaintiffs' failure to discover it before applying (to the extent such failure influenced Plaintiffs' search process), paired with their equivocal statements about alternative sites, gave the City sufficient fodder to question the City's need to amend its zoning law. There was thus sufficient evidence in the record for the City to conclude that neither local zoning requirements nor Plaintiffs' proffered proof of need required acceptance of their request to amend the PUD.

29

**B.      Denial of the Special Use Application**

The question is closer for the City's denial of the special-use application.  The City justified

that denial on three grounds, each of which the parties vehemently dispute.  First, the City adopted

evidence from the Zoning hearing concerning "the adverse aesthetic and visual impacts of [the]

proposed Cell Tower stemming from the unique and undisturbed natural and bucolic nature of the

proposed location which immediately abuts a residential neighborhood"; second, the "adverse

impacts on local property values"; and third, deficiencies in Plaintiffs' proof, both as to their need

for the Tower and as to their "demonstrated failure to consider less intrusive alternatives."

(Appendix at 290, 555.)   The court addresses these concerns below.

**1.      Aesthetic Impact**

"[A]esthetic harmony is a prominent goal underlying almost every [zoning] code."

*VoiceStream*, 342 F.3d at 831 (quoting *Aegerter*, 174 F.3d at 891).  Accordingly, "aesthetics may

constitute a valid basis for denial of a wireless permit if substantial evidence of the visual impact

of the tower was before the board."  *Id.*  That said, as "[f]ew people would argue that

telecommunications towers are aesthetically pleasing," residents will almost always raise

aesthetic objections of some nature.  *Id.* (quoting *Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51,

61 (1st Cir. 2001)).  To weigh against the requested permit, then, the evidence cannot simply be

residents' "generalized aesthetic concerns"—for example, "[a] blanket opposition to poles"—but

must instead comprise concerns "grounded in the specifics of the case . . . ."  *Helcher*, 595 F.3d

at 723.

Much of the City's evidence about the Tower's aesthetic impacts amounted to generalized

concerns.  Though numerous residents complained about the Tower's visual impact, few of them

tied those claims to specific photographs or personal observations.  For example, one resident

speculated from his personal experience ("I've been around cell sites") that "[proponents would

promise that] it's going to be beautiful and then about a year from now the mice will be in there,

30

could be homeless people in there." (PZ Hearing at 45:2–6.) And another stressed a cell-phone tower's threat to the "character" and "tradition" of the neighborhood, due to the "terrible" appearance of cell towers disguised as trees. (*Id.* at 39:17–22, 41:13–24.) But these concerns are speculative, not specific; they do not explain how this Tower, in this location, would be aesthetically displeasing. *Cf. VoiceStream*, 212 F. Supp. at 933 (finding substantial evidence of aesthetic impact in photos residents submitted and maps the Park Service created, despite the fact that "some of the comments from the public consisted of general statements that the tower was an eyesore").

Some evidence, though, was more grounded in specifics. For example, one resident pointed out—and Plaintiffs admitted—that at 100 feet, the tower would be taller than surrounding structures and trees, which ranged from forty to sixty feet tall. (PZ Hearing at 63:9–64:17; Appendix at 447; CC Hearing at 26:3–15.) In that vein, one resident noted that "a 60-foot tree would represent like the . . . . very maximum maturity age, which takes decades, and decades, and decades to achieve that," and that the tree line was more likely to be thirty to forty feet high, presenting aesthetic concerns "especially during the winter," when the branches of the surrounding deciduous trees were bare and the fake tree's branches were not. (PZ Hearing at 106:19–107:8.) Another resident testified that he watched the balloon test from his home and concluded that the Tower would "st[i]ck out like a sore thumb, and this [wa]s in the summertime, spring, summertime, full foliage from both backyard to side yard, front of the house, a couple doors down." (PZ Hearing at 71:22–72:19.) And at least one resident who reported living within 200 feet of the proposed Tower claimed that the Tower would be "very visible from the backyard of my property." (*Id.* at 78:5–24.) Another pointed out that the Tower was just seventy feet from the nearest property line (the house itself being just 160 feet away). (*Id.* at 37:18–22, 38:11–13; Pl.'s Resp. – DSOF at 5.)

Though it is a close question, the court concludes that it was not clear error for the City Council to conclude, from this evidence, that the Tower would have a net negative aesthetic impact on Geneva.   Three Seventh Circuit cases are instructive.   First, in *PrimeCo*, the Seventh Circuit affirmed summary judgment for a telecommunications provider, unmoved by the City's appeal to aesthetic concerns.   The proposed seventy-foot tower was to be disguised as a flagpole and placed in an industrial-zoned area, behind a church, that also accommodated residential uses.   352 F.3d at 1150.   Three or four residents testified against the tower, but their objections only amounted to "that they don't like poles in general; they didn't say they would object to a flagpole in the church's backyard," as was specifically being proposed.   *Id.*

On the other end of the spectrum, in *VoiceStream*, the Seventh Circuit affirmed summary judgment for the County of St. Croix, Wisconsin, finding that substantial evidence of aesthetic harm justified the County's refusal to permit construction of a 185-foot tower on a bluff overlooking the Lower St. Croix National Scenic Riverway.   342 F.3d at 821–23.   There, rather than "speculation or conjecture," the County had specific evidence: an "on-site investigation"; a "map prepared by the Park Service based on VoiceStream's crane test" showing "that the 185-foot tower would be visible for several miles along the Riverway"; photographs taken from the crane test which showed the tower "predominat[ing] the landscape of the bluff overlooking the Riverway"; and testimony from individuals who had observed the crane test and concluded that the tower would "interfere with the unique scenery" of the area.   *Id.* at 832.

Finally, in *Helcher*, the Seventh Circuit affirmed a partial grant of summary judgment for Dearborn County, Indiana, upholding denial of Cincinnati Bell Wireless, LLC's application for approval to place a 190-foot cell tower on private property there.   595 F.3d at 713–14.   The property was not historic but was part of an "otherwise bucolic landscape."   *Id.* at 724.   Bell had conducted a balloon test and claimed a 190-foot tower was necessary to be "high enough to overcome issues with tree foliage and winding roads," and the consultant hired by the zoning

32

board to assess the application recommended approval. *Id.* at 719–20. Aesthetic evidence *against* the tower mainly came from two neighboring residents, the Codys, who presented photographs showing how the tower would look from nearby residences and made "software-enhanced photographs based on those taken during Bell's balloon test, modified to show a scaled, graphical representation of the proposed tower." *Id.* at 720. Multiple other residents discussed their fears that the proposed tower would threaten the character of the neighborhood. *Id.* Affirming denial of the permit in part on aesthetic grounds, the court described the photographs as showing that the tower looked like the "Martian machine from H.G. Wells' 'War of the Worlds,' marring a landscape of forests and farms," and found that "[t]he photographic representations of the tower as viewed from the property of the Codys and other neighbors, accompanied by the objections of many residents who purchased land and built homes in this area specifically because of the natural views," constituted substantial evidence to deny Bell's permit on aesthetic grounds. *Id.* at 724. This conclusion was strengthened by the fact that the tower "would rise high above the tree line, completely out of character with any other natural or man-made structure in the vicinity." *Id.* at 725.

The evidence in this case falls somewhere between *Helcher* and *PrimeCo*. Here, unlike in *PrimeCo*, the City heard concrete, Geneva-specific aesthetic complaints from residents: the tower's height as compared to surrounding trees and buildings; the tower's visibility as observed during the balloon test; and the fact that neighboring trees were deciduous and would lose their leaves in winter, making the monopine more visible. *See Omnipoint Comms. v. White Plains*, 430 F.3d 529, 533 (2d Cir. 2005) (finding substantial evidence for denial where tower was "half again as tall as any other tree in the area" and where carrier's crane test was "defective" because it was only conducted on public ways, not from residents' backyards, and did not "consider the tower's visibility in winter, when deciduous trees are bare"). The City also heard from multiple residents claiming, as did the neighbors in *Helcher*, that they purchased property in Geneva for its bucolic

33

character, and even in some cases threatening to move out if the Tower were built. (*See* PZ Hearing at 42:11–16, 45:21–46:6, 71:3–7, 77:6–11, 84:5–9, 102:3–5, 109:1–20.)  Additionally, at least some photographic mockups Plaintiffs provided in their application show the Tower plainly visible, such that it would not be patently unreasonable or erroneous for a city official to conclude it would interfere with the City's aesthetics:



BEFORE



AFTER



BEFORE



AFTER

(Appendix at 135, 169.)  Though no residents made their own photographic mock-ups of the tower, some testified beyond mere speculation or generalized dislike of towers.

Plaintiffs point out that City staff concluded that "even in winter" the tower would have a minimal visual impact, suggesting this ought to change the court's calculus.  (Reply in Support of Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s Reply – PSJ") [39] at 1.)[18]  But this does not undercut

---

[18]     Plaintiffs also cite two cases from district courts in other circuits finding that different localities lacked substantial evidence to deny cell-tower permits.  (*See* Pl.'s Mem. of Law in Opp. to Def.'s Mot. for Summ. J. (hereinafter "Pl.'s Resp. – DSJ") [34] at 3–4 (citing *Vertex Dev., LLC v. Marion Cnty.*,  No. 5:07-cv-380-Oc-10GRJ, 2008 WL 2994259 (M.D. Fla. Aug. 1, 2008); *Cellco P'ship  v. Town of Clifton Park*, 365 F. Supp. 3d 248 (N.D.N.Y. 2019)).)  Both those cases involved less specific objections levied against the respective towers than those raised in this case, and neither controls this case's outcome.  Due to the fact-intensive and deferential

evidence the City could reasonably have relied on for the opposite conclusion.[19]  For one, the City was under no obligation to accept the broader conclusions of its staff regarding the Tower's minimal visual impact.  *Helcher*, 595 F.3d at 715, 724 (finding substantial evidence undergirded County's denial of tower permit despite recommendation to the contrary from the County's consultant).  Moreover, Plaintiffs ignore the fact that while characterizing the visual impact as "minimal," the City staff report nevertheless concluded that the Tower "will be more visible in the winter months when the surrounding trees lose their leaves."  (Appendix at 211.)    It would not be unreasonable for the City to heed this conclusion.

In sum, the relevant evidence was, even if not overwhelming, sufficient for a "a reasonable mind" to conclude that the Tower's appearance could disturb the neighborhood's aesthetics or character.  *VoiceStream*, 342 F.3d at 830.

## 2.    Impacts on Property Values

A local government may refuse to build a telecommunications facility if it decides—backed by substantial evidence, as the TCA requires—that the facility will negatively impact local property values.  *See Aegerter*, 174 F.3d at 890 (where "[o]ther evidence in the record indicated that . . . a new, modernized tower would affect property values in the area," finding that city's decision to deny permit was backed by substantial evidence); *see also PrimeCo*, 352 F.3d at 1149 (pointing out that "[a] reasonable decision whether to approve the construction" of wireless facilities requires balancing the tower's likely contribution to cellphone service with "the aesthetic or other harm" it threatens, including common concerns as to "unsightliness . . . and the adverse effect on

_____

process required to apply the substantial evidence standard, the court hews largely to in-circuit precedent.

[19]    Plaintiffs argue that the unclarity on the issue of the Tower's visibility in winter is largely of the City's doing, as City staff delayed the balloon test until May so that it could be performed in good weather.  (Pl.'s Reply – PSJ at 1.)  Still, residents' concerns that the surrounding trees would shed leaves and expose the Tower were based on knowledge of the deciduous trees populating their neighborhood as opposed to mere speculation.

property values that is caused by its unsightliness"). As long as enough evidence exists in the record for a reasonable mind to conclude that the Tower would negatively affect property values, then, the City could appropriately have relied on it when denying Plaintiffs' application.

Importantly though—and similar to the discussion of aesthetic concerns above—"[g]eneralized, nonexpert objections . . . that the proposed tower would adversely affect property values" cannot serve as the sole evidentiary basis for a permit denial. *Ill. RSA No. 3, Inc. v. Cnty. of Peoria*, 963 F. Supp. 732, 745 (C.D. Ill. 1997); *see also VoiceStream*, 212 F. Supp. 2d at 933 (discounting "general statements that the tower . . . would have a negative impact on property values" absent more specific evidence). Once again, some of the evidence the City heard concerning property values was generalized and thus insufficiently concrete. For example, numerous residents testified at the hearing or wrote letters in anticipation thereof expressing general fears about their properties' losing value. (*See, e.g.,* PZ Hearing at 42:2–6; Appendix at 427–30, 432–45.) Without tying these fears to something concrete—expertise in real-estate pricing, for example—such evidence is speculative and cannot alone be sufficient to justify the City's decision. *See RSA*, 963 F. Supp. at 745.

The City does, however, identify four pieces of evidence it claims offer more specific support of the decision to deny Plaintiffs' permit application. (*See* Def.'s Mem. in Supp. of its Mot. for Summ. J. on Counts II, III, and IV of Pl.'s Second Am. Compl. (hereinafter "DSJ") [29] at 7–8.) First, Tiffany Riehle, a local real-estate broker of fifteen years, sent the City Planner a copy of a form used by real estate brokers in "estimat[ing] [a] subject property's Most Likely Sales Price." (Appendix at 460–62.) The form includes a checklist, one item on which is the home's "[l]ocation near/in view of power lines/water towers/radio towers." (*Id.* at 462.) In a cover letter, Ms. Riehle noted that nearby cell towers are among "red flags that stigmatize a potential property," both due

to appearance and perceived health risks.[20]  (*Id.* at 460.)  Second, an architect expressed the "opinion" that the Tower "would decrease the marketability of residential properties in the immediate area of the structure when compared to residential properties outside the visible radius of the tower."  (*Id.* at 478.)  Third, multiple residents claimed that they would not have moved to Geneva if they had known about the tower.  (PZ Hearing at 42:11–16, 71:3–9, 109:1–20.)  And fourth, a resident submitted—and testified about—three published studies from other states which concluded that cellphone towers negatively impacted property values.  (Appendix at 502–46; PZ Hearing at 48:13–18.)

There is no indication that the architect had particular expertise, and the residents' general claims that the Tower would have kept them from moving to town may not be compelling.  But other evidence goes beyond mere generalized concerns.  First, Ms. Riehle, a local broker with more than a decade of experience asserted that cell towers are "red flags," and that at least some residents in Geneva selected their homes with the knowledge and desire that cell towers not surface in the neighborhood.  Residents' testimony at the hearing supported this conclusion.  And the three published studies of home sale prices noted a statistically significant decline in the value of homes proximate to cell towers: the first, a 7.6% decline within 500 feet of the tower, with a statistically significant decline until 1,500 feet; the second, somewhere between 2.65% and 9.78%, depending on the tower's visibility, when it was built, and proximity (within .72 kilometers, or about a half mile); the third, a "minimal" but "statistically significant" decline within about 600 feet.  (*See* Appendix at 507–08; 529; 537, 542–43.)

Plaintiffs contend that Mr. Layne's Property Value Impact Study is the only relevant evidence directly bearing on the Tower's impact on home prices specifically in Geneva.  In part, this is true: no other studies were done in Geneva.  But the case law does not appear to require

---

[20]     As noted earlier, *see* n. 16 *supra*, federal law prohibits denial of applications based on concerns about wireless facilities' health effects, providing their radio-frequency emissions are below the federal maximum.  *See* 47 CFR 1.1310.

the City or its residents to hire an appraiser or conduct a localized study in order to draw reasonable conclusions about property values declining around a cell tower. For example, the City was presented with three studies which detailed their methodologies, looking at housing prices before and after towers were built (albeit in different states), and finding declines in value in all three instances when those towers were close by. And, as discussed above, the City had evidence that the proposed Tower would be visible, at least to some residents. *See PrimeCo*, 352 F.3d at 1149 (noting that "[t]he unsightliness of the antenna and the adverse effect on property values *that is caused by its unsightliness* are the most common concerns") (emphasis added).

Discounting the significance of this, Plaintiffs cite *Michael Linet, Inc. v. Village of Wellington, Florida*, 408 F.3d 757 (11th Cir. 2005). In that case, affirming a Florida village's denial of a carrier's application to build a cell tower, the Eleventh Circuit criticized the telecommunications company's reliance on a study conducted in New Zealand that found no decline in property values resulting from the construction of cell towers. A study of such remote property was of little use, the court said; "residents were worried about the impact of this tower on the golf course within their community, not a different tower, different location, or different community." *Id.* at 762. Mr. Layne's study, in contrast, did consider Geneva-area cell towers and their impact on property values. But the *Michael Linet* case provides support for the City's position as well; the court there found substantial evidence for the village's property-value concerns in testimony that residents "would not have purchased their homes if the pole was present and a local realtor testified the pole would adversely impact home resale values." *Id.* at 760, 762. Here, similarly, an experienced local realtor noted in her letter that cell towers are "red flags" and that locals and new homebuyers did not expect "surprises, such as cell towers," nearby due to the location's zoning restrictions. (Appendix at 460.) Studies from other states bolstered the testimony of multiple Geneva residents that they would not have bought their homes if the tower had been there.

Moreover, the City had at least some reason to question Mr. Layne's conclusions. Layne admitted at the PZ Hearing that the data pool was limited such that he could only draw conclusions about properties within a half-mile (2,640 feet) or greater radius of towers. (PZ Hearing at 123:11–18.) He also admitted that although there were some residential properties near the four towers he studied, those towers were in "commercial industrial areas." (*Id.* at 124:12–24.) Layne reported he had conducted a more detailed study concerning a tower located in a residential neighborhood in Wilmette, but he did not attach that study or explain its findings in any detail. (*Id.* at 125:11–21.) And Sylvia Stern's letter, photos, and testimony about her own inspection of the four cell-tower locations that Mr. Layne considered confirmed that all four were in relatively undeveloped areas with "no adjacent residential properties . . . ." (PZ Hearing at 59:23–61:4; Appendix at 423–27.)

By his own admission, then, Mr. Layne's study was less detailed than other studies he had performed: he did not have data sufficient to draw conclusions about homes closer than 2,640 feet to the proposed Tower (the number of which in Geneva would be in the hundreds) (*see* Appendix at 152–54; Pl.'s Resp. – DSOF at 4); and the towers he studied as comparisons were located in more non-residential or undeveloped areas. It was not unreasonable for City officials to decide that Mr. Layne's conclusions, approximating to the half-mile, were outweighed by studies that addressed homes closer to cell towers, augmented by the opinion of a local real-estate broker.[21]

As the court reads the caselaw and record in this case, and applying the high deference owed to local governments under the standard, a reasonable mind could: (1) discount Mr. Layne's

---

[21]     It is again worth observing that the three out-of-state studies are not inconsistent with Mr. Layne's findings. Those studies show a noticeable property-value decline in homes at distances *closer* than a half-mile to cell towers (but little or none beyond that distance), while Mr. Layne showed no difference between home prices at or *beyond* the half-mile (and had insufficient data to investigate pricing at closer distances). Had Mr. Layne's study been equipped with enough data to zoom in and scrutinize home prices within bands *closer* than a half-mile to relevant cell towers, it may well have observed a decline.

study; (2) acknowledge the common-sense conclusion that the construction of a tall, visible cell tower near a home could result in a diminished value (as noted by at least one resident who saw the balloon test); (3) credit studies concluding that property values declined near cell towers; (4) consider a local real estate broker's views on the issue; and (5) listen to residents' testimony that the Tower would be visible from their property and that they would not have moved to Geneva had it been present.  This evidence is sufficient to support the conclusion that the proposed tower threatened to diminish at least some property values in the neighborhood.  *See Michael Linet, Inc.*, 408 F.3d at 762 (crediting residents' "objections . . . concerning the cell site's negative impact on real estate values"); *but see Illinois RSA*, 963 F. Supp. at 745, 746 (reversing denial of cell tower permit where the county "failed to issue a written decision" on the application and where local residents "almost uniformly complained that the proposed tower might diminish property values" but "did not present any expert or authoritative evidence on this issue").  Though also a close question, a reasonable mind could have credited the above evidence indicating property-value concerns when denying Plaintiffs' applications.

### 3. Failure to Consider Less Intrusive Alternatives

The City also argues that there was substantial evidence Plaintiffs had failed to investigate less intrusive alternatives and that a different location for the Tower "may be feasible . . . ."  (DSJ at 9; *see also* Appendix at 555.)  Having concluded the City's decision finds support in evidence concerning aesthetics and property-value concerns, the court reserves a discussion of this issue to the next section.  In that section, addressing Count III, the court considers whether the City's ruling effectively prohibits Plaintiffs from providing telecommunications service, a question directly related to Plaintiffs' consideration of alternatives.  In ruling on that argument, the court is not limited by the "substantial evidence" standard and will address the issue de novo.  *See VoiceStream*, 342 F.3d at 832 n.6 (making this point and doing the same) (citing *Second Generation Props. L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002)).

41

### C.  Conclusion

The City's decisions—both not to amend the PUD and not to grant Plaintiffs a special-use permit—were supported by enough evidence that the court cannot call them clear error.  Evidence militated both ways, and Plaintiffs presented a compelling case for the issuance of the permit. There was also, however, evidence sufficient to deny the application.  Applying the highly deferential standard applicable in this case, the court upholds the City's denial of Plaintiffs' permits under the Geneva Code.

This, however, does not end the inquiry.  Plaintiffs also assert a count under Section 332(c)(7)(B)(i)(II) -- an independent ground for reversal of a municipality's decision.  The court discusses that claim below.

### III.  Count III – Effective Prohibition

Under the TCA, any "regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).  Unlike the substantial evidence standard, which is rooted in the City's own justifications for denial, "[w]hether a particular zoning decision violates the TCA's anti-prohibition clause is a question 'that a federal district court determines in the first instance without any deference to the [local zoning] board.'"  *VoiceStream*, 342 F.3d at 833 (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002)); *see also Cellco P'ship v. White Deer Twp. Zoning Hearing Bd.*, 74 F.4th 96, 106 (3d Cir. 2023) ("[A] local zoning board decision [being] based on bona fide local zoning concerns or [being] lawful under state law tells us nothing about whether it has 'the effect of prohibiting personal wireless services.'").  The court reviews the board's decision *de novo* and, because it is not limited to the board's record, "may 'require evidence to be presented in court that is outside of the administrative record compiled by the local authority.'"  *VoiceStream*, 342 F.3d at 833.

42

Accordingly, the court treats the parties' dispute as to Count III as typical cross-motions for summary judgment, asking whether the proffered evidence leaves disputed questions of material fact on the issue of effective prohibition. Before addressing the evidence, however, the court must discuss which legal standard applies.

### A. The Applicable Legal Standard

Courts differ as to what "prohibits" the provision of personal wireless services, and recent FCC action complicates the issue. The parties spend most of their time arguing about which standard applies. The court thus begins by addressing that dispute.

### 1. The Seventh Circuit Test

Precedent in this Circuit sets a high bar for a provider seeking to establish "effective prohibition" in violation of the TCA: "a provider carries a heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." *Helcher*, 595 F.3d at 728. To meet this bar, the "provider must show that its existing application is the only feasible plan [to fill a coverage gap] and that there are no other potential solutions to the purported problem." *Id.* (quoting *VoiceStream*, 342 F.3d at 834). In other words, "so long as the service provider has not investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit does not 'prohibit or have the effect of prohibiting the provision of personal wireless services.'" *VoiceStream*, 342 F.3d at 835 (quoting 47 U.S.C. § 332(c)(7)(B)(i)(II)). The Seventh Circuit adopted this anti-prohibition standard in *VoiceStream* in 2003 and reiterated it in 2010 in *Helcher*.

### 2. The 2018 FCC Declaratory Ruling and Order

In 2018, the FCC issued a Declaratory Ruling and Order (the "FCC Order" or "Order") interpreting Section 332(c)(7)'s anti-prohibition clause and announcing a more relaxed standard as a way of "remov[ing] regulatory barriers that would unlawfully inhibit the deployment of infrastructure necessary to support" new wireless services known as 5G. *In the Matter of*

*Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088 (14) ¶ 1 (2018) (hereinafter "FCC Order").  Importantly, the Order "reject[ed]" the effective prohibition tests employed by the "First, Fourth, and Seventh Circuits . . . and the version endorsed by the Second, Third, and Ninth Circuits,"[22] and instead "articulat[ed]" a new "standard that should apply . . . ."  *Id.* ¶ 40 n.94.  The FCC defined the new standard as follows:

> [A] state or local legal requirement will have the effect of prohibiting wireless telecommunications services if it materially inhibits the provision of such services. We clarify that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service.  This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities. . . . [A] state or local requirement could materially inhibit service in numerous ways—not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services.  Thus, an effective prohibition includes materially inhibiting additional services or improving existing services.

FCC Order ¶ 37 (emphasis added).

Though this was the first time the FCC had interpreted the anti-prohibitory language of Section 332, it had, in 1997, interpreted verbatim anti-prohibitory language in Section 253(a) of the TCA, which preempts local "statute[s] or regulation[s] . . . [which] prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a); *California Payphone Association Petition for Preemption of Ordinance No. 576 NS of the City of Huntington Park, California Pursuant to Section 253(D) of the Communications Act of 1934*, 12 FCC Rcd. 14191 (1997) (hereinafter "*California Payphone*").

---

[22] The First and Fourth Circuits employ the same "heavy burden" of proof the Seventh Circuit does, described above.  (*See* FCC Order ¶ 34 n. 75 (citing *Green Mountain Realty Corp. v. Leonard*, 750 F.3d 30, 40 (1st Cir. 2014); *New Cingular Wireless PCS, LLC v. Fairfax County*, 674 F.3d 270, 277 (4th Cir. 2012)).)  The Second, Third, and Ninth Circuits instead require a provider to show that the requested facility is the "least intrusive means" for closing a significant coverage gap.  *See Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999); *APT Pittsburgh Ltd. P'ship v. Penn Township*, 196 F.3d 469, 480 (3d Cir. 1999); *T-Mobile USA, Inc. v. City of Anacortes*, 572 F.3d 987, 995 (9th Cir. 2009).  As the court discusses below, the Third Circuit has recently adopted the "materially inhibits" test in the wake of the FCC's Order.

At that time, the FCC interpreted the TCA's language to preempt any statute or regulation that "materially inhibits or limits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." *California Payphone* ¶ 31; FCC Order ¶ 16. In its 2018 Order, the FCC noted that, given the similar statutory language, the "materially inhibits" standard "applies with equal measure to the effective prohibition standard that appears in both Sections 253(a) and 332(c)(7)" since "identical words appearing in neighboring provisions of the same statute generally should be interpreted to have the same meaning." FCC Order ¶ 36. The Order also clarified that "both of these provisions apply to wireless telecommunications services as well as commingled services and facilities." *Id.*

Thus, according to the FCC Order, to show a violation of Section 332(c)(7)(B)(i)(II), a telecommunications provider need only show that a local decision materially inhibited the "introduction of new services or the improvement of existing services." *Id.* ¶ 37. Courts have characterized this new standard as a "legislative sea change" that "overrid[es] the unambiguous consensus of every other Circuit that has addressed the issue—that effective prohibition should be assessed based on some iteration of the significant gap test." *T-Mobile South, LLC v. City of Roswell, Georgia*, 662 F. Supp. 3d 1269 at 1289 (N.D. Ga. 2023). The *T-Mobile South* court concluded that the new standard imposes "severe implications on [local] zoning authority." *Id.* at 1293. Indeed, in adopting its 2019 standard, the FCC made clear that its goal was to ensure that "continuing confusion on the meaning of Sections 253 and 332(c)(7) does not materially inhibit the critical deployments of Small Wireless Facilities and our nation's drive to deploy 5G." FCC Order ¶ 35. The new standard does explicitly depart from the Seventh Circuit's test in favor of a more lenient one, and the parties in this case dispute its application.

### 3. The Applicability of the 2018 Test

Recognizing that the matter of deference is under review by the Supreme Court,[23] this court for now defers to the FCC's reasonable interpretations of the TCA's ambiguous provisions. *City of Arlington v. F.C.C.*, 569 U.S. 290, 296–97 (2013); *Chevron v. Nat'l Res. Def. Council*, 467 U.S. 837 (1984); *see also Nat'l Cable & Telecomm. Assoc. v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005) (noting that agencies' reasonable interpretations of statutes trump prior circuit precedent as long as the prior court precedent did not find that its "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion"). District courts are not only bound by the FCC's substantive rules; under the Hobbs Act, they cannot even pass on their validity. *See* 28 U.S.C. § 2342(1) (making it the exclusive province of the court of appeals whether to "enjoin, set aside, suspend (in whole or in part), or to determine the validity" of FCC orders); *see also CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 446 (7th Cir. 2010).

The parties do not appear to dispute the validity of the Order, but only argue as to its scope.[24] Defendant claims that because the Order was specifically geared toward facilitating the

---

[23] The Supreme Court has granted certiorari this year to decide whether to overrule *Chevron*. *See Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (Mem).

[24] Defendant does briefly argue that the district court is not bound by the Order on the basis that it is merely an "interpretive" rule. (Def.'s Opp. to Pl.'s Mot. for Summ. J. (hereinafter "Def.'s Opp. – PSJ") [36] at 12 (citing *PDR Network LLC v. Carlton & Harris Chiropractic, Inc.*, 139 S. Ct. 2051, 2055 (2019).) In support, Defendant relies on dicta from *PDR* which suggested that a district court's imperative to follow FCC Orders under the Hobbs Act may be limited to substantive rules as opposed to interpretive ones. *PDR*, 139 S. Ct. at 2055. If this distinction is applicable at all, the court concludes the rule at issue is in fact substantive. The FCC engaged in the notice-and-comment procedure before adopting it. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 105 (2015) (noting that notice and comment are not required for interpretive rules); *Humane Society of the U.S. v. U.S. Dep't of Agriculture*, 41 F.4th 564, 573 (D.C. Cir. 2022) (noting that "agencies must and do provide notice and an opportunity for comment" when announcing substantive rules). Furthermore, the Order explicitly "rejects" the Seventh Circuit's current test and imposes a new one as a means of nationalizing wireless policy. *See* FCC Order ¶ 40 n.94; *see also T-Mobile South*, 662 F. Supp. 3d at 1285–91 (deciding the Order is substantive, noting that the answer was even more "straightforward" for courts within Circuits that had adopted "effective prohibition" tests that the FCC rejected).

expansion of small wireless facilities (as opposed to larger structures like cell towers), its new standard applies only to the former. (Def. Opp – PSJ at 11.) Plaintiffs urge, instead, that the Order is not limited to small-cell facilities and applies to any local decision materially inhibiting the improvement of a wireless network. (*See* PSJ at 19.)

The court agrees with Plaintiffs on this score. The Order's new test is not limited to small cell facilities. The FCC Order explicitly rejects the Seventh Circuit's test, which was announced in the context of a case involving a proposed cell tower. FCC Order ¶ 40 n.94; *VoiceStream*, 342 F.3d at 833–36. And the Order states that the "materially inhibits" standard applies "in any of a variety of activities related to [a carrier's] provision of a covered service." FCC Order ¶ 37. Nowhere in the Order's language does the FCC cabin its new standard to the deployment of small-cell facilities. *See id.* To the contrary, the FCC points out that "the relevant language of Section 253(a) and Section 332(c)(7)(B)(i)(II) is not limited just to Small Wireless Facilities . . . ." *Id.* ¶ 60 n.167.[25] And it clearly states that the Order "update[s] the FCC's approach to Sections 253 and 332 by addressing effective prohibitions that apply to the deployment of services covered by those provisions." *Id.* ¶ 34 n.74. Cell towers are, of course, among the services covered by the provisions.

Other language in the order does not undermine this conclusion. It is true, as the City points out, that the Order announces the new standard in a section titled: "Overview of the Section 253 and Section 332(c)(7) Framework Relevant to Small Wireless Facilities Deployment." Order at 9101. But the fact that its new standard is "relevant" to small cells does not mean that it is

---

[25]  Defendant stresses that, in this same footnote, the FCC notes: "we proceed incrementally in our Declaratory Ruling here and address the record before us, which indicates that our interpretation of the effective prohibition standard here is particularly reasonable in the context of Small Wireless Facility deployment." (Def. Opp – PSJ at 11 (citing FCC Order ¶ 60 n.167).) But this language arose in the context of the FCC announcing a particular application of the new standard in the context of locally imposed fees; in other words, the footnote bore on *how,* not whether, the "materially inhibits" standard applied in certain circumstances, rather than bearing on the applicability of the "materially inhibits" standard generally. *See* FCC Order ¶¶ 43–80.

exclusive to them. The City also stresses that the FCC explains its goal as "resolv[ing] the conflicting court interpretations of the 'effective prohibition' language" to avoid "materially inhibit[ing] the critical deployments of Small Wireless Facilities and our nation's drive to deploy 5G." *Id.* ¶ 35. But there again, the Order expressly states that it is defining the anti-prohibition language of the TCA; that its motivation for doing so lies in small cells does not restrict the definition to them. Finally, Defendant points to a footnote in which the FCC states:

> We discuss specific applications of the *California Payphone* standard in the context of certain fees and non-fee regulations in the sections below; we leave others to be addressed case-by-case as they arise or otherwise are taken up by the Commission or courts in the future.

*Id.* ¶ 41 n.102. But once again, *how* the *California Payphone* standard applies to specific situations (for example, fee and fee-non regulations) does not bear on whether the standard applies at all. And the Order never states that the "materially inhibits" standard exclusively applies to local decisions concerning small cell facilities.

This court's reading of the Order finds support in the opinions of the few other courts to have addressed the question of whether cell towers fall within the new standard's ambit. Most tellingly, in *Cellco Partnership*, the Third Circuit adopted the new test in the context of the placement of a cell tower without even questioning whether the Order's focus on small wireless facilities precluded doing so. 74 F.4th at 102.[26] And in *T-Mobile South*, which addressed the

---

[26] Defendant argues that because "there is no indication that the defendant in [*Cellco*] argued against the application of the 2018 Small Cell Order," perhaps the Third Circuit was wrong in unquestioningly applying the new standard to a tower. (Def.'s Resp. to Pl.'s Mot. for Leave to Cite Supplemental Authority [42] at 3.) This court is not inclined to assume the Third Circuit overlooked the matter. And in any event, the Third Circuit's silence on the matter could be read the opposite way—that the question did not even need to be asked because the answer was obvious. Notably, the Third Circuit did not even need to apply the new standard, as the opinion reached the same outcome under both the Third Circuit's old standard and the Order's new one. *See Cellco P'ship*, 74 F.4th at 101–02, 105. Tellingly, then, the Third Circuit felt compelled under *Chevron* to adopt the Order's new test, even in the context of cell towers, when it could simply have reached the same outcome under its old standard without addressing the new rule's applicability. *See id.* at 103.

rule's application to a cell tower, the district court noted that, though "[t]he main focus of the Declaratory Ruling was on so-called 'small cell deployments' . . . the implications of the rule appear to apply more broadly."  662 F. Supp. 3d at 1278 n.4.  The *T-Mobile South* court chose not to apply the rule because, as a substantive rule, it could not be applied retroactively, but never suggested that such a question was irrelevant because cell towers fell outside the Order's scope. *See id.* at 1295.

The two cases cited by the City to challenge this conclusion are not persuasive.  In one, *CNSP, Inc. v. Webber*, a district court refused to apply the Order to a fee imposed on "internet providers who use wireline" in Santa Fe's public rights of way.  No. 17-CV-00355 KG/SCY, 2022 WL 4536132, at *2, *4 (D.N.M. Sept. 28, 2022).  There, the court distinguished wired internet service from the Order's focus on small cells and wireless technology.  *Id.* at *5.  Applying this distinction between wired and wireless services could make sense in the context of Section 332(c)(7), which is explicitly directed at local zoning decisions that affect "personal wireless services."  47 U.S.C. § 332(c)(7)(B)(i)(II).[27]  Another case involved a claim of unreasonable delay in the approval of a 160-foot cell tower.  *Up State Tower Co. v. City of North Tonawanda*, No. 19-CV-01082(JJM), 2020 WL 9848450, at *4 (W.D.N.Y. Sept. 28, 2020).  The plaintiff sought to rely on a paragraph of the 2018 Order which announces that "State or local inaction by the end of the Small Wireless Facility shot clock will function not only as a Section 332(c)(7)(B)(v) failure to act but also amount to a presumptive prohibition on the provision of personal wireless services within the meaning of Section 332(c)(7)(B)(i)(II)."  FCC Order ¶ 118.  But there, the paragraph forming the basis of the plaintiff's complaint dealt specifically with the "Small Wireless Facility shot clock," *id.*, such that "by its plain terms paragraph 118 of the 2018 FCC Order does not apply here."  *Up*

---

[27]       Interestingly, the plaintiff in *CNSP* was challenging a regulation under Section 253, whose anti-prohibitory language applies (perhaps slightly) more broadly to "any interstate or intrastate telecommunications service."  47 U.S.C. § 253(a).  Whether the court was correct to ignore the Order in that context is unclear; regardless, its reasoning does not compel a conclusion in the discussion of Count III in this case, which deals with Section 332 and wireless technology.

*State Tower Co.*, 2020 WL 9848450, at *4. The same cabining language is not true in the Order's paragraphs implicated in this dispute.

In sum, the FCC has announced a new substantive rule, explicitly overriding Seventh Circuit precedent. The fact that the new standard was motivated by the deployment of small cell technologies does not limit its applicability to them. Accordingly, the standard announced in the Order applies to this case.

### B. Defining the "Materially Inhibits" Test

The question remains how to apply the FCC's new test, and the Order gives relatively little specific guidance as to how to determine whether a local zoning decision materially inhibits a carrier's provision of wireless services. But there are some clues.

First, the test does not appear to require proof of a coverage gap; instead, local zoning decisions can be preempted merely for materially inhibiting the "improvement of existing services." FCC Order ¶ 37. Second, older caselaw applying the same *California Payphone* standard in the context of Section 253 shows that a local board's delay in making a decision on a carrier's permit application can contribute to a finding of effective prohibition. *See TCG New York, Inc. v. City of White Plains*, 305 F.3d 67, 76 (2d Cir. 2002) (noting unreasonable delay in City's response to carrier's request for a franchise as contributing to a finding of effective prohibition under Section 253). Third, as the Third Circuit points out in its analysis of the same question, "local government action which either imposes unreasonable fees or requires a provider to accept unreasonable costs materially inhibits wireless services." *Cellco P'ship*, 74 F.4th at 104 (citing *Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1271 (10th Cir. 2004)). Fourth, the totality of the circumstances—or the accumulation of multiple obstacles confounding a carrier—can show effective prohibition, since "a legal requirement that imposes a reasonable cost on one tower in one jurisdiction may constitute an effective prohibition when aggregated across many towers, or many wireless facilities, in several jurisdictions." *Cellco P'ship*, 74 F.4th at 104 (citing FCC Order

at 9112).   Finally, and again, the new standard is geared toward "remov[ing] regulatory barriers" to the proliferation of cellular networks; in other words, its goal is to move the needle in the balance of the effective-prohibition test in carriers' favor.   FCC Order ¶ 1; *T-Mobile, Ne., LLC v. City of Wilmington*, No. 16-1108-ER, 2020 WL 1245306, at *6 (D. Del. Mar. 16, 2020) ("This new standard grants carriers greater substantive rights at the expense of the local municipal government.")

The Third Circuit's recent decision in *Cellco Partnership*, which appears to be the only application of the "materially inhibits" standard so far in the context of a cell-tower placement, provides helpful guidance.   There, Verizon suffered from a "four-mile gap" in its coverage, leading to dropped calls along the highway near a part of White Deer Township that is nestled within a state forest.   74 F.4th at 99.   A Pennsylvania state-law moratorium from 2000 prohibited cell towers on state forest land, "limit[ing]" Verizon's options; still, they looked at "several sites and antenna configurations" and settled on a "195-foot monopole topped with a four-foot antenna" situated on a 2600-square-foot lot Verizon leased in the northeast corner of a 1.9-acre private property.   *Id.*   White Deer Township's zoning ordinances required lot sizes of an acre or more (and presumably precluded leasing smaller parcels) and that cell towers be "set back from lot lines and structures a distance equal to the height of the facility . . . plus 10% of such height"; because Verizon's tower "conformed with neither the lot size nor set back requirements," Verizon was required to request zoning variances.   *Id.*   The zoning board denied those requests, finding Verizon had not made the required showing of unnecessary hardship.   The board concluded that Verizon's challenge related to its own desired use of the property as opposed to "the capacity for the property to be used reasonably" without hardship, and additionally noted that the set-back requirements "serve[d] a legitimate zoning interest to protect" people in case the tower fell.   *Id.* at 99–100 (quotations omitted).

The district court overturned the zoning board's decision, and the Third Circuit affirmed. It concluded that Verizon's "application denial prevented Verizon from providing wireless services without incurring unreasonable costs." *Id.* at 105. The court pointed out that Verizon "was constrained by the Pennsylvania moratorium, service demands, and property sizes" when searching for a property. *Id.* It also noted that to expand the possible sites to those in the state forest, the zoning board took the position (both when denying the application and on appeal) that before proceeding with the planned cell tower, Verizon was required to "challenge[] the state's moratorium or consider[] other alternatives: cessation of the property's residential use, removal of the property's existing structures, or the construction of a series of smaller towers." *Id.* at 101. Such a requirement, the court stated, would violate Section 332(c)(7)(B)(i)(II) in that it would "impos[e] a 'substantial increase in costs' on Verizon by demanding that it commence legal action against Pennsylvania [to challenge its moratorium] before seeking a variance." *Id.* at 105–06 (quoting *Qwest Corp.*, 380 F.3d at 1271). The Third Circuit also agreed with the district court's conclusion that the zoning board "provide[d] neither evidence nor argument suggesting another location or technological means to address the service gap." *Cellco P'ship*, 74 F.4th at 101 n.3.

The Third Circuit made two other helpful points in its opinion. First, in response to the zoning board's argument that insufficiency of coverage could not constitute a hardship entitling carriers to variances, the court responded: "This is a misunderstanding of the preemptive effect of the TCA." *Id.* at 106. Secondly, the court announced that "[i]n light of our decision to adopt the 'materially inhibit' standard, not only does 'insufficiency in coverage' ordinarily entitle a provider to a variance but so does insufficiency in network capacity, 5G services, or new technology." *Id.*

Apart from *Cellco Partnership*, there is little case law addressing the "materially inhibits" standard. Older cases applying that standard were, in accordance with Section 253, focused on regulations as opposed to individual zoning decisions and thus, though helpful in distilling general principles, are not directly applicable here. *See* 47 U.S.C. § 253(a) (restricting the Section's

application to "statute[s] or regulation[s]"). Additionally, the FCC Order itself is focused on the new rule's application in the small-cell context, leaving questions as to what—if anything—is different when defining "materially inhibits" in the context of cell towers.

That said, from *Cellco* and the FCC Order, the court identifies the following criteria as relevant to the question of whether a city's decision materially inhibited the provision of wireless facilities: insufficiency of coverage; a lack of alternatives available to a proposed site; unreasonable costs imposed on, or asked of, the carrier; and unreasonable delay in making the decision. No one element is likely decisive, and a combination of these factors could "add up" to material inhibition, but a carrier's need for a tower and the availability of other sites may well be particularly significant. Finally, the court notes that even the FCC's new, lenient standard requires a showing of *material*—not *de minimis*—inhibition; in other words, the effective-prohibition test is not toothless.

### C. Applying the "Materially Inhibits" Test

In confronting a motion for summary judgment, the court must "[v]iew[] the evidence in the light most favorable to the non-moving party" and "determine whether there is evidence on which a reasonable jury could find for that party." *Sybron Transition Corp. v. Security Ins. Co. of Hartford*, 107 F.3d 1250, 1255 (7th Cir. 1997). "[S]peculation is not sufficient to survive summary judgment; there must be evidence" to demonstrate the existence of disputed facts. *Khungar v. Access Community Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (citations omitted). In other words, "[t]he non-movant need not match the movant witness for witness, nor persuade the court that his case is convincing; he need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact." *Liu v. T&H Machine, Inc.*, 191 F.3d 790, 796–97 (7th Cir. 1999). And when, as here, the court considers cross-motions for summary judgment, it adopts "a dual, 'Janus-like' perspective" and interprets disputed facts in favor of each nonmovant. *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015).

Plaintiffs primarily argue—and the City disputes—that they demonstrated sufficient need for the Tower and that they lacked alternative locations to place it. The court considers these arguments and, for each, explains why summary judgment is inappropriate on the factual record before the court.

### 1.    Insufficiency of Coverage

Plaintiffs point to Mr. McDaniel's affidavit and propagation maps showing "a significant gap in service" in Geneva. (Appendix at 312.) That affidavit also noted that Verizon's capacity was at or over its limit there, and that four of the six nearby sectors onto which wireless traffic was offloaded were "exhausted and requir[ing] immediate relief." (*Id.* at 315.) The search ring shows that Plaintiffs needed to place the new facility within a quarter-mile radius of Geneva Commons. (*Id.*) The affidavit also noted the substantial increase in the use of wireless technology in recent years. (*Id.*) Plaintiffs point to their testimony at the hearing recounting these circumstances. (*See, e.g.,* PZ Hearing at 7:2–8:12.)

Additionally, Mr. McDaniel filed a declaration in support of Plaintiffs' motion for summary judgment averring that "[t]he proposed tower for the Oscar Swan Property is to address both coverage and capacity issues on Randall Road and IL-38," where "[p]resently there is unreliable coverage for in-residence and businesses, as well as vehicular traffic in that area." (McDaniel Decl. ¶ 10.)[28] The declaration goes on to state that "there are severe capacity issues for this area" and that the "site is a high priority issue for Verizon;" that "Verizon has existing towers 1.5 miles north and 1 mile south" of the Oscar Swan site, and that "[e]ach tower has three sectors," four of the six being "completely exhausted, with no ability to offload one into another or handle additional data capacity"; that a "new tower is needed to . . . prevent dropped calls and busy

---

[28]    The City argues that the court may not rely on this declaration or other evidence adduced at the summary judgment stage, and is confined to the City's record. (See Def. Resp. -- PSOF at 1–2.) As noted previously, however, the court's assessment of the "effective prohibition" claim is de novo.

signals, particularly at peak times," including 911 calls, which "too may be dropped or blocked if

there is no coverage or capacity"; and that the propagation maps (reproduced below) reflect the

"current coverage and capacity shortfalls and how the new site will resolve those issues." (*Id.* ¶¶

10–12.)



(Appendix at 322–23.) Finally, Mr. McDaniel testified that the Oscar Swan location would be "a

home run for us" that would "have an immediate impact to our network," and "improve our network

and improve our coverage and performance for our customers." (PZ Hearing at 33:10–16.)

The City disputes Plaintiffs' account of their need for the Tower on two fronts. First, the City argues that Plaintiffs proffered only their own say-so to prove that they had a coverage need as opposed to supplying specific, underlying data concerning coverage. Second, the City points to its own evidence—mainly, testimony from Geneva residents at the PZ Hearing suggesting that they already had adequate Verizon coverage—to cast doubt on Plaintiffs' coverage need. With respect to Plaintiffs' submissions, the City notes that Verizon presented no underlying evidence such as "field test" data, the number of dropped calls, complaints from customers regarding cell service in Geneva, or data suggesting emergency calls were being dropped. (Def.'s Resp – PSJ at 5; DSOF ¶¶ 33–34; PZ Hearing at 34:16–35:3.) Further, the City argues that "simply relying on propagation maps—without providing actual data—is inadequate for Plaintiffs to satisfy their burden under the TCA." (Def.'s Resp – PSJ at 5.)

In support of its position, the City cites two cases in which district courts, while upholding localities' decisions to deny permits to telecommunications providers, recognized that relying solely on coverage maps—essentially graphical depictions divorced from underlying data—constitutes "insubstantial proof as to whether there exists a gap in coverage for the area to be serviced by the proposed cell tower." *Verizon Wireless Tennessee Partnership v. Desoto County* ("*Desoto County*")*,* 419 F. Supp. 3d 950, 953 (N.D. Miss. 2019); *see also Cellco Partnership v. Bd. of Supervisors of Fairfax Cnty., Va.* ("*Fairfax County*"), 140 F. Supp. 3d 548, 584 (E.D. Va. 2015)) (concluding that Verizon's reliance on propagation maps and the testimony of its RF engineer was insufficient to meet the Fourth Circuit's more stringent "effective prohibition" test, noting that "[a]t most, Verizon's evidence indicates that the Board's decision prevents Verizon from improving existing service"). Even under the FCC's new, more lenient standard, the same general defect exists in the evidence Plaintiffs have offered concerning service demands.

Finally, the City provides some modest evidence in tension with Plaintiffs' purported need for the Tower, pointing out that three residents of Geneva who testified at the hearing were

Verizon customers who said they had not experienced any service problems, (PZ Hearing at 52:19–22, 57:11–15, 79:23–80:6), and that there was no evidence that emergency officials had complained to the City Planner during the Tower review process about service issues in the area. (*Id.* at 132:7–134:15; Appendix at 286.)  In broad strokes, then, the City argues that testimony during the hearing indicated residents had adequate coverage.

As the court reads the record, the Plaintiffs have surfaced some limited evidence of "insufficiency in coverage," and the City has pointed to some limited evidence challenging that conclusion.  *See Cellco P'ship*, 74 F.4th at 106 (implying that insufficient coverage, as opposed to a full coverage gap, is enough need to justify an effective prohibition claim under the "materially inhibit" standard); *see also* FCC Order ¶ 37 (noting that the "materially inhibit" test applies "not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities," and that "materially inhibiting . . . the improvement of existing services" is enough to constitute effective prohibition).  Viewed in the light most favorable to the non-movant (here, the City), the evidence raises a dispute about the degree of the insufficiency.  *See, e.g., Fairfax County*, 140 F. Supp. 3d at 584 (crediting "crowd-sourced data" suggesting adequate coverage "showed that genuine factual disputes exist[ed] over the absence of coverage in the relevant area" (quotation omitted)); *Desoto County*, 419 F. Supp. 3d at 954–55 (crediting the county supervisor's "personal[] test[]" of cell coverage in countering carrier's claim of a coverage gap).  The degree of insufficiency is central to the effective-prohibition inquiry, and on the existing record, the court is unable to draw conclusions about how materially Verizon's network would suffer without the Tower.  Without more information, the court is unable to assess Plaintiffs' need for the Tower, and whether the City's denial in the face of that need amounts to a "material inhibition" of service—determinations necessary for a thorough, meaningful application of the FCC's new test.

### 2.    Alternative Sites

Plaintiffs' proffered evidence is similarly incomplete with respect to the availability of alternative, less intrusive sites for the Tower.  Mr. McDaniel's affidavit in Plaintiffs' application reviewed the Geneva Code's hierarchy of wireless-facility types, requirement by requirement, explaining why none of them were possibilities for addressing Verizon's coverage deficiency in Geneva.  (Appendix at 315–16.)  His declaration stated the same, noting that in or around the search ring, "there are no other base stations, or existing buildings or structures (such as rooftops or steeples) tall enough to use for a new tower, nor are there any co-location or combined wireless communication facilities available for Verizon to use."  (McDaniel Decl. ¶ 14.)  McDaniel noted (and the City does not appear to dispute) that "there was no city owned property in the search ring that would be suitable."  (*Id.* ¶ 15.)  As to private properties, the affidavit he submitted along with Plaintiffs' application added that "[r]eal estate specialists did identify several non-public properties in non-residential zoning districts which they considered but could not come to terms with the property owners" such that the Oscar Swan location was "the only successful candidate."[29]  (Appendix at 316.)  Plaintiffs also testified to the lack of alternative sites at the PZ Hearing, with Mr. Shinkle calling the Oscar Swan location Plaintiffs' "primary" one, and "the most obvious site that meets [Geneva's] requirements."  (PZ Hearing at 6:6–8; 13:2–4.)  Mr. Shinkle also stated that "[i]f we can't go here, I don't know where we could go.  This is a very unique site that happens to fall right in line with your zoning requirements regarding new antenna facilities." (*Id.* at 117:11–14.)

As discussed earlier, the City challenges the assertion that no alternative sites existed.  In denying Plaintiffs' applications, the City asserted that Plaintiffs "did not genuinely consider one or

---

[29]    Under Geneva's Code of Ordinances, Plaintiffs would have been required to obtain a special-use permit for any wireless tower on private land in the City—Oscar Swan or any other potential location.  GENEVA CODE § 11-3-12(C).  Accordingly, Plaintiffs' rejection of alternative private properties would have been rooted in concerns other than special-use zoning restrictions.

more other site alternatives" and opined that it "may be feasible for [Plaintiffs] to achieve the same or substantially similar coverage objectives via a more appropriate location and/or via other less intrusive means and alternatives . . . ."  (Appendix at 355.)   Mr. Shinkle was equivocal on this issue in Zoning and City Council Hearings, the City asserts; in response to a direct question as to whether alternatives existed, he said only, "[w]ell, what I'm saying is that this [Oscar Swan] meets all the requirements.  And we think it's a great site.  It's in the area and it checks all the boxes." (CC Hearing at 19:10–20; *see also* PZ Hearing at 116:6–7.)  The City also points to the fact that Mr. McDaniel's affidavit notes the existence of other private properties that could house the Tower but for which Verizon could not "come to [lease] terms . . . ." (Appendix at 316, DSJ at 9.)   The City also stresses the vagueness of statements Plaintiffs made about their search (for example, Mr. Shinkle's statement at the PZ Hearing that Verizon offers "average to above average market rates" for leases), and criticizes Plaintiffs' refusal to reveal further details on the ground that such details are proprietary.  (DSJ at 10; PZ Hearing at 114:14–19.)

Reading the evidence in the light most favorable to the City, then, Plaintiffs knew of alternative, private property sites for the Tower but declined to pursue those alternatives due to some unknown greater expense.  This evidence by itself does not defeat Plaintiffs' claim:  The FCC's 2018 Order rejected any test that requires proof that no alternative sites exist. (*See* FCC Order ¶¶ 34 n.75, 40 n.94.)  It appears undisputed that potential other locations would have been costlier to some unknown degree—another factor which could contribute to a finding of effective prohibition under the FCC's new standard.  (Def.'s Resp. – PSJ at 9 (arguing that Plaintiffs "*had* identified potential alternatives, albeit ones that may be less lucrative or favorable to Plaintiffs")); *see also Cellco P'ship*, 74 F.4th at 106 (considering unreasonable costs under "materially inhibits" test).

But the court remains uncertain exactly how costly or otherwise unappealing potential alternative sites were, and whether such inadequacies amounted to an unreasonable imposition.

A very modest additional cost might not constitute a "material" inhibition on Plaintiffs' effort to provide service. Without more explicit factual details of Plaintiffs' search—including what alternative sites were considered, whether comparable lease terms were available, and the like— the court cannot effectively weigh whether the City's denial materially inhibited them from providing telecommunications services.

### 3. Other Considerations

The parties devote substantial time in their briefs to two other considerations related to the speed of the City's decision-making on Plaintiffs' application: who bore responsibility for the late discovery of the PUD; and the fact that the City Council rendered its decision about three weeks after the FCC's shot clock had run. Both considerations do affect the "materially inhibits" analysis. S*ee Cellco P'ship*, 74 F. 4th at 103–04 (noting that unreasonable delay factors into the "material inhibits" inquiry). However, neither weighs especially strongly in this case.

First, the June 2022 discovery of the PUD meant an additional hurdle for Plaintiffs' pursuit and a slight delay in ending it. Accordingly, the parties dispute who bore responsibility for the oversight. The City Council claimed in its denial that Plaintiffs "had a title report run on the Property and knew, or should have known, of the prohibition of Special Uses on the Property." (Appendix at 555.) Indeed, in the City Council hearing, Mr. Shinkle admitted that Plaintiffs had done a title report during the application process, but did not say whether the report mentioned the PUD. (CC Hearing at 57:13–58:3.) Mr. Shinkle also acknowledged some responsibility for the oversight, admitting that the failure to uncover the PUD was "probably a miss on both parts" and that "[w]e should have" discovered it. (*Id.* at 42:5–13, 76:22–77:9.) Other evidence, however, supports the notion that Plaintiffs did due diligence. A declaration from Elisabeth Rutkowski, TowerNorth's "Site Development Manager," which Plaintiffs attached to their motion for summary judgment, avers that Plaintiffs ran a title check in December 2020 and again in November 2021, and that neither disclosed the PUD Ordinance. (*See* Decl. of Elisabeth Rutkowski in Support of

Pl.'s Mot. for Summ. J. (hereinafter "Rutkowski Decl.") [31-1] ¶¶ 8–10.)  Plaintiffs have also attached those two title reports to the Rutkowski Declaration.[30]  (*See generally* Group Ex. A to Rutkoski Decl.)

Relatedly, the parties dispute whether the City delayed its decision unreasonably.  The TCA requires local authorities to make decisions on applications for wireless facilities "within a reasonable period of time after the request is duly filed . . . ."  47 U.S.C. § 332(c)(7)(B)(ii).  The FCC has promulgated binding regulations which make 150 days the presumptively reasonable time period for claims like Plaintiffs'.[31]  47 CFR § 1.6003(c)(iv).  Plaintiffs stress that the regulations end any tolling period if the City does not notify "the applicant in writing that the applicant's supplemental submission was not sufficient to render the application complete and clearly and specifically identifies the missing documents . . . that need to be submitted" within ten days of having received the resubmitted application.  47 CFR § 1.6003(d)(3)(i)–(iii).  Given that the City did not formally notify Plaintiffs of any deficiency concerning their amended application in March, Plaintiffs argue that the tolling period ended ten days after their resubmission and had crossed the 150-day mark by the time they sued in August.  (PSJ at 22.)  The City contends

---

[30]     The City argues that these title reports are inadmissible on hearsay grounds and because Plaintiffs did not produce them during discovery.  (*See* Def.'s Resp. – PSJ at 15, 15 n.12.)  Neither objection has merit.  Plaintiffs assert that "[a]lthough not included with the Initial Disclosure, the title reports were later provided to the City" and that the City was on notice the reports could surface because Plaintiffs' complaint references both the title check and the title reports' silence on the PUD.  (Pl.'s Reply – PSJ at 5 n.9 (citing Second Am. Compl. ¶ 49).)  The court finds that this renders the inclusion of the appended title reports "substantially justified or . . . harmless."  FED. R. CIV. P. 37(c)(1).  And the reports are not hearsay.  Hearsay is an out-of-court statement introduced to prove the truth of the matter asserted.  FED. R. EVID. 801.  The title reports are not being introduced for their truth—that the PUD existed—but rather as evidence that Plaintiffs were (or were not) on notice of the PUD's existence.  *See Daniel v. Cook County*, 833 F.3d 728, 735–36 (7th Cir. 2016) (noting that document "could be offered for the non-hearsay purpose of proving the sheriff knew of the problems described in the report" and was thus "on notice").

[31]     The court dismissed Plaintiffs' unreasonable delay claim on mootness grounds, but the delay may have some arguable relevance in assessing whether the City's decision-making process materially inhibited Plaintiffs' ability to provide or improve wireless services.  *See TCG New York, Inc.*, 305 F.3d at 76.

instead that the clock was tolled until May, when the Plaintiffs completed the balloon test that was referred to in the March submission. (Def.'s Resp. – PSJ at 14–15.) The court concludes Plaintiffs have the better of this argument, given that the FCC's regulation requires an explicit message "in writing" to the effect that the application remains incomplete, which did not occur here. 47 CFR § 1.6003(d)(3)(i). Regardless who is correct on this issue, however, the Plaintiffs suffered merely a three-week delay, which, regardless who was responsible, is unlikely to tip the scales in either side's favor.

### 4. Conclusion

The "materially inhibit" test has not yet been addressed in the Seventh Circuit, and little guidance exists both as to whether and how to apply the test here, in the context of a cell-tower. However, the court finds the reasoning of the Third Circuit persuasive, both as to the Order's application here and as to the extent to which the test favors preemption in situations in which a carrier has sought to improve its network and met local government resistance. *See Cellco P'ship*, 74 F.4th at 106 (noting that "'insufficiency in coverage' ordinarily entitle[s] a provider to a variance" under the FCC's new standard).

By the standard articulated in the *Cellco* case, Plaintiffs may well succeed on their effective prohibition claim. The City's denials do appear to have inhibited Plaintiffs to some degree from providing telecommunications services, as at least some evidence supports Plaintiffs' contention that their network was strained, that demand was growing, and that there were limited places to put the Tower. But without knowing more specific details about how vital this site was to Verizon, the court cannot effectively assess the extent to which that inhibition was *material*. To grant summary judgment on this factual record could effectively rob the word "materially" of meaning. The FCC Order's departure from Seventh Circuit standard weighs in favor of Plaintiffs. But on this record, summary judgment on Count III is denied.

IV.     **Count IV – § 253(a)**

In its prior Memorandum Opinion and Order, the court addressed at length but did not expressly make a finding as to whether a private right of action exists to enforce Section 253(a) of the TCA.  (Mem. Op. and Order at 12–20.)   As discussed above, Section 253(a) also looks to whether a locality's regulations "materially inhibit[ed]" telecommunications services.   *See California Payphone* ¶ 31; FCC Order ¶ 16.   Given that the same factual issues and "materially inhibit" standard present here, then, the court will resolve Count IV when faced with the more complete evidentiary record to be produced at an evidentiary hearing.

**CONCLUSION**

Whether the City drew the right conclusions from the evidence presented at the Zoning and City Council hearings, and whether the "materially inhibits" test effects too broad a shift in power away from local zoning boards, are not questions this court may answer.  Indeed, under the Hobbs Act, the court may not pass on the reasonableness (and thus validity) of the 2018 Order's interpretation of the TCA's effective prohibition language.  *See* 28 U.S.C. § 2342(1), 47 U.S.C. § 402(a); *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 445–46 (7th Cir. 2010); *see also T-Mobile*, 662 F. Supp. 3d at 1284 (noting that, if it had power to do so, the court would find the Order unreasonable because "[i]nstead of accommodating the needs of wireless providers in a manner that would simultaneously preserve local government zoning authority, the FCC's interpretation would . . . effectively nullify local authority by mandating approval of all (or nearly all) applications.") (quotations omitted).

This court is bound by the FCC's Order, which displaces local zoning boards' authority to the extent it materially inhibits the proliferation—and improvement—of wireless services in the United States.  But even under this new, lenient standard, Plaintiffs have failed to present enough evidence for the court to confidently conclude that the City's refusal to let them situate the Tower on Oscar Swan, as opposed to somewhere else, effected a material imposition on their efforts to

improve their network sufficient to trigger preemption by the TCA.[32]  For these reasons, the court GRANTS summary judgment for the City as to Count II and DENIES both parties' motions for summary judgment as to Counts III and IV, ordering a trial on the issue of effective prohibition under the new test articulated above.

ENTER:

Dated:  February 14, 2024

_____
REBECCA R. PALLMEYER
United States District Judge

## **APPENDIX**

 a. Small cell facility:

  (i) Attached:

   1.  Concealed on City-owned property, right-of-way or public easement;

   2. Concealed on other public property;

   3. Concealed on non-public property;

   4. Non-concealed on city-owned property, right-of-way or public easement;

   5. Non-concealed on other public property;

   6. Non-concealed on non-public property.

  (ii) New freestanding small cell facility:

   1.  Concealed on City-owned property, right-of-way or public easement;

   2. Concealed on other public property;

   3. Concealed on non-public property;

---

[32] The court understands and is sensitive to the fact that Plaintiffs sought to avoid revealing proprietary information in Geneva's public proceedings; to the extent the evidence required at trial implicates the same concerns, the court is prepared to issue any necessary or appropriate protective orders.

4. Non-concealed on city-owned property, right-of-way or public easement;

5. Non-concealed on other public property;

6. Non-concealed on non-public property.

b. Replacement of existing wireless communication facility in any zoning district.

c. Concealed antenna(s) on a base station.

d. Non-concealed antenna(s) on a base station:

(i) On city-owned property in any non-residential zoning district;

(ii) On other public property in any non-residential zoning district;

(iii) On non-public property in any business zone.

e. Co-location or combined wireless communication facility.

f. Concealed freestanding towers:

(i) On city-owned property in any non-residential zoning district;

(ii) On other public property in any non-residential zoning district;

(iii) On non-public property in any zoning district.

g. Preferred concealment type (wherever located):

(i) Tree of a type naturally occurring or normally found in the geographic area;

(ii) Church steeple;

(iii) Bell or clock tower.

h. Non-concealed towers:

(i) On city-owned property in any non-residential zoning district;

(ii) On other public property in any non-residential zoning district;

(iii) On non-public property in any non-residential zoning district.

i. Preferred tower type (wherever located):

(i) Monopole;

65

(ii) Lattice;

(iii) Guyed.[33]

GENEVA CODE ch. 3, tit. 11-3-12(E)(2).

---

[33]      "Guyed" refers to towers reinforced with wires.  *See Guy, Merriam-Webster's Collegiate Dictionary* 591 (10th Ed. 2001).