**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **TOWERNORTH DEVELOPMENT, LLC**<br>**and CHICAGO SMSA LIMITED**<br>**PARTNERSHIP d/b/a VERIZON WIRELESS,**     ) ) ) )<br><br>        **Plaintiffs,**     ) ) )<br>      **v.**     ) )<br>**CITY OF GENEVA,**     ) ) )<br>        **Defendant.**     ) | **No. 22 C 4151**<br><br>**Judge Rebecca R. Pallmeyer** |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiffs TowerNorth Development, LLC ("TowerNorth") and Chicago SMSA Limited Partnership d/b/a Verizon Wireless ("Verizon") sued the City of Geneva, Illinois ("the City") under the Telecommunications Act of 1996 ("TCA"), challenging the City's denial of their application to build a cell-tower on a parcel of land in City territory. Plaintiffs alleged that the City unreasonably delayed its decision on Plaintiffs' application in violation of 47 U.S.C. § 332(c)(7)(B)(ii), that the denial was unsupported by "substantial evidence" under 47 U.S.C. § 332(c)(7)(B)(iii), that the City's decisions and zoning regulations had the "effect of prohibiting" Plaintiffs from providing cell service in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II), and that the City zoning regulations at issue are preempted by 47 U.S.C. § 253(a).

This dispute has already generated two lengthy opinions, one addressing the City's motion to dismiss and a second ruling on the parties' cross-motions for summary judgment. *See TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2023 WL 6388257 (N.D. Ill. Sept. 30, 2023) ("*TowerNorth I*"); *TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2024 WL 621616 (N.D. Ill. Feb. 14, 2024) ("*TowerNorth II*"). In the first ruling, the court dismissed Plaintiffs' unreasonable delay claim as moot but denied the City's request to dismiss the Section 253(a) preemption claim. In the second ruling, the court granted the City's motion for summary judgment on the "substantial evidence" claim but denied it on both the "effective prohibition" and preemption

claims, and denied Plaintiffs' motion entirely.  The court concluded that an evidentiary hearing was necessary to resolve (i) whether the City's denial of Plaintiffs' application had the effect of prohibiting Plaintiffs from providing telecommunications services under an interpretation of Section 332(c)(7) set forth in a 2018 Order of the Federal Communications Commission ("FCC"), and (ii) whether the zoning regulations at issue in this case are preempted under Section 253(a).

The evidentiary hearing is now complete, and the parties have submitted competing briefs on the evidence presented, as well as the impact of the Supreme Court's intervening decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), on the applicable legal standard for Plaintiffs' "effective prohibition" claim.  The City argues that *Loper Bright*'s overruling of *Chevron* deference requires the court to disregard the standard adopted by the 2018 FCC Order in favor of the standard that had controlled in the Seventh Circuit prior to the FCC's 2018 Order.  The 2018 FCC Order interprets "effective prohibition" to mean any action by a municipality that "materially inhibits" the carrier's provision of wireless services.  The standard articulated by the Seventh Circuit in *VoiceStream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818 (7th Cir. 2003), was far more deferential to localities, effectively upholding a municipality's denial unless the carrier could show that its proposal reflected the only feasible plan to address a demonstrated gap in network coverage.

For the reasons explained below, the court finds that *Loper Bright*'s overruling of *Chevron* deference does not alter the court's responsibility to apply the FCC Order's "materially inhibits" standard to Plaintiffs' effective prohibition claim.  But the court need not decide that issue conclusively because based on the evidentiary record before the court, the City prevails on Plaintiffs' "effective prohibition" claim even under the "materially inhibits" standard.  The court thus grants summary judgment in Defendant's favor on Count III of Plaintiffs' Second Amended Complaint.

In its prior summary judgment ruling, the court confirmed that Section 253(a) of the TCA, the basis for Count IV of Plaintiffs' complaint, also considers whether a state or local regulation

2

"materially inhibits" a carrier's efforts to provide telecommunication services. It is not obvious that private parties may bring equitable preemption claims to enforce Section 253(a), or that Plaintiffs have standing to bring such a claim, but again, the court need not definitively decide this issue. Assuming such a private right of action exists, and that Plaintiffs have standing, the court finds (consistent with its ruling on Count III) that Plaintiffs have not shown that the City of Geneva regulations at issue materially inhibit Plaintiffs' ability to provide telecommunications service within the meaning of the TCA.

The City's pending motion for reconsideration [85] of the court's summary judgment opinion is stricken as moot.

## BACKGROUND

The court's February 2024 opinion laid out the factual and procedural background of this case in detail based on the parties' original summary judgment submissions. *See TowerNorth II,* 2024 WL 621616, at *1–11. To briefly recap, TowerNorth is a company that develops and leases wireless communications facilities for the use of telecommunications carriers like Verizon. *Id.* at *1. In December 2021, TowerNorth and Verizon applied for a special-use permit to build a cell-tower facility that would address what they characterized as a "significant gap in service" in Geneva and the surrounding area. *Id.* at *2. The proposed tower was to be sited in the southwestern corner of the "Oscar Swan" property, a seven-and-a-half-acre parcel of open land in the City, and would take the form of a 100-foot "monopine" (a metal tower disguised as a pine tree) with an adjacent storage facility. *Id.* at *2–3.

The City's municipal code requires entities who build or maintain wireless communications facilities to obtain special use permits. *Id.* at *2. While reviewing the Plaintiffs' special use application for this cell-tower project, the City discovered that the Oscar Swan site sat within a zoning district called the "Blackberry Planned Unit Development" (PUD) and that the PUD prohibited special uses of any kind on most of the parcels within it, including the Oscar Swan site. *Id.* at *4. Plaintiffs were therefore required to submit an additional application to amend the PUD

3

along with the special use application and did so, presenting both requests for review by the City at a July 14, 2022 public hearing. *Id.* at *3.

At that hearing before the City's Planning and Zoning Commission ("PZ Commission"), Plaintiffs described the Oscar Swan site as their "primary" option and a "home run" to address the reported coverage gap, but provided little in the way of specifics about either the scope and severity of the gap or their process for selecting the site, due to an alleged need to protect Verizon's "competitive advantage" in its "proprietary data" that might be used by rival carriers. *Id.* at *5–6. Multiple Geneva residents voiced strong opposition to the tower, which they viewed as a potential eyesore for the surrounding area that could decrease property values, while also questioning (based on anecdotal evidence) whether Verizon's purported coverage gap actually existed. *Id.* at *6–7.

The City did not act immediately after the hearing, and on August 8, 2022, TowerNorth filed this lawsuit, alleging that the City unreasonably delayed in acting on its applications. *Id.* The City Council convened a hearing that same night, at which Plaintiffs' representatives reiterated that Oscar Swan was a "great site," that it "me[t] all the requirements," and that it "check[ed] all the boxes." *Id.* at *14. TowerNorth failed, however, to satisfy the Council's requests for more detail about their need for a tower or their consideration of alternative sites. *Id.* at *9–10. The Council unanimously voted to deny Plaintiffs' applications, citing public concerns over the project's "adverse aesthetic and visual impacts," its potential effects on "local property values," and "TowerNorth's demonstrated failure to consider less intrusive alternatives." *Id.* at *10.

After the City's denial, TowerNorth amended its complaint, adding Verizon as an additional plaintiff and alleging several additional counts under the TCA. The Second Amended Complaint contained four counts: (1) that the City's decision was unreasonably delayed in violation of 47 U.S.C. § 332(c)(7)(B)(ii); (2) that the denial was unsupported by substantial evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii); (3) that the denial effectively prohibited Plaintiffs from providing personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); and (4) that the City's

4

zoning regulations effectively prohibited their ability to provide telecommunications services in violation of 47 U.S.C. § 253(a), and were thus preempted by the TCA. (*See* Second Am. Compl. [11] ¶¶ 99–146.)

The City moved to dismiss Counts I and IV for failure to state a claim in October 2022 [17]. The court dismissed Count I as moot but denied the motion without prejudice as to Count IV, postponing a definitive ruling on the City's argument that Section 253(a) does not create a private right of action. *See TowerNorth I*, 2023 WL 6388257, at *11.

Both parties moved for summary judgment on Counts II, III, and IV in March 2023 [28, 31]. The court granted the City's motion with respect to Count II, finding that the City's decision to deny Plaintiffs' requests for amendment to the PUD and for a special use permit to build the cell-tower at Oscar Swan were supported by substantial evidence. *TowerNorth II*, 2024 WL 621616, at *20, 30. As the court explained, the "highly deferential" substantial-evidence test under the TCA requires only that the defendant's decision be backed by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* at *11 (internal citations omitted).

The court denied both parties' motions for summary judgment on Counts III and IV, however. *Id.* at *30. The court began with the understanding that Plaintiffs' "effective prohibition" claim was governed by the "materially inhibits" test that the FCC adopted in a 2018 Order, excerpted below:

> a state or local legal requirement will have the effect of prohibiting wireless telecommunications services if it materially inhibits the provision of such services. We clarify that an effective prohibition occurs where a state or local legal requirement materially inhibits a provider's ability to engage in any of a variety of activities related to its provision of a covered service. This test is met not only when filling a coverage gap but also when densifying a wireless network, introducing new services or otherwise improving service capabilities. . . . [A] state or local requirement could materially inhibit service in numerous ways—not only by rendering a service provider unable to provide an existing service in a new geographic area or by restricting the entry of a new provider in providing service in a particular area, but also by materially inhibiting the introduction of new services or the improvement of existing services. Thus, an effective prohibition includes materially inhibiting additional services or improving existing services.

5

*TowerNorth II*, 2024 WL 621616, at *21 (citing *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Investment*, 33 FCC Rcd. 9088 (14) ¶ 1 (2018) (hereinafter "2018 FCC Order")). The FCC's reasonable interpretation of the TCA's "effective prohibition" clause, the court held, was both entitled to deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and binding on this court under the Hobbs Act, 28 U.S.C. § 2342(1), which strips district courts of jurisdiction to pass on the validity of the FCC's orders. *Id.* at *22. In adopting the "materially inhibits" test, the FCC had "explicitly rejected" the test previously applied by the Seventh Circuit to "effective prohibition" claims under the TCA. *Id.* at *23 (citing 2018 FCC Order ¶ 40 n. 94). That earlier Seventh Circuit test imposed on the carrier the "heavy burden" to show not just that its building application had been rejected but that further reasonable efforts to adjust the application were "so likely to be fruitless" that it would be "a waste of time to even try," and that there were "no other potential solutions to the purported problem" that the project was meant to address. *VoiceStream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818, 834 (7th Cir. 2003) (internal citations omitted).

Even under the carrier-friendly "materially inhibits" test, however, the court found material disputes of fact over whether the City's denial of Plaintiffs' application to build on the Oscar Swan property effectively prohibited Plaintiffs from providing wireless services in the surrounding area. *Id.* at *25. In particular, the parties presented conflicting evidence over (1) the extent of the Verizon coverage issues in the area of Geneva in question and (2) the adequacy of alternative solutions to the coverage issues. *Id.* at *26–29. These gaps in the record, the court concluded, needed to be filled at an evidentiary hearing. *Id.* at *30.

Finally, the court held at summary judgment that resolving the Plaintiffs' Section 253(a) preemption claim in Count IV would also require an evidentiary hearing, because under the FCC's interpretation, that provision also looks to "whether a locality's regulations" (as opposed to

individual zoning decisions) "materially inhibited telecommunications services."[1]  *Id.* (internal citations omitted).

Just three weeks before that hearing was set to begin, the Supreme Court issued its decision in *Loper Bright Enters. v. Raimondo*, overruling *Chevron* and holding that courts "must exercise their independent judgment" in evaluating agency interpretations of ambiguous statutes, rather than deferring to the agency's permissible construction.  603 U.S. 369, 412 (2024).  With the applicable legal standard thrown into question, the court elected to proceed with the hearing as scheduled, under the tentative understanding that the Seventh Circuit's preexisting effective prohibition test, articulated in *VoiceStream*, likely applied in the wake of *Loper Bright*.  [81].[2]  The City also filed a separate motion for reconsideration [85] of the court's February 2024 order, effectively arguing that the court's holding that the City's denial of the PUD amendment and special use permit were supported by substantial evidence also requires a conclusion that, under the test outlined by the Seventh Circuit, the City prevails on the question of whether its denials "effectively prohibited" provision of cell phone service.

The court conducted an evidentiary hearing in July 2024 [87] and the parties have submitted post-hearing briefs and replies [97, 98, 100, 101] outlining their respective positions on the "effective prohibition" and preemption claims.  In this ruling, the court summarizes the evidence presented at the hearing before revisiting the legal standard applicable to the "effective prohibition" claim, and finally ruling on the parties' cross-motions for summary judgment on Counts III and IV.

---

[1]       Indeed, the application of the "materially inhibits" standard to Section 253(a) preceded and inspired the FCC's deployment of the standard in the 2018 Order.  *See Cellco P'ship v. White Deer Twp. Zoning Hr'g Bd.*, 74 F.4th 96, 102 (3d Cir. 2023) (internal citations omitted).

[2]       The court did not, however, "confirm[] that the Seventh Circuit's standard controls," as the City claims.  (Def. Br. [97] at 1.)

**FINDINGS OF FACT**

Plaintiffs presented three witnesses at the evidentiary hearing: Jackie C. Ramsey, Jr., Director of Systems Performance for Verizon's Illinois/Wisconsin network, who was in a similar but lower position overseeing systems performance in the Chicago area at the time this suit commenced; Mark Layne, a commercial real estate appraiser who served as Plaintiffs' site-acquisition consultant during their search for a suitable parcel of land; and Jessie McDaniel, a Verizon radio frequency ("RF") engineer who worked on the Geneva site.  (July 19, 2024 Hr'g. Tr. [92] (hereinafter "Tr.") at 19:14–16, 79:14–80:5, 219:21–220:3.)  Both Mr. Layne and Mr. McDaniel had also testified at the hearings on Plaintiffs' initial applications before the City.  *See TowerNorth II*, 2024 WL 621616, at *5, 8.  The City cross-examined each of Plaintiffs' witnesses but presented no witnesses or evidence of its own.  The court will begin by examining the evidence presented by Plaintiffs regarding the coverage issues that Verizon was attempting to solve, before turning to evidence regarding potential alternatives to the Oscar Swan site.

I.      **Verizon Coverage Issues in the Randall-Lincoln Area**

This dispute was prompted by Verizon's concerns regarding its network coverage in the area surrounding the intersection of Randall Road and Illinois Route 38 (also referred to as Lincoln Highway).  *TowerNorth II*, 2024 WL 621616, at *26; (Tr. at 91:13–14.) This area, which the court refers to as the "Randall-Lincoln area," includes the Geneva Commons shopping center along Randall Road, as well as surrounding roads, neighborhoods, and businesses.[3]  (Pl. Hr'g Ex. 48 [105-5] at COG 00314.)   The area encompasses portions of both the City of Geneva and its immediate neighbor to the north, the City of St. Charles:  in fact, the intersection of Randall Road

---

[3]      Plaintiffs, citing a 2020 traffic study by the City's engineering division, estimate that this stretch of Lincoln Highway serves about 21,000 vehicles per day, and the nearby stretch of Randall Road serves about 31,900 vehicles per day.  (*See* Pl. Hr'g Ex. 48 [105-5] at COG 00312, 00314.)

and Lincoln Highway itself is in St. Charles.  (*See* Def. Hr'g Ex. 20 [103] at VZW-4186–87 (maps roughly outlining the Randall-Lincoln area).)

At summary judgment, Plaintiffs presented only "limited evidence" of coverage issues in the Randall-Lincoln area.  *TowerNorth II*, 2024 WL 621616, at *27.  The City, for its part, offered some "modest evidence" downplaying the coverage concern:  namely, the testimony of three Geneva residents who stated that they were Verizon customers and had not experienced any service problems in the Randall-Lincoln area.  *Id.*  At the evidentiary hearing, the City offered nothing new on this score, but Plaintiffs made a more robust showing concerning coverage issues.

Jackie Ramsey, the Verizon Systems Performance Director, explained that Verizon's coverage concerns in the Randall-Lincoln area include both the quality of customer's telephone calls and customers' ability to access Verizon's network for "data usage."  (*See* Tr. at 23:23–24:12; 252:11–16.)  To measure the performance of its network, Verizon uses metrics called key performance indicators, or "KPIs."  (*Id.* at 28:19–23.)  Ramsey's testimony identified four KPIs that are particularly important to Verizon's assessment of coverage integrity:  "dropped calls, access failures, utilization, and throughput."  (*Id.* at 220:11–13.)  Of these terms, dropped calls is self-explanatory.  Access failures, also referred to as "setup failures" or "blocked calls," are instances where a customer attempts to initiate a phone call on the Verizon network but is unable to do so at all.  (*Id.* at 49:15–17.)  "Throughput" refers to the speed of a user's connection to the Verizon network for data usage, measured in megabits per second.  (*Id.* at 51:19–23.)  Finally, "utilization" (also referred to as "control channel utilization") describes the Verizon network's interaction with users' mobile devices.  (*Id.* at 54:25–55:5.)  Ramsey testified that utilization is expressed in percentages, but did not explain exactly what is measured by these percentages, other than to clarify that lower utilization percentages translate to better network performance, while higher utilization percentages translate to worse performance.  (*Id.* at 55:6–11.)

Plaintiffs' evidence shows that, according to all the metrics defined above, Verizon's network was underperforming in the Randall-Lincoln area during the three-year period

encompassing 2019, 2020, and 2021, and particularly in the final six months of 2021 (i.e., the months just before Plaintiffs submitted their application to build a cell-tower at Oscar Swan). During this three-year period, Verizon detected an average of 11,146 dropped calls per day originating in the Randall-Lincoln area; in the final six months of 2021, the rate of dropped calls was nearly twice as high. (Tr. at 48:5–49:10; Pl. Hr'g Ex. 6 [105] at VZW-8059–60.) The average number of daily "blocked calls" or "setup failures" during this period was 1,611, with the average more than doubling in the final six months of 2021. (Tr. at 50:21–51:12; Pl. Hr'g Ex. 6 at VZW-8063–8064.) The throughput (or speed of network connection) for Verizon users in the Randall-Lincoln area fell below Verizon's target of five megabits per second about 75% of the time, and in the final six months of 2021, the throughput was below target some 95% of the time. (Tr. at 51:19–52:17; Pl. Hr'g Ex. 6 at VZW-8050–51.) Finally, the network utilization percentage for the Randall-Lincoln area exceeded Verizon's target of 50% utilization more than half the time during this period and was above the utilization target 93% of the time in the final six months of 2021. (Tr. at 55:19–56:12; Pl. Hr'g Ex. 6 at VZW-8055–56.) Jessie McDaniel, the Verizon RF engineer who testified at the hearing, explained that he had relied on the KPI metric data described above when he submitted affidavits to the City as part of Plaintiffs' special use permit application in 2022. (Tr. at 228:23–230:5; Pl. Hr'g Ex. 48 at COG 00314–15.)

The City presented no evidence or testimony at the hearing that called into question Plaintiffs' use of the KPI metrics to assess the need for improved service in the Randall-Lincoln area. At this stage, the only evidence that casts doubt on Plaintiffs' need for improved Verizon service in the area is what the City provided at summary judgment: the testimony of three Geneva residents who said they were Verizon customers and claimed they had not experienced any service problems, as well as the purported lack of complaints from Geneva emergency officials about Verizon service in the area. *TowerNorth II*, 2024 WL 621616 at *27.

10

## II.    Potential Solutions to the Randall-Lincoln Coverage Issues

Although the data offered by Plaintiffs to demonstrate coverage deficiencies in the Randall-Lincoln area goes back only to 2019, it appears that Verizon had been seeking to address coverage issues in this area well before then. Layne, the site acquisition consultant who worked with Verizon, testified that he was first assigned to search for sites in the Randall-Lincoln area in February 2017. (Tr. at 83:17–22.) According to Layne, his first step was to search the area for tall, existing structures where Verizon could place an antenna or other equipment: examples of such structures include existing cell-towers, water tanks, and electrical transmission towers. (*Id.* at 81:18–24.) Layne was not able to locate any existing structures of the appropriate height. (*Id.* at 92:3–5.) From there, Layne considered alternatives, as described below.

### A.    Cell-Tower Site Candidates

Layne testified that his next step was to compile a summary of potential sites for a new cell-tower, based on his review of applicable land-use regulations and his attempts to contact landowners in the Randall-Lincoln area. (*Id.* at 90:13–15.) Layne emailed this summary to Verizon on February 24, 2017. (Pl. Hr'g Ex. 11 [105-1] at INSITE-066–066.0003.) By that time, Layne had contacted the owners of five potential sites and had identified eight other potential alternative sites—some in Geneva, and some in neighboring St. Charles—whose owners he had not yet contacted. (*Id.* at INSITE-0066.0002–03.) When Layne began the search for a tower site in February 2017, he and Verizon were working with a different company of the same kind as TowerNorth; this company was called "Parallel Infrastructure," and will be referred to here by that name, though it was acquired by another company called "Lendlease" while Layne's search was ongoing. (*See* Tr. at 100:2–19, 129:12–16; *see also* Pl. Hr'g Ex. 11 at VZW-7211.)

### 1.    Metro Storage

Of the sites identified in his February 24, 2017 email to Verizon, Layne reported that the owners of a site referred to as "Metro Storage" were the most interested in the project, though that site had the "least available ground space, making it somewhat unattractive for a tower

11

partner." (Pl. Hr'g Ex. 11 at INSITE-0066.) The Metro Storage site is in St. Charles, not in Geneva. (Tr. at 167:6-7; Pl. Hr'g Ex. 11 at INSITE 0066.0002.)

By April 2017, Layne had determined to move forward in negotiations with Metro Storage (Tr. at 93:10–12; Pl. Hr'g Ex. 13 [105-1] at INSITE-0074.) Layne spent much of the following year negotiating lease terms with the owners of Metro Storage, eventually reaching agreement on a lease for a parcel of land for which Verizon would pay $1,400 monthly rent. (Pl. Hr'g Ex. 14–16 [105-2] at INSITE-0423–47 (displaying emails back and forth between Layne and Metro Storage in 2017).) The project hit a snag in May 2018, however, when Layne learned from the owners of the Metro Storage property that execution of the lease and construction of a cell-tower would require the approval of a neighboring property owner, pursuant to a restriction in the deed conveying title from the neighbor to the owners of Metro Storage.[4] (Tr. at 98:13–21; Pl. Hr'g Ex. 21 [105-2] at VZW 7370–71.) Layne testified that the neighboring property owner "was preventing progress" and "wasn't going to release [the owners of Metro Storage] to move forward with the lease," and that the Metro Storage owners were unwilling to move forward because of the risk that the neighbor might sue to enjoin construction based on the deed restriction, despite an offer by Parallel Infrastructure to indemnify them for the costs of litigation. (*See* Tr. at 100:20–101:20.) In September 2018, Layne informed Verizon that the Metro Storage site was no longer "a viable candidate," and he "went back to square one and started reviewing the other potential candidates" from the summary he had sent to Verizon in February 2017. (Tr. at 101:5–17; Pl. Hr'g Ex. 21 at VZW 7370.)

---

[4] It is not perfectly clear from the record, but the deed appears to be dated to 2003. (*See* Pl. Hr'g Ex. 21 at VZW 7371 (photocopy of deed restrictions page stamped with the code "2003K001886."))

2.    **BEI**

The next candidate site that Layne and Verizon pursued is referred to by Plaintiffs as "BEI."
The BEI site, like the Metro Storage site, is in St. Charles, Illinois.  (Pl. Hr'g Ex. 11 at INSITE-
0066.0002; Tr. 115:5–9.)  And as with the Metro site, Layne and Verizon would soon encounter
challenges at BEI.

Layne testified that in order to access the BEI parcel, Verizon required an easement
through one of two properties: an apartment complex to the south of the parcel, or a Meijer
supermarket to the east.  (Tr. at 109:10–110:4; Pl. Hr'g Ex. 23 [105-2] at VZW-7555.)  According
to Layne, City of St. Charles staff were concerned that the apartment complex owner would not
grant an easement because the complex had previously objected to the idea of a cell-tower in the
area, but Plaintiffs presented no admissible evidence that the complex owner ever communicated
such concerns to the City of St. Charles.  (*See* Tr. 115:22–116:24.)  In any event, it appears that
Layne's only effort to negotiate an easement was with Meijer.   According to Layne, Meijer's
demand was steep:  it demanded $20,000 up front and $5,000 per year over a 30-year lease
term, totaling $170,000 over the life of the lease. (Tr. at 111:10–113:2; Pl. Hr'g Ex. 26 [105-3].)
Layne found this excessive; in his experience, easements of this nature were typically
compensated by a "onetime payment," in most cases "somewhere in the neighborhood of $1,500."
(Tr. at 112:11–13.)

Then there was the question of a lease for the BEI property itself.  Layne testified that its
owner is a man named Austin Dempsey, the principal of a local real estate development company.
(Tr. 114:2–10.)  Layne testified at some length concerning his communications with Dempsey.[5]
In July 2019, Layne sent two lease proposals for the BEI site to Dempsey's office.  (*See* Pl. Hr'g
Ex. 28 [105-3] at INSITE-3329; Tr. at 114:19–20.)  Option A contemplated a $5,000 upfront fee

---

[5]    The City objects to the court's consideration of this testimony, but the objection, which
appears only in post-hearing briefs, is waived.  (*See* Defs. Br. [97] at 15; Pl. Reply [101] at 6 n.
5.)

13

and a $1,500 monthly rent for an initial five-year lease term plus four renewal terms of five years each. (*Id.* at 114:20–23.) Option B included a $3,000 upfront fee, and a $1,200 monthly rent with a five-year initial term and four renewal terms of five years each with a 7.5% "term escalation."[6] (*Id.* at 114:24–115:2.) Layne received no response from Dempsey's office. (*Id.* at 115:3–4.) Layne testified that he then sent a proposed ground lease template to Dempsey's office in October 2019; again, Dempsey did not respond. (Pl. Hr'g Ex. 28 at INSITE 3329; Pl. Hr'g Ex. 30 [105-3] at VZW-8847; Tr. at 118:23–119:17.)

Eventually, Layne was able to schedule a call with Dempsey for January 3, 2020. (*See* Pl. Hr'g Ex. 30 at VZW-8846.) According to Layne, in this call Dempsey claimed he had never seen the draft lease Layne had sent, and asked Layne to resend it. (Tr. 119:18–120:6.) Layne testified that he also asked Dempsey about the possibility of securing an easement from BEI to provide utilities to the tower site, and according to Layne's notes regarding this call, Dempsey was "okay with" that proposition. (*Id.* at 120:18–21; Pl. Hr'g Ex. 30 at VZW-8846.) Layne testified that following the January 3 call with Dempsey, Layne re-forwarded the proposed lease to Dempsey's office but received no response despite following up by phone with Dempsey's assistant several times over the next few months.[7] (Tr. at 122:2–11.) Layne was frustrated enough that he on occasion referred to Dempsey as "the Wizard of Oz" because it was so difficult to communicate with him. (*Id.* at 121:23–24.)

Eventually, Layne explained, he was able to track down a cell-phone number for Dempsey, and called Dempsey on April 6, 2020, catching him by surprise. (*Id.* at 123:11–15.) In an email to Verizon after this call, Layne wrote that Dempsey was not willing to take action that might have a negative impact on the future marketability of the property by encumbering it with a

---

[6]     "Term escalation" is not defined in Plaintiffs' papers, but the court infers that it refers to an increase in monthly rent of up to 7.5% at each term renewal.

[7]     Layne's email reforwarding the proposed lease to Dempsey does not appear to be in evidence.

cell-tower—or at least, not at the lease price Layne proposed. (Pl. Hr'g Ex. 32 [105-3] at VZW-7146.) According to Layne's email, Dempsey needed to see "something at least double" the amount that Layne had proposed back in July 2019—that is, at least twice as much as the $3,000 upfront, $1,200 monthly, and 7.5% term escalation proposal. (Pl. Hr'g Ex. 32 at VZW-7726.) In this email, Layne relayed that Dempsey "threw out a number" of $4,000 per month in rent, which Layne said, "was not going to happen." (*Id.*)

Finally, Layne testified that, at some point prior to the April 6, 2020, call, he learned (he does not say how) that it was Mr. Dempsey who was the unresponsive neighbor who had previously blocked the use of the Metro Storage property for a cell-tower in the summer of 2018. *See supra* at p. 6–7; (Tr. at 124:3–8.) In his email to Verizon describing the April 6 call with Dempsey, Layne relayed that when he asked Dempsey if he would reconsider allowing Verizon to build a tower at the Metro Storage site, Dempsey "refused, basically saying if he couldn't have the money, nobody could." (Pl. Hr'g Ex. 33 [105-3] at VZW-7726.)

Ultimately, Layne was not able to come to terms with Dempsey for building a cell-tower at the BEI site. (Tr. at 124:19–21.) After negotiations for the BEI site failed, in May 2020 Layne briefly re-traced his steps: He first reached out to the owners of another property that Layne had identified and contacted back in February 2017, but the owners were no longer interested. (Tr. at 125:5–17; Pl. Hr'g Ex. 11 at INSITE-0066.0002; Pl. Hr'g Ex. 12 [105-1] at INSITE-0085; Pl. Hr'g Ex. 35 [105-3] at VZW-0903.) Layne also inquired with the Meijer supermarket about building the tower on their property, but Meijer was unwilling to allow a tower any higher than 35 feet. (Tr. at 125:18–126:15, 127:1–128:2; Pl. Hr'g Ex. 36 [105-4] at VZW-7669–70.) This was not tall enough to meet Verizon's needs: by that point, Layne had consulted with Jesse McDaniel (the Verizon RF engineer) about height requirements, and McDaniel had told him that 100 feet was the minimum acceptable height, and that a height of 130 feet was preferable. (Pl. Hr'g Ex. 41 [105-4] at INSITE-0102; Tr. at 128:1–13, 227:20–228:3.)

Layne testified that after being rebuffed by Meijer, he expanded the geographic bounds of his search for a suitable candidate and sent inquiry letters in June 2020 to the owners of other properties that he thought could be viable. (Tr. 128:15–20; Pl. Hr'g Ex. 30 at VZW-8846.)

### 3. Dempsey 2

Layne's renewed outreach would once again bring him into contact with Austin Dempsey, the local real estate developer who owned the BEI parcel (and who reportedly had soured the Metro Storage proposal). One of the responses Layne received to his June 2020 letters was from a Dempsey-owned LLC, regarding a property that Plaintiffs refer to as "Dempsey 2." (Tr. at 130:10–18.) The Dempsey 2 property is in the City of Geneva, just northwest of the Oscar Swan property that is the subject of the proposal Plaintiffs are now pursuing. (*See* Pl. Hr'g Ex. 42 [105-3] at VZW-5778.) Layne testified that he and Dempsey set up a call for July 6, 2020 to discuss the prospect of building a tower at the Dempsey 2 site, and during this call, Dempsey stated he would be willing to lease the property for $2,500 per month. (Tr. at 133:20–134:10.)

After speaking with Dempsey regarding the lease, Layne consulted with Jesse McDaniel to see whether the Dempsey 2 site would be acceptable from a technical perspective. (*Id.* at 134:10–14.) McDaniel confirmed that it was, again, assuming a tower height of preferably 130 feet but no less than 100 feet. (*Id.* at 134:15–20, 227:18–228:3.) By this time, however, Layne had doubts about the feasibility of the Dempsey 2 site. Layne had come to believe that the City of Geneva would be unlikely to support development at Dempsey 2 given the site's "proximity to residences and future highest and best use for some sort of office or commercial development," adding that Dempsey 2 was "wide open with no existing natural concealment, and [would] be difficult to design."[8] (Pl. Hr'g Ex. 43 [105-4] at VZW-5775.) Layne explained that the absence of any natural concealment was of concern because the City of Geneva's zoning code requires that

---

[8] As the City elicited on cross-examination, Layne was, by this point, not thrilled about the prospect of working with Dempsey, who Layne referred to as seeming "disingenuous" and being a "pain in the ass." (Tr. at 157: 22–158:9.)

"any proposed wireless communication facility shall be designed so as to minimize the visual impact of the facility by blending it into the existing aesthetic of the area or buffering the facility from view."  (Tr. at 147:3–19); GENEVA, ILL., CODE § 11-3-12(F)(8) (2024).  In Layne's view, any tower at the Dempsey 2 site would "stick out like a sore thumb," rather than "blending in," and would be viewed by the City as a "non-concealed" tower.  (Tr. at 147:20–148:1.)  This was a problem, Layne said, because the City's zoning code dictates a maximum height of 80 feet for all new, non-concealed towers—and Verizon needed a tower of at least 100 feet.  (Tr. 148:1–5); GENEVA, ILL., CODE § 11-3-12(F)(10)(a)(ii) (2024).  Finally, Layne also testified that because of the shape of the Dempsey 2 parcel, and the City's property-line setback requirements, any tower at Dempsey 2 would have had to be placed near the center of the parcel—which, according to Layne, Dempsey opposed.  (Tr. at 146:6–16; Pl. Br. [97] at 6.)

As Plaintiffs now note, it turns out that Dempsey 2 falls within the same PUD as the Oscar Swan site; recall that the PUD bars all special uses, meaning that in order to build at Dempsey 2, Plaintiffs would have to submit both a special use application *and* an application to amend the PUD, as with Oscar Swan.  (*See* Tr. at 152:17–22); *supra* at p. 2.  Plaintiffs did not know this at the time, and in fact did not realize the PUD existed at all until the City raised the issue while reviewing Plaintiffs' special use application for Oscar Swan.  *Supra* at p. 2.

### 4.    Oscar Swan

In August 2020, Layne received a call from the owner of the Oscar Swan site in Geneva, one of the properties in Layne's sights after he had expanded his search.[9]  (Tr. 135:13–14.)  As Layne explained in an email to Verizon on August 11, 2020, the Oscar Swan owner was willing to consider the placement of a tower in the woods at the southwest corner of the property.  (Pl. Hr'g Ex. 42 at VZW-5778.)  In his email, Layne stated that he believed he could get a tower at

---

[9]    Plaintiffs have now explained that TowerNorth only became involved in this case after Oscar Swan came into the picture, replacing Parallel Infrastructure as Verizon's partner in the tower project.  (Tr. at 148:13–20; Pl. Br. at 20 n. 13.)

Oscar Swan to "conform to the Geneva zoning code more easily than Dempsey 2," as the woods would "more effectively screen the equipment" and, Layne stated, he would have "an easier time meeting setbacks." (Pl. Hr'g Ex. 42 at VZW-5778.)

Soon after this contact, Layne met in person with the owner of Oscar Swan. (Tr. at 136:2–3; *see generally* Pl. Hr'g Ex. 43.) As Layne explained in a post-meeting email to Verizon, there were three potential locations on the Oscar Swan property where the tower could be built, which Layne referred to as options A, B, and C. (Pl. Hr'g Ex. 43 at VZW-5775, 5777.) Layne explained that the owner's preferred option was A, because the placement of a tower there would "least impact future development of the parcel," and that section already had "paved access." (*Id.*) Both options A and C "benefit[ted] from natural concealment and the ability to meet fall zone setbacks," though C was the owner's least favorite option. (*Id.*) According to Layne, "fall zone setbacks" are a particular kind of setback requirement based on where a tower would land if it "toppled like a tree." (Tr. at 175:1–3.) Option B would work, Layne opined, only if Verizon could "engineer a zero fall zone radius" because of the location's proximity to the property line. (Pl. Hr'g Ex. 43 at VZW-5775.) As Layne explained at the evidentiary hearing, a tower with a "zero" or "zero-degree" fall zone is a tower designed to fall "straight down," collapsing on itself rather than toppling over, like a tree. (Tr. at 175:1–8.)

All told, after visiting the Oscar Swan site in August 2020, Layne was "much less a fan of Dempsey 2." (Tr. at 177:19–20; Pl. Hr'g Ex. 43 at VZW-5775.) As described above, Layne had already formed the view that Dempsey 2 would not be desirable from the City's perspective because a tower at Dempsey 2 would not conform with some of the City's zoning requirements. After this point, there were no further negotiations for the Dempsey 2 site. Instead, Layne and the owner of Oscar Swan negotiated terms, including specifically an annual rent of $30,000, equivalent to a monthly rent of $2,500: the same amount Dempsey had asked for at the Dempsey 2 site. (Tr. at 214:11–20; Pl. Hr'g Ex. 45 [105-4] at VZW-6642.) Once the Oscar Swan lease was ready, the Plaintiffs began the application process with the City that kicked off this litigation.

B.      Viability of Small Cell Solutions

Before turning to analysis of Plaintiffs' legal claims, the court addresses one further factual matter:  the possibility that Plaintiffs might address the coverage issues in the Randall-Lincoln area without building a new cell-tower at all, but instead by building multiple "small cell" facilities. These small cells are much shorter structures than cell-towers, just fifteen to twenty feet in height on average, according to Jackie Ramsey, Jr., the Verizon Systems Performance Director.  (Tr. at 58:6–9.)  From a technical perspective, Ramsey explained, small cells are not substitutes for cell-towers (or "macro" towers, as Ramsey calls them).  (*Id.* at 57:17–21.)  This is because small cells create a "limited footprint" of network coverage:  they cover far less terrain than cell-towers, and the electromagnetic waves that they emit are not always powerful enough to pass through foliage or buildings.  (*Id.* 57:6, 57:23–58:1.)  For this reason, Ramsey testified, small cells are typically used to fill small coverage holes or create "capacity hotspots" within existing networks.  (*Id.* at 57:10–16.)  Small cells have two additional limitations:  First, Ramsey explained, small cells have a less reliable power supply than macro towers, which, unlike small cells, can be equipped with "backup batteries and generators." (*Id.* at 232:4–9.)  Second, Ramsey noted that putting too many small cells close together causes "interference" between the waves emitted by the cells, which in turn affects the network quality produced by the cells.  (*Id.* at 232:10–17.)

As early as 2019, Verizon and Layne had considered the deployment of small cells to address coverage issues in the Randall-Lincoln area as a "Plan B" if Verizon were unsuccessful in finding a candidate site for a "macro" solution.  (Def. Hr'g Ex. 20 [103] at VZW-4185.)  There is no evidence that Plaintiffs viewed small cell deployments as anything more than an undesirable Plan B.  As Jessie McDaniel, the Verizon RF engineer, reiterated in an email sent on August 8, 2022 (the same day Plaintiffs' applications were denied by the City), small cells are not a better solution than a "macro" tower.  (Def. Hr'g Ex. 25 [104] at VZW-6198.)  McDaniel noted that small cells would be a "very good option to help offload traffic in the area along Randall Rd," but a cell-

tower could successfully address the coverage along both Randall Road *and* Route 38 (Lincoln Highway), as well as in the residential area in between the two roadways. (*Id.*)

At the evidentiary hearing, both parties introduced propagation maps projecting the improvement in coverage created by two small cells deployed along Randall Road near the Geneva Commons shopping center, as well as the projected improvement in coverage created by a cell-tower at the Oscar Swan site. (*See* Pl. Hr'g Ex. 55 at VZW-8855; Defs. Hr'g Ex. 29 [104] at VZW-8856.) These propagation maps support McDaniels's analysis that the small cells deployed along Randall Road would be effective in improving coverage in their immediate vicinity, but unlike the cell-tower, would not improve the situation along Lincoln Highway, or in the residential area in between.

Finally, at the evidentiary hearing, Ramsey testified that small cell facilities typically cost about $180,000 each. (Tr. at 240:9–15.) By comparison, Ramsey explained, macro towers typically cost anywhere from $350,000 to $500,000 to build. (*Id.* at 59:2–3.)

## ANALYSIS

### I. Plaintiffs' Section 332(c)(7)(B)(i)(II) Effective Prohibition Claim

#### A. Legal Standard

In its summary judgment opinion, this court held that the FCC's "materially inhibits" test governed Plaintiffs' claim of "effective prohibition" under the TCA. That decision hinged (in part) on the deference owed to the FCC's reasonable interpretation of the TCA under *Chevron*, and to the derivative principle that such reasonable interpretations trump prior circuit precedent as long as that precedent left open some room for agency discretion. *See City of Arlington v. FCC*, 569 U.S. 290, 296 (2013) (citing *Chevron*, 467 U.S. at 842–43); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2002). But the court recognized the possibility that the Supreme Court's forthcoming decision in *Loper Bright* might require revisiting this analysis. *See id.* ("[T]his court *for now* defers to the FCC's reasonable interpretations of the TCA's ambiguous provisions.") (Emphasis added.) *TowerNorth II*, 2024 WL 621616, at *22.

The court now revisits the question. Does the FCC's 2018 Order continue to supersede the Seventh Circuit's opinion in *VoiceStream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818 (7th Cir. 2003) in determining the proper test for "effective prohibition"? As the court explained in a short order entered on July 1, 2024 [81], *Loper Bright* removes an obligation this court would otherwise have had to defer to the FCC's 2018 Order under *Chevron* and *Brand X*. The court thus assumed it would assess the evidence in this case with the understanding that the proper rule to apply was the Seventh Circuit's preexisting standard. ([81] at 1 (citing *VoiceStream*, 342 F.3d at 834–35)). The court's order also explained, however, that the *Chevron* doctrine is not the only relevant consideration. ([81] at 1-2.) Although the parties had not raised the issue in their pleadings, the court noted it might well be bound by the FCC's "materially inhibits" standard pursuant to the Hobbs Administrative Orders Review Act, 28 U.S.C. § 2342, *et seq.*, which vests "exclusive jurisdiction" in the courts of appeals to "enjoin, set aside, suspend (in whole or in part), or to determine the validity" of "all final orders of the Federal Communications Commission made reviewable by Section 402(a) of [the TCA.]" 28 U.S.C. § 2342. Venue for a challenge to an FCC order is set either in the D.C. Circuit or in the judicial circuit in which the petitioner resides or has its principal office. 28 U.S.C. § 2343. The circuit court where venue is set for a particular challenge becomes the "Hobbs Act court" for that legal issue, and that court's holdings become "binding on all courts of appeal" nationwide. *Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285, 289–90 (7th Cir. 2018).

The 2018 FCC Order at issue in this case has already been challenged under the Hobbs Act system of review described above, and the Ninth Circuit upheld most of the Order's provisions in *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), *cert. denied*, 141 S. Ct. 2855 (2021).[10] The Ninth Circuit's decision in *City of Portland* has not been revisited or called into

---

[10] The Ninth Circuit's decision in *City of Portland* was itself premised on *Chevron* deference. 969 F.3d at 1037. But as the Supreme Court made clear, its decision in *Loper Bright* did not "call into question prior cases that relied on the *Chevron* doctrine," and those cases remain "subject to statutory *stare decisis*." *Loper Bright*, 603 U.S. at 376.

question by that court or any other, including the Seventh Circuit. This court's July 1 order recognized there might be reason to doubt the Hobbs Act's application here, citing a concurring opinion filed by Judge Pryor in the Eleventh Circuit's decision in *Gorss Motels, Inc. v. Safemark Sys., LP*, which suggested that, to the extent that the Hobbs Act required district courts to defer to FCC orders interpreting a statute, the Hobbs Act was unconstitutional. 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor, J., concurring).[11] This court nevertheless explicitly left open the possibility that the 2018 FCC Order is applicable, and the parties have since addressed the Hobbs Act issues in their respective post-evidentiary hearing briefings.

Having considered the parties' briefing and undertaken a closer analysis, the court now concludes that under the Hobbs Act and Seventh Circuit law, this court is bound by the FCC's 2018 Order, meaning that the carrier-friendly "materially inhibits" test adopted in the court's summary judgment order continues to apply. The Seventh Circuit has previously confirmed that district courts, pursuant to their Article III obligations, must consider "the Hobbs Act's jurisdictional restrictions" *before* conducting "any analysis of the merits" of a case, including what the proper interpretation of a statute might be. *CE Design, Ltd. v. Prism Bus. Media, Inc.*, 606 F.3d 443, 447 (7th Cir. 2010).[12] Because, as the *CE Design* court explained, ignoring or choosing not to enforce the FCC's interpretation of a statute is the same as invalidating that interpretation, *see id.* at 488,

---

[11]    The City argues that the court should decline to adopt the FCC Order under the "constitutional doubt" canon. (Def. Resp. [100] at 6.) As Plaintiffs recognize, however, neither the Eleventh Circuit nor any other court of appeals has taken up Judge Pryor's reading of the Hobbs Act—yet. (*See* Pl. Br. at 4.) Still, it is worth noting that currently pending before the Supreme Court is a case, *McLaughlin Chiropractic Assoc. v. McKesson Corp.*, explicitly framed by the Petitioner as a vehicle to answer the question of "whether the Hobbs Act requires federal courts to treat an agency's legal interpretation of a federal statute as invariably binding." Petition for Writ of Certiorari, (No. 23-1226); *True Health Chiropractic, Inc. v. McKesson Corp.*, Nos. 22-15710, 22-15732, 2023 WL 7015279 (9th Cir. Oct. 25, 2023) (opinion below). In a previous case, *PDR Network, LLC v. Carlton & Harris Chiropractic, Inc.*, the Court had suggested (without deciding) that the Hobbs Act might not preclude a party from challenging the validity of FCC orders in later enforcement proceedings if they lacked a "prior" and "adequate" opportunity to do so as required by the Administrative Procedure Act. 588 U.S. 1, 7–8 (2019) (citing 5 U.S.C. § 703).

[12]    *CE Design* predates *Loper Bright*, but *Loper Bright* has no bearing on the basic principle that jurisdictional issues must be resolved before merits issues.

the jurisdictional bar of the Hobbs Act precludes this court from applying any standard other than the FCC's "materially inhibits" test in determining whether the City's conduct imposes an "effective prohibition" within the meaning of the TCA.

The court thus proceeds in applying the "materially inhibits" test to Plaintiffs' "effective prohibition" claim.

### B.    Application of the FCC's "Materially Inhibits" Standard

As of the date of the court's summary judgment opinion, "the 'materially inhibits' test ha[d] not yet been addressed in the Seventh Circuit, and little guidance exist[ed] both as to whether and how to apply the test here, in the context of a cell-tower." *TowerNorth II*, 2024 WL 621616, at *30. Both statements remain true today. The court thus treats the application of the "materially inhibits" test to a local zoning decision regarding cell-tower deployment as an issue of first impression.

The court had previously identified the following criteria as relevant to the question of whether a city's decision materially inhibited the provision of wireless service: "insufficiency of coverage"; "a lack of alternatives available"; "unreasonable costs imposed on, or asked of, the carrier"; and "unreasonable delay in making the decision." *Id.* at *25. The court also concluded that the goal of the new standard, more broadly, is to "move the needle" in carriers' favor within the balance of the "effective prohibition" test. *Id.* at *24 (citing 2018 FCC Order ¶ 1). The court extracted these principles from the text of the 2018 FCC Order itself, and from the Third Circuit's opinion in *Cellco P'ship v. White Deer Twp. Zoning Hr'g Bd.*, 74 F.4th 96 (3d Cir. 2023), the only federal appellate decision to date to interpret and apply the "materially inhibits" standard in the context of a cell-tower project. *See TowerNorth II*, 2024 WL 621616, at *25.

Of the four factors identified in the court's earlier decision, one—unreasonable delay—requires only brief discussion. In their Second Amended Complaint, Plaintiffs charged the City with violating TCA Section 332(c)(7)(B)(ii), by unreasonably delaying its decision on Plaintiffs' application. (Second Am. Compl ¶¶ 99–112); *see also TowerNorth I*, 2023 WL 6388257, at *5–

6.  But as explained in this court's summary judgment ruling, the delay was a brief one, and Plaintiffs offered no evidence that they were harmed by it.  *TowerNorth II*, 2024 WL 621616, at *29.

With respect to the claim of insufficiency of coverage, the court concludes that there is no meaningful dispute on this issue:  Verizon's network coverage in the Randall-Lincoln area was clearly underperforming as measured by four "KPI" metrics: dropped calls, blocked calls, throughput (or network speed), and utilization percentage.  The City presented no evidence to contradict Plaintiffs' showing and argued in its post-hearing briefing only that the metrics were of Plaintiffs' own design and are not mandated by any statute or regulation (Def. Resp. [100] at 9)— but the fact that Verizon sets its own benchmarks for network performance does not automatically make those benchmarks suspect, and the City has proposed no alternative standards.  The anecdotal evidence at summary judgment (the testimony of three Geneva residents who said things are fine) pales in comparison to the objective, large-scale evidence Verizon has now provided to the contrary.

That leaves for consideration the remaining two factors—a lack of available alternatives, and imposition of unreasonable costs on the carrier.  Here the court begins by addressing the "small cell" option.  Plaintiffs have satisfied the court that, certainly under the carrier-friendly "materially inhibits" test, they are likely entitled to build a cell-tower (if any site is available) to address the coverage issues in the Randall-Lincoln area rather than relying on small cells.  In other words, if the only available choices in this case were a 100-foot tower at the Oscar Swan site, or a collection of small cell deployments in the Randall-Lincoln area, Plaintiffs would likely succeed on their "effective prohibition" claim.  The evidence confirms that a collection of small cells deployed in the Randall-Lincoln area would not replicate the effect of a cell-tower at Oscar Swan.  Essentially, all the City has been able to show is that Verizon would rather have small cells on Randall Road than nothing at all.  The City presented no testimony or evidence to controvert Plaintiffs' showing that small cells create a more limited footprint of wireless service

24

than cell-towers, that small cells are less reliable than cell-towers because they are not backed up by batteries or generators, and that deploying too many small cells too close together can be counterproductive because the waves emitted by the cells tend to interfere with each other.

Further, although Verizon did not focus on the relative cost of small cell deployments at the time of its applications, it now appears that a cell-tower would also be more cost-effective than small cell deployments. The cost to Verizon of each small cell deployment is about $180,000 to $185,000; by contrast, the testimony in this case showed that the cost to erect a 100-foot cell-tower could range from $350,000 to $500,000. Based on the propagation maps discussed by both parties during the evidentiary hearing, deploying two small cells along Randall Road (at a cost of about $370,000) would achieve only a small fraction of the Verizon coverage created by a cell-tower at the Oscar Swan site. The court infers that even adding another small cell (or two) along Lincoln Highway would still achieve far less total coverage than the cell-tower, and at that point the cost of the small cell solution would well exceed the cost of the tower.

That leaves the central question: Did the City violate the TCA by denying the application to build a tower at Oscar Swan? If the court were to apply the "effective prohibition" test outlined by the Seventh Circuit in *Voice Stream*, it would be hard-pressed to conclude that Plaintiffs' evidence meets that test. In this case, (1) the carrier's investigation has revealed at least one alternate site in the municipality—Dempsey 2—where the projected cost and performance of a cell-tower appear to be equivalent to those at the denied site, but (2) the carrier has on its own removed that alternate site from the municipality's consideration by failing to submit an application. It is not clear that Plaintiffs' application at Oscar Swan represented the only feasible solution to the purported coverage problem in the Randall-Lincoln area.

The more difficult question is whether the "materially inhibits" test outlined by the FCC Order changes the analysis. In *Horizon Tower Ltd., LLC, v. Park Cnty. Wy.*, the District of Wyoming recently concluded that the defendant county's "denial of a permit to build a tower in one of the only locations feasible to remedy the service gap 'materially inhibits' the provision of

25

wireless services."  No. 23 C 37-ABJ, 2024 WL 4525229, at *11 (D. Wyo. Oct. 4, 2024).  *Horizon Tower* could be read as allowing a carrier to prevail under the "materially inhibits" standard merely by identifying an area in need of improved service and then selecting one of multiple feasible locations in which to build a cell-tower.  This court does not read the 2018 FCC Order as requiring that conclusion.

The Order certainly puts a thumb on the scale for carriers, but as the Third Circuit emphasized in *Cellco*, it remains the case that Congress has "preserved local zoning authority over 'the placement, construction, and modification'" of facilities like cell-towers.  74 F.4th at 100 (quoting 47 U.S.C. § 332(c)(7)(A)).  Fundamentally, then, disputes such as this one continue to exist in "the realm of trade-offs between the carrier's desire to efficiently provide quality service to customers and local governments' primary authority to regulate land use."  *Omnipoint Holdings, Inc. v. City of Cranston*, 586 F.3d 38, 51 (1st Cir. 2009) (quoting *Town of Amherst, N.H. v. Omnipoint Comm'cns. Enters.*, 173 F.3d 9, 15 (1st Cir. 1999)).  *Some* choices regarding such trade-offs must be reserved to municipalities, even if the "outer limit" of the municipalities' decision-making power has been constricted by the 2018 FCC Order.  *See Omnipoint Holdings*, 586 F.3d at 51.  As the court articulated these "outer limits" in its earlier ruling, it recognized that unreasonable costs could impose material inhibition, and that multiple, independently reasonable obstacles might, when taken together, add up to effective prohibition under the totality of the circumstances.  *TowerNorth*, 2024 WL 621616, at *24 (citing *Cellco*, 74 F.4th at 104).

The City's position suggests that Plaintiffs are required to leave no stone unturned when considering alternatives to the Oscar Swan cell tower proposal.  That likely overstates the standard; and in fact, Plaintiffs did explore several other options that either failed in negotiations or would have presented some of the same problems than those that the City identified with the Oscar Swan site.  Metro Storage and BEI were not viable options, at least in comparison to Oscar Swan.  The Metro landowner was not willing to enter into the lease proposed by Layne because of the litigation risk posed by Dempsey (even after Parallel Infrastructure offered to indemnify

Metro against that risk). Meanwhile, Dempsey's last ask for rent at the BEI property was $4,000 per month ($1,500 per month more than at Dempsey 2 or Oscar Swan) over 30 years. And recall that to build at BEI in the first place, Plaintiffs would have had to secure an access easement from one of two neighboring properties. The owner of one of these properties (the Meijer supermarket) had demanded a significant price for the easement alone: $170,000 over 30 years.[13]

But as explained earlier, Plaintiffs did not submit a proposal to the City for the Dempsey 2 site as an alternative to Oscar Swan, despite having investigated the Dempsey 2 site. Plaintiffs concluded, based on that investigation, that the site both met Plaintiffs' technical requirements and was available to lease at the same price as Oscar Swan. Plaintiffs have not demonstrated to the court that the cost of building the tower itself would be greater at Dempsey 2 than at Oscar Swan. Instead, Plaintiffs asset that they were justified in not submitting a Dempsey 2 proposal at all because Layne, the site acquisition consultant, predicted that the City would be more likely to issue zoning approvals for the Oscar Swan property.[14] In particular, Plaintiffs highlight the City's "setback" requirements, the City's requirement that concealed cell-towers "blend in" to the "existing aesthetic" of the area, and the fact that the Dempsey 2 property falls under the same

---

[13]     The City discounts the concern about the price of the easement, citing an email from Jennifer Brown, an employee of Parallel Infrastructure, to Mark Layne, Verizon's site acquisition consultant, in which Brown stated: "Steep price for an easement ($170,000), but I wouldn't expect anything less from Meijer! I'm actually impressed that you got them to agree to an easement at all. Great work!" (Def. Resp. at 13 n. 5 (citing Pl. Hr'g Ex. 26 at VZW-7522).) It might be true that the price of the easement alone would not have made BEI totally unworkable compared to Oscar Swan, but again, recall that Dempsey was also asking for an additional $1,500 per month in rent at BEI.

[14]     Plaintiffs also urge that building at Dempsey 2 was not as feasible as Oscar Swan because Layne, Verizon's site acquisition consultant, "found Mr. Dempsey to be very difficult to work with and not responsive, and thus not a good 'partner' on a long-term lease." (Pl. Br. at 21.) The court is not persuaded by this argument. While it appears that Dempsey had previously been a thorn in Verizon's side, blocking development at the Metro Storage site using his deed restriction and then slow-rolling negotiations at his own BEI site, Plaintiffs have produced no evidence that Dempsey intended to make Verizon's life difficult at the Dempsey 2 site. Much to the contrary: according to Plaintiffs' own evidence, Dempsey quickly responded to Layne's letter about building at Dempsey 2, and the parties were able to reach an agreement on rent at the parcel shortly after.

PUD ordinance as Oscar Swan, which in principle bars the construction of a cell-tower. (*See* Pl. Reply [101] at 6–7.)

The City's requirements are obviously significant. And a carrier seeking to build a cell-tower should, of course, strive to identify potential zoning obstacles before submitting a building application: working ahead in this manner can help to avoid delays in reviewing applications, like the one that occurred in this case when the City discovered the existence of the PUD during its review. But the court is uncertain that a carrier's professed expectations about the enforcement of zoning restrictions may fairly be characterized as an "effective prohibition." After all, decisions about whether to grant variances or amendments to those restrictions are ultimately within the municipality's purview. City officials might well conclude that a monopine tower would sufficiently "blend in" to the "aesthetic" of the Dempsey 2 property to satisfy the Geneva Code (and the potential objections of neighboring residents). The City's conclusion on that score would trump Plaintiffs' view that the monopine would "stick out like a sore thumb." (*Compare* Def. Br. [97] at 15 *with* Pl. Reply at 7.) And if the City decided that a "zero-degree fall zone" tower design would warrant a variance to the City's setback requirements, Plaintiffs' view that this tower design would not solve the "setback issues" at Dempsey 2 would become irrelevant. (*Compare* Def. Br. at 15 *with* Pl. Resp. [101] at 6.) Finally, as an amendment to the PUD would be necessary for either site, the City might prefer an amendment that permitted a tower at Dempsey 2 over construction of a tower at Oscar Swan, where residents had voiced objections.

As the court noted in denying summary judgment, the FCC standard is "not toothless"; even this more lenient standard "requires a showing of *material*—not *de minimis*—inhibition." *TowerNorth II*, 2024 WL 621616, at *25. In this case, the evidence shows that Plaintiffs failed to apply for the Dempsey 2 site as well as the Oscar Swan site, despite the fact that Dempsey 2 was available at the same lease price as Oscar Swan and had been approved within Verizon from a technical standpoint. Even if Plaintiffs' prediction that they were more likely to receive approval for variances at Oscar Swan than Dempsey 2 was reasonable, it was the City's prerogative—not

the Plaintiffs'—to rule out an otherwise technologically and economically feasible tower site by denying zoning variances. On this record, the court concludes that the City's denial of Plaintiffs' application at Oscar Swan did not materially inhibit the Plaintiffs' ability to provide wireless services in the Randall-Lincoln area.

The court now moves to address Plaintiffs' preemption claim under Section 253(a) of the TCA, which forms the basis of Count IV.

## II.    Plaintiffs' Preemption Claim Under Section 253(a)

As the court has previously confirmed, the "materially inhibits" standard also applies to preemption claims under Section 253(a). *See id.* at *21 (internal citations omitted). The difference between "effective prohibition" claims under Section 332(c) and preemption claims under Section 253(a) is that the former extend to "individual zoning decisions" (*see VoiceStream*, 342 F.3d at 833), while the latter seek to invalidate entirely a "[s]tate or local statute or regulation" that has "the effect of prohibiting a carrier from providing services." 47 U.S.C. § 253(a); *see also TowerNorth I*, 2023 WL 6388257, at *5 (describing Plaintiffs' Section 253(a) claim as a "substantive challenge" to the City's regulations).

At summary judgment, the court declined to rule on Plaintiffs' Section 253(a) claim because further evidence was needed in order to apply the "materially inhibits" standard, as with the effective prohibition claim. *TowerNorth II*, 2024 WL 621616, at *30. And in its ruling at the motion to dismiss stage, the court had also expressed doubt regarding two other issues: whether Plaintiffs were entitled to sue for equitable enforcement of Section 253(a) pursuant to the Supremacy Clause, and if so, whether Plaintiffs had standing to bring such a claim. *Tower North I*, 2023 WL 6388257, at *10–11.

The court now confirms that Plaintiffs have not made out a claim under Section 253(a), making resolution of the equitable right of action and standing issues unnecessary. To prevail on their Section 253(a) claim, Plaintiffs need not show that the challenged regulatory scheme "has the effect of *categorically prohibiting* the provision of telecommunications services in Geneva,

Illinois," as the City urges. (Defs. Br. at 22–23 (emphasis added).) As Plaintiffs correctly note, the FCC reiterated in its 2018 Order that "a prohibition does not have to be complete or insurmountable to constitute an effective prohibition," and thus run afoul of Section 253(a). 2018 FCC Order ¶ 41; (Pl. Reply at 15.) Plaintiffs do, however, need to show that the challenged City of Geneva ordinances *necessarily* "materially inhibit" the provision of wireless services, not just that a particular zoning decision relying on these regulations inhibited the provision of services. Alternatively, Plaintiffs could also prevail by showing that such ordinances, if widely adopted across Illinois or other jurisdictions, would create unreasonable costs for Verizon in the aggregate. *See Cellco*, 74 F.4th at 104 ("A legal requirement that imposes a reasonable cost on one tower in one jurisdiction may constitute an effective prohibition when aggregated across many towers, or many wireless facilities, in several jurisdictions"); *P. R. Tel. Co. v. Mun. of Guayanilla*, 450 F.3d 9, 18–19 (1st. Cir. 2006) (ordinance requiring carriers to pay monthly fee of 5% of gross revenue from doing business in the municipality materially inhibited provision of services where imposition of such ordinances in all municipalities across Puerto Rico would reduce carrier's Commonwealth-wide annual profit by 86%.)

Plaintiffs have not made such a showing here. The essence of their Section 253(a) argument is that "the PUD Ordinance banning all Special Uses, when combined with the requirement that a cell-tower have a Special Use Permit, prevents the City from even considering a Special Use Permit." (Pl. Reply at 14 (describing the injury that Plaintiffs argue gives them standing in this case).) That claim is factually inaccurate. As Plaintiffs' own statement of material facts submitted at summary judgment confirms, the City's Planning & Zoning Commission considered *both* Plaintiff's application to amend the PUD *and* Plaintiff's application for a special use permit. (Pl. Rule 56.1(d) Statement of Material Facts [30] ¶¶ 49–51.) Meanwhile, Plaintiffs have not introduced evidence to suggest that the wide-spread adoption of the regulatory scheme at issue here would burden Verizon with unreasonable costs in the aggregate. Plaintiffs' Section 253(a) claim is dismissed.

## CONCLUSION

For the reasons stated above, Counts III and IV of Plaintiffs' case are dismissed, and Plaintiffs are not entitled to injunctive relief. Defendants' motion to reconsider [85] the court's summary judgment order and opinion is stricken as moot.

ENTER:

Dated: March 31, 2025

_____
REBECCA R. PALLMEYER
United States District Judge