UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| TOWERNORTH DEVELOPMENT, LLC and CHICAGO SMSA LIMITED PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF GENEVA, ILLINOIS,<br><br>Defendant. | No. 22 C 4151<br><br>Judge Rebecca R. Pallmeyer |

**MEMORANDUM OPINION AND ORDER**

In December 2021, TowerNorth Development, LLC ("TowerNorth") and Verizon Wireless ("Verizon") applied for a permit to construct a cellular tower on a parcel of land, known as "Oscar Swan," in Geneva, Illinois. But local residents opposed the project, and the City of Geneva (the "City") ultimately denied the application. Plaintiffs subsequently brought this lawsuit under the Telecommunications Act of 1996 ("TCA"), seeking an order compelling the City to approve the permit. The City moved to dismiss and, later, both parties moved for summary judgment; those motions were granted in part and denied in part in reported decisions. *See TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2023 WL 6388257 (N.D. Ill. Sept. 30, 2023); *TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2024 WL 621616 (N.D. Ill. Feb. 14, 2024).

In July 2024, the court conducted an evidentiary hearing on the remaining claims. Following this hearing, the court issued a third written ruling, holding that Plaintiffs were not entitled to relief under the TCA. *TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2025 WL 975753 (N.D. Ill. Mar. 31, 2025). That ruling was based on the court's finding that a proposed alternative site, known as "Dempsey 2," was available for lease at a similar price, meaning that Plaintiffs had not established that the City of Geneva's denial of the Oscar Swan permit "materially inhibit[ed] Plaintiffs' ability to provide telecommunications service." *Id.* at *2, *16. But after the

entry of judgment, Plaintiffs moved for rehearing, arguing that new evidence confirmed that Mr. Austin Dempsey, the owner of Dempsey 2, had effectively refused to negotiate with Plaintiffs and that Dempsey 2 was therefore not a viable alternative location for the proposed cell tower. The court granted this motion, and on December 17, 2025, held a second evidentiary hearing focused on the viability of Dempsey 2. *TowerNorth Dev., LLC v. City of Geneva*, No. 22 C 4151, 2025 WL 2767029 (N.D. Ill. Sept. 29, 2025).

As explained below, the evidence presented at that hearing directly undermines Plaintiffs' contention that it was stonewalled in its effort to negotiate with Dempsey. To the contrary, TowerNorth and Dempsey have engaged in active negotiations concerning the Dempsey 2 site, continuing to a date just days before the evidentiary hearing. The court therefore stands by the conclusions reached in its prior opinion, and holds that Plaintiffs are not entitled to the injunction they seek. Their motion for reconsideration [119] of the earlier ruling is denied.

## **BACKGROUND**

The court has already issued four substantial rulings in this case. (*See* Mot. to Dismiss Order, 2023 WL 6388257; Summ. J. Order, 2024 WL 621616; Post-Hearing Order, 2025 WL 975753; Order on Mot. to Reconsider, 2025 WL 2767029.) The court assumes the parties' basic familiarity with the factual and procedural history of this case but will summarize that history briefly below.

### I. Factual Background

TowerNorth is a company that develops, owns, and leases wireless communications facilities" for the use of telecommunications carriers like Verizon. (Summ. J. Order, 2024 WL 621616, at *1.) Carriers like Verizon use the facilities constructed by TowerNorth to transmit wireless cellular signals and provide cell phone service to their customers. (*Id.*)

Beginning in 2021, TowerNorth sought to construct a cell phone tower in Geneva, Illinois in order to address a coverage gap—an area where cellular coverage is spotty—in Verizon's network. (*Id.* at *2.) Verizon's engineers determined that the ideal location for the cellular tower

2

would be somewhere within a quarter-mile radius of a location within Geneva known as "Geneva Commons." (*Id.*) After a search, TowerNorth focused on four candidate sites, known by the parties as Metro Storage, BEI, Dempsey 2, and Oscar Swan. (Post-Hearing Order, 2025 WL 975753, at *6–*10.)

As Mark Layne, Plaintiffs' site-acquisition consultant, explained at the court's first evidentiary hearing, Layne attempted to negotiate with the owners of Metro Storage, but those negotiations fell apart when the neighboring landowner, Austin Dempsey, exercised a deed option to block the project. (*Id.* at *6–*7.) Layne then began to pursue the BEI site, which was also owned by Mr. Dempsey, but those negotiations proved challenging for other reasons. (*Id.* at *7–*8.) Construction on the BEI site would require an easement through a neighboring property, itself very costly, and Dempsey's $4,000 per month rental demand was far higher than TowerNorth was willing to accept. (*Id.*) Layne then contacted Dempsey about a third property, "Dempsey 2," which Dempsey offered to lease at a price of $2,500 a month. (*Id.* at *9.) But Layne declined; the Dempsey 2 site was technologically feasible, but Layne believed the City would not approve the project due to Dempsey 2's proximity to residences and commercial properties.[1] (*Id.*) And he was disinclined to work with Mr. Dempsey, whom he referred to as a "pain in the ass." (*Id.* at *9 n.8.) Oscar Swan emerged as the best candidate property. The plot's owners offered to rent the parcel at a price of $2,500 a month, the same price as Dempsey 2. (*Id.* at *9–*10.) And Layne believed that a tower located in the wooded areas of Oscar Swan would be more palatable to local regulators than a comparable tower at Dempsey 2. (*Id.*) TowerNorth therefore

---

[1] According to Layne's testimony, the Dempsey 2 site was "wide open with no existing natural concealment . . . ." In his view, the "absence of any natural concealment was of concern because the City of Geneva's zoning code requires that 'any proposed wireless communication facility shall be designed so as to minimize the visual impact of the facility by blending it into the existing aesthetic of the area or buffering the facility from view.'" (Post-Hearing Order, 2025 WL 975753, at *9 (citation omitted).)

3

proceeded to submit a permit application to the City of Geneva for construction on Oscar Swan.[2] (*Id.* at *10.)

The process did not go smoothly. On July 14, 2022, the Geneva Planning and Zoning Commission ("PZ Commission") convened a public hearing at which local residents expressed vehement opposition to the project. (Summ. J. Order, 2024 WL 621616, at *5.) Many testified that the proposed antenna would be unsightly, and would have a negative impact on their property values and on their plans to remain in Geneva at all. (*Id.* at *6–*7.) Others, themselves Verizon customers, testified that they had not experienced coverage problems and therefore questioned whether the tower was necessary in the first place. (*Id.*) Following the hearing, the PZ Commission unanimously voted to recommend denial of Plaintiffs' permit applications. (*Id.* at *8.) The City Council did not immediately act on the application but, on August 8, 2022, perhaps prompted by TowerNorth and Verizon's filing of this lawsuit on that same day, the City Council unanimously voted to reject the application. (*Id.* at *8–*9.)

Plaintiffs then filed a Second Amended Complaint, in which they alleged that the City's denial of their application inhibited wireless service in violation of the Telecommunications Act ("TCA"), which, *inter alia*, prohibits local government entities from taking action that effectively prohibits the provision of wireless service. (*See* Second Am. Compl. [11] ¶¶ 122–140 (citing 47 U.S.C. § 332(c)(7)(B)(i)(II)).) Specifically, Plaintiffs alleged (1) that the City's decision was unreasonably delayed in violation of 47 U.S.C. § 332(c)(7)(B)(ii); (2) that the denial was unsupported by evidence, as required by 47 U.S.C. § 332(c)(7)(B)(iii); (3) that the denial

---

[2] Plaintiffs also considered the viability of using so-called "small-cell facilities" instead of a traditional tower. (Post-Hearing Order, 2025 WL 975753, at *10.) Compared with towers, small-cell facilities are much smaller (around fifteen to twenty feet in height) but are also less effective. As Jackie Ramsey Jr., Verizon's System Performance Director, testified at the first evidentiary hearing, small-cell facilities emit less powerful waves that cannot always pass through buildings or landscapes. Because of this, small-cell facilities are typically used to plug coverage gaps of a small size, but are poorly suited for addressing large coverage issues. Plaintiffs determined that small-cell facilities would be an incomplete solution for the coverage gap in Geneva; after the first evidentiary hearing, the court noted that the evidence supported that determination. (*See id.* at *10–*11.)

effectively prohibited Plaintiffs from providing personal wireless services in violation of 47 U.S.C. § 332(c)(7)(B)(i)(II); and (4) that the City's zoning regulations effectively prohibited them from providing telecommunications services in violation of 47 U.S.C. § 253(a), and were thus preempted by the TCA. (*See id*. ¶¶ 99–146.) The court dismissed Count I on motion (*see* Mot. to Dismiss Order [43]) and granted summary judgment in favor of the City on Count II. (*See* Summ. J. Order [46].)

## II. The Court's Initial Decision

On July 19, 2024, the court held an evidentiary hearing on the remaining counts. (*See* Minute Order [87].) Plaintiffs presented the testimony of three fact witnesses: (1) Jackie C. Ramsey, Jr., who oversaw Verizon's systems performance in the Chicago area at the time of the events underlying this lawsuit; (2) Mark Layne, Plaintiffs' site-acquisition consultant, and (3) Jessie McDaniel, a Verizon engineer. (Post-Hearing Order, 2025 WL 975753, at *5.) The City did not call any witnesses, but ultimately prevailed: in its March 31, 2025 ruling, the court addressed the parties' arguments about the relevant standard for review of the City's decision, and concluded that regardless of the standard to be applied, the City was entitled to deny Plaintiffs' application. (*See id.*)

### A. Confusion About the Proper Legal Standard

The TCA restricts the power of local municipalities to make zoning and permitting decisions that inhibit the establishment of wireless telecommunications services. Under this statute, it is unlawful for a "local government or instrumentality thereof" to make decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). In the early 2000s, the Seventh Circuit adopted a municipality-friendly interpretation of this statute, imposing on a carrier "a heavy burden of demonstrating not just that the application has been rejected but that further reasonable efforts *are so likely to be fruitless* that it is a waste of time even to try." *Helcher v. Dearborn Cnty.*, 595 F.3d 710, 727–28 (7th Cir. 2010) (emphasis added). Under this standard, "so long as the service provider has not

5

investigated thoroughly the possibility of other viable alternatives, the denial of an individual permit" does not violate the TCA. *VoiceStream Minneapolis, Inc. v. St. Croix Cnty.*, 342 F.3d 818, 834–35 (7th Cir. 2003); *accord Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002) (adopting a similar test). But in 2018, the Federal Communications Commission ("FCC") issued an order explicitly rejecting the test adopted in *Helcher* and *VoiceStream*—instead, the FCC adopted a more carrier-friendly interpretation of the TCA which made it unlawful for a municipality to "materially inhibit" service. *In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088 ¶¶ 34, 35 & n.75 (Sep. 27, 2018) (hereinafter "FCC Order") (explicitly rejecting the Seventh Circuit approach).

At the time this case was filed, it appeared that the court was governed by the FCC's interpretation—under Supreme Court precedent that was in place then, *see City of Arlington v. FCC*, 569 U.S. 290, 296 (2013); *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005), subsequent agency interpretations of statutes were due *Chevron* deference even if they were at odds with prior binding court interpretations of those same statutes. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–45 (1984). So, as explained in this court's summary judgment opinion, the court initially deferred to the FCC's interpretation, and applied its "materially inhibits" test, preferred by Plaintiffs. But based on the Supreme Court's decision in *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), issued just days before the evidentiary hearing was set to begin, the City argued that this court should apply the test approved by the Seventh Circuit rather than the FCC's more-carrier-friendly "materially inhibits" test.

The court concluded that the Plaintiffs had the better of this argument in light of the Hobbs Administrative Orders Review Act ("Hobbs Act"), 28 U.S.C. § 2342, *et seq.* (Post Hearing Order, 2025 WL 975753, at *11–*12.) That Act vests "exclusive jurisdiction" in the courts of appeals to "enjoin, set aside, suspend (in whole or in part), or to determine the validity" of "all final orders of

6

the Federal Communications Commission made reviewable by" the TCA. 28 U.S.C. § 2342(1). The Hobbs Act also establishes a unique system for challenging certain FCC orders—under this system, a challenger must challenge the FCC order in one of the courts of appeals, whose decision would then become binding precedent nationwide. *Id.* § 2342; *see also Brodsky v. HumanaDental Ins. Co.*, 910 F.3d 285, 289–90 (7th Cir. 2018). Because the Ninth Circuit had upheld much of FCC's 2018 Order in *City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020), this court concluded that it remained bound by the 2018 FCC Order, and found that the agency's "materially inhibits" standard governed this case.[3] (Post-Hearing Order, 2025 WL 975753, at *12–*13.) But that conclusion, too, has since been undermined by the Supreme Court: In *McLaughlin Chiropractic Assocs., Inc., v. McKesson Corp.*, 606 U.S. 146 (2025), the Court clarified that the Hobbs Act does not require district courts to follow an agency's interpretation of a statute—instead, a district court must independently determine the statute's meaning based on ordinary tools of statutory interpretation. This court's understanding of the state of play is that the 2018 FCC Order is no longer binding, and Seventh Circuit law controls the standard of review—meaning that Plaintiffs must show that reasonable efforts to find an alternative to their preferred approach are likely to be fruitless.

### B. Merits of TCA Claim

The *McLaughlin Chiropractic* ruling post-dated this court's decision, but even under the more carrier-friendly standard approved by FCC, this court concluded that Plaintiffs were not entitled to injunctive relief under the TCA. The court considered a number of factors, but zeroed in on the apparent availability of Dempsey 2 as an alternative site. The court noted that

> the evidence shows that Plaintiffs failed to apply for the Dempsey 2 site as well as the Oscar Swan site, despite the fact that Dempsey 2 was available at the same

---

[3] In so holding, the court noted that the Hobbs Act might well be invalid to the extent that it requires "district courts to defer to FCC orders interpreting a statute." (Post-Hearing Order, 2025 WL 975753at *12 (citing *Gorss Motels, Inc., v. Safemark Sys., L.P.*, 931 F.3d 1094, 1106 (11th Cir. 2019) (Pryor, J., concurring)).) Still, at the time of the court's decision, neither the Supreme Court nor any of the Court of Appeals had, at that time, rejected the interpretation of the Hobbs Act that requires deference to the agency.

> lease price as Oscar Swan and had been approved within Verizon from a technical standpoint. Even if Plaintiffs' prediction that they were more likely to receive approval for variances at Oscar Swan than Dempsey 2 was reasonable, it was the City's prerogative—not the Plaintiffs'—to rule out an otherwise technologically and economically feasible tower site by denying zoning variances.

(Post-Hearing Order, 2025 WL 975753. at *16.) In other words, because Plaintiffs did not show they were unable to build the tower in a different location, the City's rejection of the Oscar Swan site did not materially inhibit the establishment of Verizon wireless service. (*Id.*) The court's written opinion was dated March 31, 2025, but the court delayed entering judgment [118] until July 2, 2025, with the hope that the parties would reach a settlement agreement or find a feasible alternative to the Oscar Swan property.

## III. Motion to Reconsider

The most recent entry in this saga came on July 30, 2025, when Plaintiffs moved for rehearing and reconsideration [119]. The primary basis for rehearing, according to Plaintiffs' Motion, was new evidence that undermined the court's prior conclusion about the availability of Dempsey 2. Specifically, Plaintiffs hoped to present the testimony of Ray Shinkle, who had negotiated with Dempsey on Plaintiffs' behalf. Plaintiffs asserted that Shinkle's testimony would show that the Dempsey 2 site was, in fact, unavailable for lease.

Shinkle submitted a Declaration (the "Shinkle Declaration") describing his proposed testimony. (*See* Shinkle Decl. [119-1].) In this Declaration, Shinkle claimed that negotiations with Dempsey were going poorly—he depicted Dempsey as being completely unwilling to negotiate a lease deal with Plaintiffs. The court described Shinkle's declaration as follows:

> According to Plaintiffs, Shinkle would testify about his communications with Austin Dempsey, the owner of Dempsey 2, that took place after the court's March 31, 2025 Order and before the court entered judgment. Shinkle claims that he reached out to Dempsey in April 2025, to let him know that Plaintiffs were prepared to accept a proposal for lease of the Dempsey 2 parcel that Dempsey had made (and Verizon had rejected) in 2024. The effort was unsuccessful: Dempsey rejected the proposal. Instead of the deal he had proposed earlier, Dempsey now requested a 20% revenue sharing agreement in return for making the Dempsey 2 site available. After Shinkle advised Dempsey that TowerNorth's policy does not allow for revenue sharing, however, Dempsey relented, advised Shinkle that he "could agree to terms without revenue sharing," and requested a draft lease for review.

8

> Shinkle prepared a draft lease and sent it to Dempsey for review on May 8, 2025. But then Dempsey stopped communicating. As of July 30, 2025, Shinkle had not received any comments on the lease from Dempsey or his lawyer, despite multiple outreach attempts throughout the summer.

(Order on Mot. to Reconsider, 2025 WL 2767029, at *2 (citations omitted).) As the court explained at the time, Shinkle's proposed testimony suggested that Dempsey had dodged Shinkle's many attempts to communicate, and had repeatedly failed to provide written comments on the lease, despite multiple promises to do so. This unresponsiveness, together with evidence that Dempsey had arguably been responsible for negotiations failing at the BEI and Metro Storage sites, suggested that Dempsey had no genuine interest in allowing the project to proceed. Moreover, the court's decision to deny an injunction with respect to Oscar Swan was premised on the availability of Dempsey 2; if Dempsey 2 was in fact unavailable, Plaintiffs might be permanently barred from relief based on erroneous factual findings.[4] Over the City's objection, the court scheduled a second evidentiary hearing for the primary purpose of hearing evidence concerning Mr. Shinkle's efforts to negotiate with Mr. Dempsey.[5] (*See id.*)

---

[4] As the court then explained:

> If the court does not consider this new evidence now, Plaintiffs may be frozen out of future judicial review. Dempsey's continued refusal to lease his property is not a decision that can be challenged under the TCA. The City's denial of a permit is subject to challenge, but only if Plaintiffs identify a consenting landowner and submit a permit application. So if Dempsey is unwilling to lease Dempsey 2, Oscar Swan could very well be forever unavailable due to a court order that rests on a potentially erroneous conclusion: that a potential alternative site exists, but Plaintiffs failed to pursue it. The court believes that consideration of the new evidence is warranted to prevent this outcome.

(Order on Mot. to Reconsider, 2025 WL 2767029, at *5.)

[5] In a status conference one week before the scheduled rehearing, the parties revealed that they were not planning to subpoena Mr. Dempsey to provide testimony at the hearing. This was jarring—considering that Dempsey's attitudes towards the negotiations were the pivotal issue on which this case turns, it was surprising that neither party intended to call him at the hearing. The court requested that the parties issue a subpoena to Mr. Dempsey, and Plaintiffs complied. (*See* Minute Order [137].)

9

**DISCUSSION**

**I.     Findings of Fact**

The second evidentiary hearing was held on December 17, 2025. Plaintiffs presented the live testimony of two witnesses: (1) Austin Dempsey, who appeared pursuant to subpoena, and (2) Elisabeth Rutkowski, a TowerNorth employee responsible for overseeing site negotiation and construction. Plaintiffs also produced exhibits, primarily emails between Shinkle and Dempsey-- evidence that their negotiations concerning the Dempsey 2 site had in fact continued over a number of months.[6]

As Plaintiffs' own evidence established, TowerNorth's claims about Austin Dempsey's unwillingness to negotiate are unsupported. Far from being unavailable or non-responsive, Dempsey has been engaged in active negotiations with TowerNorth officials for several months. Indeed, the most recent communication between Dempsey and TowerNorth occurred less than two weeks prior to the evidentiary hearing, and nothing about those communications suggests that further negotiations would be fruitless. If anything, the record shows that delays in negotiations were the product of TowerNorth's own non-responsiveness: in two separate episodes, TowerNorth officials waited *months* to respond to Dempsey's communications. Dempsey acknowledged that there were occasional delays in his own communications; but the record, described below, shows he was no less responsive in negotiations to lease the parcel (and perhaps more responsive) than TowerNorth.

Initial negotiations began between Shinkle and Dempsey in July 2024. Shinkle emailed Dempsey two options for leases: the first was an "[e]asement/buyout" for a fixed sum of $325,000 for a 99 year term; the second option was a "Ground Lease" which included a base rent of $2,500 per month, a 2% annual escalator, and no revenue sharing. (TN-3734.) On August 22, 2024,

---

[6]     The emails and exhibits referenced in this section are cited using the Bates numbers provided by the parties. Citations to testimony at the second evidentiary hearing reference can be confirmed after issuance of the final transcript.

10

Dempsey responded, stating that his firm was "interested in moving forward with the discussion," and asked for an on-site meeting the following week. (TN-3732.) Shinkle responded that he would prefer to receive Dempsey's input on potential lease terms prior to an in-person site visit. (TN-3732.) On September 4, 2024, Dempsey countered by requesting that the annual escalator be raised to 3.25%. (TN-3731.) When Shinkle did not immediately respond, Dempsey followed up on October 3, 2024. (*Id.*) Shinkle stated that he was waiting on the Verizon team for "review and response." (*Id.*) *Shinkle* then ceased communicating for more than six months.

On April 7, 2025, Shinkle finally responded. He reported that "[a]fter much deliberation," TowerNorth was "pleased to accept" Dempsey's prior offer.[7] (TN-3730.) Dempsey responded just four days later, confirming that he was "mostly good with the terms that you proposed," but requested that the deal incorporate a 20% revenue share, which he stated he believed was "common for sites like ours in infill markets." (TN-3729.) Dempsey explained in his testimony that he included this additional proposed term because his firm had conducted research during the lengthy delay (caused by Shinkle's silence), and that research showed that large towers, once built, could incorporate the antennas of rival cellular carriers. (Tr. at 16:24–17:24.) Recognizing that payments from these rivals could offset the expense TowerNorth was taking on, Dempsey's firm desired a portion of the potential revenue. (*Id.*) The parties went back and forth over the next month on various proposals, but Dempsey ended up relenting on the revenue share proposal, and agreed to the prior offer of $2,500 per month, with a 3.25% escalator, and no revenue sharing. (TN-3727.) On May 8, 2025, Shinkle sent Dempsey a lease draft for review. (*Id.*) By May 21, Dempsey had forwarded the draft to his attorney for review. (TN-3725.)

On June 10, Dempsey emailed Shinkle and Rutkowski. He stated that his "team ha[d] reviewed the lease" and would be "presenting comments shortly." (TN-3724.) He requested an

---

[7] The court notes that its written opinion denying an injunction with respect to the Oscar Swan site occurred on March 31, 2025. The emails between Shinkle and Dorsey do not mention of the ongoing legal proceedings, so it is unclear whether Dorsey was aware of this lawsuit prior to his receipt of the subpoena.

in-person meeting at the site. (*Id.*) On June 20, 2025, Dempsey met in-person at the site with Shinkle and another individual, who Dempsey later described as "potentially an engineer of some sort." (Tr. at 21:24–22:1; *see also* TN-3723; TN-3698.) On June 30, Dempsey informed Shinkle, in an email, that he was out of town, but would be returning the draft lease later that week. (TN-3719.)

Then in late July 2025, when Shinkle emailed Dempsey to follow up on "lease review," Dempsey responded by stating that his recollection was "that we are waiting on the revised drawings as the next step." (TN-3715.) It appears Shinkle understood that the ball was in his court with respect to the drawings, as he responded that the site plan was expected "this week," but requested that Dempsey not wait for the plan before proceeding with his review of the lease. (TN-3714.) On August 13, Shinkle sent a site plan to Dempsey (TN-3696), and on August 18, Dempsey emailed to request a phone call with Shinkle to discuss the proposal. (TN-3714.) During the phone call, which took place on August 20, Dempsey expressed concerns about the proposed tower's taking up too much space on the parcel, leaving less of the land for potential development. (Tr. at 26:11–25.) Dempsey and his partners declined to move forward with the project. (*Id.*; TN-3708.) But a few days later, they had a change of heart—on August 26, Dempsey emailed Shinkle and stated that his firm would agree to the lease, so long as the base rent was increased to $2,850 per month. (TN-3708.) Shinkle responded on August 28, and requested that Dempsey review a site plan, revise the lease, and return it to him. (*Id.*) Dempsey did not immediately respond, but after Shinkle contacted him on September 19, Dempsey promptly apologized for the delay, explaining that he was under the impression that his attorney had already sent the redline. (TN-3707.) He promised that he would reach out to the attorney and get back to Shinkle as soon as possible. (*Id.*) Dempsey's attorney, Andrew Kolb, sent the redlined lease to Shinkle via email on September 23, 2025. (TN-3618.)

Shinkle did not respond for nearly a month. On October 20, 2025, Kolb emailed Shinkle to follow up. (TN-3705.) On October 22, Shinkle responded and stated that TowerNorth's real

12

estate attorney had an "unexpected personal issue," but promised that they would hear back soon. (*Id.*) In the meantime, Shinkle requested that Dempsey approve a proposed site plan— Dempsey did so on October 23. (*Id.*; TN-3703.) But Shinkle's attorney did not respond promptly, and on November 3, 2025, Kolb and Dempsey emailed once again. Shinkle reported that the delay was attributable to the attorney's personal emergency and that he would send a redlined lease later in November. (TN-3804.) On November 17, Shinkle emailed again, promising to send the redline "this week." (TN-3804.) Finally, on December 4, 2025, after a delay of over two months, Shinkle returned the draft lease to Kolb and Dempsey. (TN-3803.)

Plaintiffs now suggest that Dempsey's last lease proposal was unacceptable. Elisabeth Rutkowski, who described herself "oversee[ing] all of the site development managers and escalations" at TowerNorth, testified concerning the long-term costs of operating a cell tower at the Oscar Swan site versus Dempsey 2. (Tr. at 47:24–25.) The precise differences varied based on final terms, but according to Ms. Rutkowski, over a thirty-year lease, the Dempsey 2 site proposal would likely be a total of $269,000 to $477,000 more expensive than Oscar Swan. (TN-3648.) If the most recent terms proposed by Dempsey make it into the final agreement, Dempsey 2 would be $477,000 more expensive over thirty years. (Tr. at 53:6–56:20.)

**II.     Analysis**

As described above, the evidence at the hearing provides no support for Plaintiffs' claims here. To the contrary, Mr. Dempsey's testimony—and the documentary record of the parties' communications—confirms the court's earlier finding: Plaintiffs have not shown that the denial of the Oscar Swan permit constitutes a prohibition or effective prohibition of wireless service in violation of the TCA. 47 U.S.C. § 332(7)(B)(i)(II). It appears that Dempsey 2 was, and remains, available as an alternative site for the cellular tower.

As an initial matter, the court notes that its decision to reopen the hearing was largely prompted by the Shinkle Declaration. That declaration was, on its face, misleading: it omitted significant events and mischaracterizes the ongoing negotiations with Mr. Dempsey. Consider

13

just one example: the Shinkle Declaration, which was dated July 30, 2025, makes no mention of the fact that in June 2025, Shinkle met, *in-person*, with Dempsey at the Dempsey 2 site to discuss the tower project. An in-person meeting would likely be the most memorable interaction between the two men, so Shinkle's failure to mention it in his affidavit is (at best) puzzling. And a close look at the evidence suggests that the omission was deliberate. For example, the Shinkle Declaration characterizes an email sent on June 10 as follows:

> On June 10, 2025, Mr. Dempsey emailed myself and Elisabeth Rutkowski, Director of Site Development for TowerNorth. He indicated that his "team" had reviewed the lease and would be presenting comments "shortly."

(Shinkle Decl. [119-1] ¶ 13.) But this description leaves out half of the email. Dempsey's full email reads as follows:

> Good afternoon, Our team has reviewed the lease and we will be presenting comments shortly. ***Ray would you like to schedule a time to meet at the site?*** Thanks Austin Dempsey.

(TN-3724 (emphasis added).) Dempsey's June 10, 2025 message was a direct request for a site visit, a sign that he had a genuine interest in a deal. Shinkle's selective quotation of this email leaves out context that very much changes its meaning.

Significantly, uncontroverted evidence presented at the hearing shows that negotiations only intensified as time went on. Dempsey and Shinkle continued to negotiate, exchanged site plans, and appeared to be nearing a deal. Despite this, Plaintiffs never supplemented their filings, requested additional time, or suggested negotiations might eliminate the need for a hearing. Even in subsequent briefing on the same issue, Plaintiffs never once mentioned that negotiations with Dempsey were ongoing, instead leading the court to believe that negotiations had stalled, that Dempsey had failed even to communicate with Plaintiffs, and that the Dempsey 2 site was effectively unavailable. It is troubling to note, further, that Plaintiffs had no intention of calling Mr. Dempsey as a witness at all until the court insisted they do so.

The court concludes that Dempsey 2 remains available as an alternative, and that Plaintiffs have thus not met their burden of establishing that the City's denial of the Oscar Swan

14

permit violated federal law. Plaintiffs were in fact engaged in active negotiations with Austin Dempsey for a deal at an alternative site all along. The best they can do to establish Dempsey's purported incalcitrance is point to occasional delays in his responses to TowerNorth's communications, but none of those delays are so lengthy as to suggest that the site was unavailable. And, as pointed out above, TowerNorth was itself responsible for two lengthy delays: the company failed to respond to Dempsey for seven months from September 2024 to April 2025; and again from September 2025 to December 2025. Plaintiffs' argument that Dempsey is not genuinely interested in closing a deal finds no support in the record.

At the hearing, Plaintiffs suggested one additional argument: that a lease at Dempsey would be more expensive than the one they had negotiated for the Oscar Swan property. Even assuming the Oscar Swan proposal is still on the table, at the same terms negotiated years ago, the court is not convinced. Recall the remedy sought here: the court is not being asked to choose which of the two sites is better; instead, it must determine whether the City's denial of the Oscar Swan permit was so unreasonable so as to constitute a prohibition or effective prohibition of wireless service. *See* 47 U.S.C. § 332(7)(B)(i)(II). Over a thirty-year lease term, Oscar Swan is nominally less expensive, but Plaintiffs have offered no basis for the court to conclude that the additional expense is prohibitive. In any event, the TCA does not require municipalities to approve the cheapest option for carriers, nor does it authorize federal courts to micromanage the regulatory authority of local governmental bodies. *See Aegerter v. City of Delafield, Wis.*, 174 F.3d 886, 891 (7th Cir. 1999) (noting that, in writing the TCA, Congress left "most of the substantive authority to approve the location of personal wireless service facilities in the hands of state or local governments"). If Congress had intended to enact such a requirement, it would surely have said so explicitly. Indeed, the text of statute suggests the opposite: it broadly retains much of state and local control "over decisions regarding the placement, construction, and modification" of cellular towers, with a few limited exceptions. 47 U.S.C. § 332(7)(A).

**CONCLUSION**

Plaintiffs' motion for reconsideration [119] is denied. The Clerk is directed to reenter judgment against Plaintiffs and in favor of Defendants. This ruling is final and appealable.

ENTER:

Dated: December 30, 2025

_____
REBECCA R. PALLMEYER
United States District Judge